USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/5/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

PHILIP VASTO, ZAO YANG, ALEX TORRES, and
XIAOJ ZHENG, *individually and on behalf of all others
similarly situated*,

Plaintiffs,

-v-

CREDICO (USA) LLC, CROMEX INC., JESSE
YOUNG, AND MEIXI XU,

Defendants.

------------------------------------------------------------------X

15 Civ. 9298 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Philip Vasto, Zao Yang, Alex Torres, and Xiaoj Zheng (collectively,

"plaintiffs") bring this action on behalf of themselves and similarly situated persons, alleging

violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, New York Labor

Law ("NYLL"), Article 6 §§ 190 *et seq.*, and Article 19 §§ 650 *et seq.*, the Arizona Wage Act

("AWA"), Ariz. Rev. Stat. §§ 23-350 *et seq.*, and the Arizona Minimum Wage Act ("AMWA"),

Ariz. Rev. Stat. §§ 23-362 *et seq.*  Plaintiffs allege that defendants Credico (USA) LLC

("Credico"), Cromex Inc. ("Cromex"), Jesse Young ("Young"), and Meixi Xu (also known as

"Corona") maintained unlawful employment practices, including misclassifying their employees

as independent contractors and thereby failing to pay minimum wage or overtime compensation

at the statutorily required rates for employees.  Since plaintiffs initiated this lawsuit, five

additional plaintiffs have filed notices of consent to join this action.

Before the Court is plaintiffs' motion for conditional certification of a class under the

FLSA, which plaintiffs would define to include all persons across the country who performed

face-to-face marketing work for Credico and its subcontractor companies, while classified as

independent contractors, from July 2012 to the present.  Plaintiffs seek court-facilitated notice of

this action to such persons via email and text message.

For the reasons that follow, the Court grants plaintiffs' motion for conditional

certification and authorizes court-facilitated notice to members of the putative collective.

## I.    Background

### A.    Factual Allegations[1]

#### 1.    The Credico Network

Credico is a Delaware corporation headquartered in Chicago, Illinois.  FAC ¶ 22.  It

provides face-to-face sales and marketing services to companies in, among others, the

telecommunications, financial services, and energy industries, and to charitable organizations.

*Id.* ¶ 26; Vasto Decl., Ex. 4 (Credico Website, "Credico USA Continues U.S. Expansion")

("Credico Art.").  Credico's clients include Fortune 500 companies, such as Comcast, Verizon,

and Sprint.  *See* Credico Art.; Vasto Decl., Ex. 6, Ex. A ("Corona Lecture Tr."), at 3.  Young is

Credico's president.  FAC ¶ 24; Credico Art.

---

[1] The following facts are drawn from the First Amended Class Action Complaint, Dkt. 6
("FAC"), the declarations by the four named plaintiffs and five opt-in plaintiffs in support of
plaintiffs' motion for conditional certification, and their accompanying exhibits, Dkt. 62, Exs. 2–
7 ("Vasto Decl."); *id.*, Ex. 8 ("Torres Decl."); *id.*, Ex. 9 ("Zheng Decl."); *id.*, Ex. 10 ("Yang
Decl."); Dkt. 87, Ex. 1 ("Leite Decl."); *id.*, Ex. 2 ("Amjad Decl."); *id.*, Ex. 3 ("Bolden Decl.");
*id.*, Ex. 4 ("Luchnick Decl."); *id.*, Ex. 5 ("Vilchez Decl."); Dkt. 98 ("Luchnick Supp. Decl."),
and the declarations by plaintiffs' counsel, and their accompanying exhibits, Dkt. 63 ("Savytska
Decl."); Dkt. 87, Ex. 7 ("Savytska Supp. Decl.").  The Court also refers to the Credico-Cromex
subcontractor agreement, annexed to a declaration submitted by Credico, which plaintiffs cite
and rely on in their reply brief.  Dkt. 84, at 7–40 ("Kravtchenko Decl.").  At the conditional
certification stage, the Court may not "resolve factual disputes" or "make credibility
determinations."  *Costello v. Kohl's Ill., Inc.*, No. 13 Civ. 1359 (GHW), 2014 WL 4377931, at *7
(S.D.N.Y. Sept. 4, 2014) (quoting *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368
(S.D.N.Y. 2007)) (internal quotation marks omitted).  Accordingly, in resolving this motion, the
Court assumes all non-conclusory facts alleged by plaintiffs to be true.

Credico serves its clients through a global network of independent sales offices ("ISOs"). FAC ¶ 28; Credico Art.  As of 2014, Credico contracted with more than 400 ISOs across 19 countries, including more than 100 offices throughout the United States.  Credico Art.  Each ISO employs workers ("agents") to engage in face-to-face sales and marketing for one or more of Credico's clients.  *See* FAC ¶ 28; Corona Lecture Tr. 1–4.  The agents' primary duty is to gather applications from consumers seeking to enroll in program(s) offered by Credico's client.  *See* FAC ¶¶ 1, 28, 30; Corona Lecture Tr. 1–4.

Cromex is an ISO headquartered in New York City.  FAC ¶ 23.  It provides sales and marketing services for Sprint's Assurance Wireless brand.[2]  *See id.* ¶¶ 61, 67; Kravtchenko Decl. at 19–26.  Corona is Cromex's owner and manager.  *Id.* ¶ 25.

Although ISOs are officially designated as "subcontractors,"[3] plaintiffs allege that Credico exercises "centralized control" over all ISOs in its network.  Pl. Reply Br. 4; FAC ¶¶ 1, 29–32.  For instance, plaintiffs allege that Credico: (1) requires ISOs to use a centralized accounting service, referred to as the "Hub";[4] (2) requires ISOs to pay agents a fixed commission for every qualified customer they sign up;[5] (3) requires ISOs to maintain office sales, payment,

---

[2] Assurance Wireless offers services for the federal Lifeline Assistance Program, which provides mobile phones and services to qualifying low-income consumers.  Savytska Decl., Ex. 1, Ex. A, at 1; *id.*, Ex. 5, ¶ 4.

[3] Although plaintiffs originally characterized the ISOs as subsidiaries of Credico, *see generally* Dkt. 62 ("Pl. Br."), in their reply brief, they acknowledge that Credico "maintains official connections to its subcontractors only through subcontractor agreements," Dkt. 87 ("Pl. Reply. Br."), at 4; *see also* Savytska Decl., Ex. 1, Ex. A, ¶ 2(e)(i) (Sprint-Credico contract authorizing Credico to use specified subcontractors to market the Assurance Wireless brand).

[4] *See* Luchnick Supp. Decl. ¶ 18; *id.*, Ex. 2 ("Credico Accounting Manual"), at 20–21; *id.*, Ex. 6, at 5–13; Leite Decl. ¶ 16; Amjad Decl. ¶ 13.

[5] *See* Luchnick Supp. Decl. ¶ 9; Credico Accounting Manual, at 20; Amjad Decl. ¶ 10; *id.*, Ex. 2.

and agent data in the online Credico ARC Portal;[6] (4) determines where new ISO owners may open their offices and which Credico client their agents may promote;[7] (5) provides ISO owners with strict guidelines for posting job openings;[8] (6) requires all agents to complete the "agent on boarding process";[9] (7) hosts regional and national "new owners meetings" and summits at which new owners and assistant managers are provided with instructions on how to run an ISO in the Credico network;[10] (8) retains authority to terminate ISOs' agents;[11] and (9) closes ISOs that do not meet the target number of sign-ups or generate sufficient revenue.[12]

Most significant here, plaintiffs allege that Credico requires each of its ISOs to train its workers according to Credico's "Management Training Program," a six-to-twelve month course through which entry-level agents advance to more senior positions within their ISO and the Credico network.  FAC ¶ 31.[13]  Plaintiffs allege that this program "dictates the manner in which

---

[6] Luchnick Supp. Decl. ¶¶ 10–12; *id.* Ex. 3 ("ARC Rules").

[7] FAC ¶ 29; Leite Decl. ¶ 15; Luchnick Decl. ¶ 12.

[8] Leite Decl. ¶ 19; *id.*, Ex. 4.

[9] Credico Accounting Manual, at 12.

[10] *See* Luchnick Supp. Decl. ¶¶ 4–19; *id.*, Exs. 2–6; Amjad Decl. ¶ 20.

[11] FAC ¶ 1; Leite Decl. ¶ 17; *id.*, Ex. 2; Amjad Decl. ¶ 18.

[12] *See* Leite Decl. ¶¶ 12, 15, 20; Amjad Decl. ¶ 21.

[13] Documents issued by Credico and individual ISOs describe the Management Training Program as consisting of four core stages:  During the first stage, which lasts two to four weeks, entry-level "account executives" work only in the field while they learn the basics of how a sales force operates and develop self-management, public speaking, and time management skills. Luchnick Supp. Decl., Ex. 5 ("Credico Recruiting Manual"), at 10–11; *see also* Vasto Decl., Ex. 1 (Cromex overview of the "Management and Training" program); *id.*, Ex. 7 ("Leadership Program" overview handout, issued by Credico ISO Wallace Morgan); *id.*, Ex. 14 (Management Training Program overview, issued by Credico ISO Renegade Global Group).  Once promoted to the "corporate trainer" stage, which typically lasts five to eight months, agents take on the additional responsibilities of interviewing and training lower-level agents, while continuing their

the [ISOs] train their workers, . . . the manner in which the workers can approach potential customers[,] . . . the number of hour[s] that [the ISOs'] workers must work each week, and the manner in which [the] workers must be paid." *Id.* ¶¶ 31–32.

The particular allegations of the named and opt-in plaintiffs, as set forth in their declarations, are summarized below.

### 2. The Named Plaintiffs' Employment at Cromex

At various points in 2015, the four named plaintiffs worked for Cromex in New York City, promoting Assurance Wireless cellphones and wireless services.[14]  In their declarations, the named plaintiffs make various common factual allegations about their employment at Cromex. Each attests that he[15] was required to undergo training when he began work at Cromex, during which he worked 12–15 hour days without pay.[16]  Following training, each attests, he participated in Credico's Management Training Program.[17]  While plaintiffs allegedly progressed to varying stages of the Management Training Program,[18] each attests that regardless of his title,

---

field work.  *Id.*  At the "assistant manager" level, agents begin to engage in office management, recruitment, event planning, and client communications.  *Id.*  Finally, at the "campaign manager" or "owner" level, agents run an entire ISO.  *Id.*

[14] Vasto worked for Cromex between March 2015 and May 2015.  Vasto Decl. ¶¶ 3, 35.  Yang worked for Cromex between February 2015 and April 2015.  Yang Decl. ¶¶ 3, 32.  Torres worked for Cromex between January 2015 and March 2015.  Torres Decl. ¶¶ 3, 24–25.  Zheng worked for Cromex between February 2015 and August 2015.  Zheng Decl. ¶¶ 3, 30.

[15] Solely for ease of reference, the Court uses the male pronoun to refer to the declarants collectively.

[16] Vasto Decl. ¶¶ 5–9; Yang Decl. ¶¶ 6–8; *id.*, Ex. 1; Torres Decl. ¶¶ 5–7; Zheng Decl. ¶¶ 5–6.

[17] Vasto Decl. ¶ 11; Yang Decl. ¶ 5; Torres Decl. ¶ 8; Zheng Decl. ¶ 4.

[18] Yang was promoted to corporate trainer.  Yang Decl. ¶ 25.  Zheng was promoted to corporate trainer and senior corporate trainer, before being demoted to account executive.  Zheng Decl. ¶¶ 21–23.  There is no indication that Vasto or Torres advanced past the first stage of the

"the only work [he] and [his] co-workers performed was to go out in the field and try to sign up new customers for Assurance Wireless."[19]  Each attests that he and his coworkers were required to sign up a minimum number of qualified customers per week, and were told that failure to meet such quotas could result in termination.[20]

Each plaintiff attests that, at the start of his employment, he received a copy of Cromex's Account Executive Manual, which provides an overview of the Management Training Program, the schedule agents are expected to follow, and the tactics agents are expected to use when making sales pitches.[21]  Under the mandatory schedule, each attests, all account executives were required to report to the office by 7:30 a.m. for "atmosphere room" meetings, at which their supervisors played loud music and shouted motivational slogans in an attempt to motivate them for the day's work.[22]  After these meetings, each attests, he was told the location to which to report for his shift, also referred to as a "ride-out," which would last until between 5:30 and 6 p.m.[23]  Each attests that he was given a tablet to use to sign up customers during his ride-out.[24]

---

Management Training Program.

[19] Vasto Decl. ¶ 12; Yang Decl. ¶ 5; Torres Decl. ¶ 8; Zheng Decl. ¶ 4.

[20] *See* Vasto Decl. ¶ 28; Yang Decl. ¶ 21; Torres Decl. ¶ 19; Zheng Decl. ¶ 18.

[21] Vasto Decl. ¶ 13; Yang Decl. ¶ 11; Torres Decl. ¶ 9; Zheng Decl. ¶ 7; *see also* Vasto Decl., Ex. 2.

[22] Vasto Decl. ¶¶ 14–15; Yang Decl. ¶¶ 12–13; Torres Decl. ¶¶ 10–11; Zheng Decl. ¶¶ 8–9. Zheng attests that senior corporate trainers and corporate trainers were required to report to the office at 6:45 and 7 a.m., respectively, for special meetings, after which they followed the same schedule as the other Cromex workers.  Zheng Decl. ¶¶ 21–22.  Torres attests that he was required to report to the office by 6:45 a.m. in his role as a corporate trainer.  Torres Decl. ¶ 22.

[23] Vasto Decl. ¶¶ 16, 22; Yang Decl. ¶¶ 14, 19; Torres Decl. ¶¶ 12, 16; Zheng Decl. ¶¶ 10, 15.

[24] Vasto Decl. ¶ 16; Yang Decl. ¶ 14; Torres Decl. ¶ 12; Zheng Decl. ¶ 10.  Vasto attests that Corona informed the Cromex agents that these tablets were provided by Credico.  Vasto Decl.

Each attests that, after his shift, he was required to return to the Cromex office to go over the day's sales and participate in "bell and gong," a ritual in which top performers hit a gong or rang a bell corresponding to the number of sign-ups they made that day.[25]  Each attests that he and his coworkers were not permitted to leave the office until these activities concluded at 7 p.m.[26]

Each plaintiff attests that he and his coworkers "were required to go through this routine six days per week, Monday through Saturday."[27]  Because the Management Training Program's mandatory daily routine amounted to between 10 and 12 hours per day, each attests, he worked an average of between 69 and 72 hours per week.[28]  Each attests that he observed that the 40 other agents participating in the Management Training Program at Cromex "did largely the same work [he] did [and] were required to work during the same hours."[29]

Plaintiffs assert that, given the degree of control that defendants exercised over them, they qualified as employees under the FLSA and were "jointly employed" by each of the

---

¶ 41.

[25] Vasto Decl. ¶ 22; Yang Decl. ¶ 19; Torres Decl. ¶¶ 16, 28.  Zheng does not mention the "bell and gong" ritual, but does attest that she and her coworkers were required to return to the Cromex office by 6 p.m. each day to go over the day's sales.  *See* Zheng Decl. ¶ 15.

[26] Vasto Decl. ¶ 24; Yang Decl. ¶ 20; Torres Decl. ¶ 17; Zheng Decl. ¶ 16.

[27] Vasto Decl. ¶ 25; Yang Decl. ¶ 20; Torres Decl. ¶ 18; Zheng Decl. ¶ 17.

[28] *See* Vasto Decl. ¶¶ 14, 24, 27; Yang Decl. ¶¶ 9, 12, 20, 26; Torres Decl. ¶¶ 10, 17, 31; Zheng Decl. ¶¶ 8, 16, 24.

[29] Vasto Decl. ¶ 34; Yang Decl. ¶ 31; Torres Decl. ¶ 23; Zheng Decl. ¶ 29.  Vasto also attests that, through his observation of agents employed by Wallace Morgan, an ISO that shares office space with Cromex, he learned that "workers at Wallace Morgan were required to keep the same hours and follow the same 'Management Training Program' as workers at Cromex."  Vasto Decl. ¶¶ 48–49.

defendants.  FAC ¶¶ 1, 44–45.  Accordingly, plaintiffs claim, they were entitled to minimum wage and overtime compensation for hours worked in excess of 40 hours per week.  *See id.* ¶¶ 73–74.

However, plaintiffs allege, they and their colleagues were misclassified as independent contractors.  *Id.* ¶¶ 2, 8.  Accordingly, each plaintiff attests that he and his coworkers, regardless of their title, "were paid only by commission, at $10 for every qualified customer [they] signed up.  If the customer signed up but turned out to be unqualified for the Assurance Wireless program, [they were] not paid."[30]  Each plaintiff attests that, as a result of this practice, he and his coworkers were never paid overtime compensation, despite consistently working more than 40 hours per week.[31]  Moreover, each attests, because he was typically able to sign up only 30–50 qualified customers (amounting to weekly compensation of $300–$500),[32] there were many weeks in which he did not earn minimum wage for all hours worked.[33]

---

[30] Vasto Decl. ¶ 29; Yang Decl. ¶ 23; Torres Decl. ¶ 20; Zheng Decl. ¶ 19.  This compensation policy is memorialized in the Credico-Cromex contract, which Credico submitted along with its opposition to plaintiffs' motion.  *See* Kravtchenko Decl. at 7–40.  The contract states that for every "approved sale" of an Assurance Wireless product or service, the agent who made the sale is to receive $10, and Cromex is to receive $7.  *Id.* at 9, 28.  Vasto attests that Corona explained to him and other Cromex agents that Credico determined the commission they were paid, and that "the same system applies for every company in the Credico network, regardless of which client they work for."  Vasto Decl. ¶¶ 43–44.

[31] Vasto Decl. ¶¶ 27, 32; Yang Decl. ¶¶ 26, 29; Torres Decl. ¶¶ 31, 33; Zheng Decl. ¶¶ 24, 27.

[32] *See* Vasto Decl. ¶ 30; Yang Decl. ¶ 24; Torres Decl. ¶ 32; Zheng Decl. ¶ 20.

[33] *See* Vasto Decl. ¶¶ 29–30; *id.*, Ex. 3 (showing earnings between $70 and $220 per week); Yang Decl. ¶¶ 23, 27; *id.*, Ex. 4 ($220 paycheck for one week's work); Torres Decl. ¶ 32; Zheng Decl. ¶ 25.  Yang and Zheng attest that, based on their conversations with their coworkers, they "understand that most other workers at Cromex also did not earn minimum age for all hours worked."  Yang Decl. ¶ 28; Zheng Decl. ¶ 26.

### 3. Torres's and the Opt-In Plaintiffs' Employment at Other Credico ISOs

At various points between 2012 and 2015, Torres and the five opt-in plaintiffs, Matheus Leite, Aysha Amjad, Danielle Bolden, Emily Luchnick, and Lillian Vilchez, collectively worked at seven Credico ISOs in four states, conducting face-to-face marketing for six Credico clients.[34]

Regardless of the ISO that employed him or the service he was marketing, each of these plaintiffs makes certain common factual allegations about his employment. Each attests that he participated in a "Management Training Program," under which he was required to (1) arrive at the office in the morning for motivational "atmosphere room" meetings; (2) report to the field for "ride-outs"; and (3) return to the office for evening meetings, where he participated in additional rituals like "bell and gong."[35] Each attests that he was required to follow this routine five or six days per week, consistently amounting to more than 40 hours per week.[36]

---

[34] Torres transferred from Cromex to Vaeley Marketing Group in Phoenix, Arizona, where he marketed Assurance Wireless services. Torres Decl. ¶¶ 25–27. Leite worked at New York Client Solutions in New York City and Apollo Enterprises in Jersey City, New Jersey, before starting his own ISO, Winmor Incorporated, in Long Island, New York. Leite Decl. ¶¶ 2–3, 11– 12, 14–15. After Leite was forced to close down his company, he worked as an account executive at Wallace Morgan in New York City. Id. ¶ 20. At each ISO, Leite marketed Direct Energy services. Id. ¶¶ 2, 12, 15, 20. Amjad worked at New York Client Solutions before opening Apollo Enterprises. Amjad Decl. ¶¶ 2, 9–10. At both companies, she marketed Direct Energy services. Id. Bolden worked at Emie Marketing in Orlando, Florida, where she marketed Assurance Wireless services. Bolden Decl. ¶¶ 4, 6, 8. Luchnick worked at Red Ten in New York City, where she conducted marketing for Liberty Power Products, Lexington Power and Light, Verizon, and Direct Energy. Luchnick Decl. ¶¶ 2–3. She later worked for New York Client Solutions. Id. ¶ 7. Vilchez worked at Miami Marketing Associates in Miami, Florida and Florida Business Consulting in Miami, Florida, where she conducted marketing for Assurance Wireless and the Nature Conservancy, respectively. Vilchez Decl. ¶¶ 4, 21.

[35] Leite Decl. ¶¶ 6–7; Amjad Decl. ¶¶ 3, 5; Bolden Decl. ¶¶ 7, 10–14; Luchnick Decl. ¶ 5; Vilchez Decl. ¶¶ 7–12.

[36] Leite Decl. ¶¶ 6–7, 10; Amjad Decl. ¶¶ 4, 6; Bolden Decl. ¶¶ 9, 17; Luchnick Decl. ¶ 5; Vilchez Decl. ¶¶ 13, 15.

Each opt-in plaintiff attests that he was classified as an independent contractor and paid only a set fee per qualified customer that he signed up.[37]  Accordingly, each attests, he never received overtime payments.[38]  Additionally, three opt-in plaintiffs attest that they did not receive minimum wage for all hours worked.[39]

Each opt-in plaintiff who was promoted from account executive to a more senior position attests that, notwithstanding his change of title, his schedule and payment remained the same, with the exception that he was required to report to the office earlier for additional morning meetings.[40]  Similarly, each plaintiff who worked for more than one ISO attests that, at each company, he and his colleagues were compensated in the same manner ("a set fee per qualified sign-up"), and required to "keep the same general hours" and undergo the same daily routine.[41]

Two opt-in plaintiffs, Leite and Amjad, offer mirror-image accounts of their experiences starting their own ISOs, once they graduated from the Management Training Program.  Each attests that he received instructions from his former supervisors and other Credico officials (including, in Leite's case, Credico Vice President for the United States, Raf Diaz), which he was told were binding on all ISO owners within the Credico network.  Leite Decl. ¶¶ 13, 15, 22; Amjad Decl. ¶¶ 9, 12.  Specifically, each attests, he was instructed that, before opening his ISO,

---

[37] Leite Decl. ¶¶ 4, 8; Amjad Decl. ¶¶ 2, 4; Luchnick Decl. ¶¶ 2, 6.  While attesting that they were paid only a set fee for each qualified sign-up, Bolden and Vilchez do not explicitly state that they were classified as independent contractors.  *See* Bolden Decl. ¶ 15; Vilchez Decl. ¶¶ 14–15.

[38] Leite Decl. ¶ 10; Amjad Decl. ¶ 6; Bolden Decl. ¶ 17; Luchnick Decl. ¶ 6; Vilchez Decl. ¶ 15.

[39] Leite Decl. ¶ 10; Bolden Decl. ¶ 17; Vilchez Decl. ¶¶ 15–16.

[40] Leite Decl. ¶¶ 5, 7; Amjad Decl. ¶ 7; Bolden Decl. ¶ 19; Luchnick Decl. ¶ 9.

[41] Leite Decl. ¶¶ 12, 20–21; Amjad Decl. ¶¶ 11–12; Luchnick Decl. ¶ 8; Vilchez Decl. ¶¶ 19, 23; Torres Decl. ¶¶ 27–29.

he must raise a certain amount of money and organize a team of agents.  Leite Decl. ¶ 13; Amjad Decl. ¶ 9.  Additionally, each attests, he was told where to open his office and what marketing campaign his business should promote.  Leite Decl. ¶ 15; Amjad Decl. ¶ 9.  Finally, each attests, he was informed that the uniform features of the Management Training Program, including the six-day workweek schedule, and the morning and evening meetings, were necessary for a "successful business" in the Credico network.  Leite Decl. ¶ 22; Amjad Decl. ¶ 12.

### B. Procedural History

On July 27, 2015, plaintiffs filed a complaint in the Northern District of Illinois, bringing claims, on behalf of themselves and other similarly situated employees, against defendants under the FLSA, NYLL, AWA, and AMWA.  Dkt. 1.  The case was assigned to the Hon. Milton I. Shadur, United States District Judge.  On July 30, 2015, plaintiffs filed the FAC.  Dkt. 6.  On August 5, 2015, plaintiffs moved for class certification as to their state law claims and for limited discovery on class certification-related issues.  Dkt. 10.  On September 28, 2015, Credico answered.  Dkt. 26.

On October 19, 2015, plaintiffs moved to amend the FAC to add additional claims and parties.  Dkt. 33.  On October 23, 2015, plaintiffs moved for conditional certification and judicial notice under the FLSA.  Dkt. 38.  On November 3, 2015, Judge Shadur summarily denied plaintiffs' motion for conditional certification.  Dkt. 41.

On November 4, 2015, plaintiffs moved to transfer the case to this District.  Dkt. 42.  On November 9, 2015, plaintiffs withdrew their motion for leave to amend the FAC.  *See* Dkt. 46.  That day, Judge Shadur granted plaintiffs' motion to transfer.  *Id.*

On December 4, 2015, the Court accepted this case as related to *Martin v. Sprint/United Management Company*, 15 Civ. 5237, a separate action pending on the Court's docket.[42]

On December 22, 2015, plaintiffs filed a renewed motion for conditional certification and a memorandum of law in support.  Dkt. 62 ("Pl. Br.").  Plaintiffs also submitted supporting declarations by plaintiffs' counsel, Savytska Decl., and the named plaintiffs, Dkt. 62, Exs. 2–10.

On January 4, 2016, the Court granted in part and denied in part the *Martin* plaintiffs' motion for conditional certification. 15 Civ. 5237, Dkt. 86, *reported as Martin v. Sprint/United Mgmt. Co.*, No. 15 Civ. 5237 (PAE), 2016 WL 30334 (S.D.N.Y. Jan. 4, 2016).[43]  The Court directed the parties to this case, in briefing this motion, to be mindful of its analysis in *Martin*. Dkt. 69.

On January 11, 2016, Cromex and Corona answered.  Dkts. 77, 78.  On January 22, 2016, Cromex and Corona notified the Court that they do not oppose plaintiffs' motion for conditional certification.  Dkt. 82.[44]  On January 22, 2016, however, Credico filed a brief in opposition, Dkt.

---

[42] The plaintiffs in *Martin* were formerly employed by companies ("Sprint Partners") that contracted with Sprint/United Management Company ("Sprint"), either directly or through intermediary companies, like Credico, to provide face-to-face marketing for Sprint's Assurance Wireless brand. 15 Civ. 5237, Dkt. 1.  The defendants are Sprint and Wallace Morgan, a Credico ISO.  *Id.*  On July 7, 2015, the *Martin* plaintiffs filed suit, bringing claims virtually identical to those here: that Sprint and Wallace Morgan violated the FLSA and NYLL by misclassifying their employees as independent contractors and thereby failing to pay minimum wage or overtime compensation at the statutorily required rates.  *Id.*  On October 23, 2015, they moved for conditional certification.  15 Civ. 5237, Dkt. 52.

[43] The Court declined to conditionally certify a nationwide class of (1) all workers who collected applications for the Lifeline Program through Assurance Wireless, or (2) all workers who performed such work through Credico or one of its subcontractors.  *Id.*  It conditionally certified a narrower collective, consisting of all workers who performed such work through Wallace Morgan in New York City.  *Id.*

[44] Specifically, they represented that they "do not oppose that portion of plaintiffs' motion seeking conditional certification with respect to Cromex's independent contractors who performed face-to-face services and sales from July 2012 to the time that Cromex no longer utilized independent contractors in its sales activities."  *Id.*  They "[took] no position with respect

83 ("Credico Br."), along with a declaration by its client services manager, Kravtchenko Decl. On February 4, 2016, Credico filed an amended answer.  Dkt. 85.

On February 5, 2016, plaintiffs replied, Dkt. 87 ("Pl. Reply Br."), and filed consent forms and declarations by five plaintiffs who have opted into this lawsuit, Dkt. 86; Dkt. 87, Exs. 1–5. Plaintiffs also filed supplemental declarations by Zheng and plaintiffs' counsel, Dkt. 87, Exs. 6–7, and a revised notice and consent form, *id.*, Ex. 8.

On February 22, 2016, the Court granted plaintiffs leave to file new evidence in support of their motion.  Dkt. 97.  On February 23, 2016, plaintiffs submitted a declaration by opt-in plaintiff Emily Luchnick, Luchnick Supp. Decl., and accompanying exhibits.

On February 26, 2016, with leave of court, Credico filed a sur-reply, Dkt. 105 ("Credico Sur-reply Br."), along with five supporting declarations, Dkts. 100–104.

## II.     Applicable Legal Standards

The FLSA provides that an action may be maintained against an employer "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  "Although they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs."  *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (quoting *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).[45]

---

to the arguments set forth against Credico."  *Id.*

[45] *Hoffmann-La Roche* involved the parallel provision of the Age Discrimination in Employment Act, which incorporated the FLSA's enforcement provisions, including § 216(b).  Accordingly, "*Hoffmann-La Roche*'s interpretation of § 216(b) . . .  binds us in FLSA cases as well."  *Myers*, 624 F.3d at 554 n.9.

"In determining whether to exercise this discretion . . . the district courts of this Circuit appear to have coalesced around a two-step method," which the Second Circuit has endorsed as "sensible." *Id.* at 554–55; *see, e.g.*, *Martin*, 2016 WL 30334, at *4; *Romero v. H.B. Auto. Grp., Inc.*, No. 11 Civ. 386 (CM), 2012 WL 1514810, at *8 (S.D.N.Y. May 1, 2012); *Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819 (GEL), 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006); *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997).

"The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Myers*, 624 F.3d at 555. "The court may send this notice after plaintiffs make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id.* (quoting *Sbarro*, 982 F. Supp. at 261). Although "[t]he 'modest factual showing' cannot be satisfied simply by 'unsupported assertions,' . . . it should remain a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist." *Id.* (quoting *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991)); *accord Damassia*, 2006 WL 2853971, at *3 ("[A] plaintiff's burden at this preliminary stage is minimal." (internal quotation marks omitted) (collecting cases)); *Sbarro*, 982 F. Supp. at 261 ("The burden on plaintiffs is not a stringent one."). "A court need not evaluate the underlying merits of a plaintiff's claims to determine whether the plaintiff has made the minimal showing necessary for court-authorized notice." *Damassia*, 2006 WL 2853971, at *3; *accord Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 105 (S.D.N.Y. 2003); *Sbarro*, 982 F. Supp. at 262.

"At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs.  The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice."  *Myers*, 624 F.3d at 555.

III.   **Discussion**

A.      **Conditional Certification**

Plaintiffs move for conditional certification of a collective consisting of all persons who performed face-to-face marketing work for Credico and its subcontractor ISOs in the United States between July 2012 and the present, while classified as independent contractors.  Pl. Br. 1. To justify such conditional certification, plaintiffs must make a "modest factual showing" of a "factual nexus" that binds all members of the proposed collective together as victims of a common unlawful practice.  *Martin*, 2016 WL 30334, at *4–5; *Sbarro*, 982 F. Supp. at 261; *see also Vasquez v. Vitamin Shoppe Indus. Inc*., No. 10 Civ. 8820 (LTS), 2011 WL 2693712, at *3 (S.D.N.Y. July 11, 2011) ("As Plaintiff proposes a nationwide class, he bears the burden of showing a nationwide policy or plan pursuant to which [plaintiffs are subjected to FLSA violations].").  After reviewing the pleadings, plaintiffs' declarations, and the documentary evidence submitted in connection with this motion, the Court finds that plaintiffs have satisfied this minimal burden.

1.      **The Plaintiffs' Declarations Support an Inference of an Unlawful Credico-wide Policy**

The declarations of the four named and five opt-in plaintiffs, who collectively worked at 10 ISOs in four states, commonly allege practices that violate the FLSA.  Specifically— regardless of the ISO at which he worked, the marketing campaign on which he was staffed, or

15

the title he held—each declarant attests that he: (1) lacked discretion over the manner in which he performed his work and was consistently monitored by his employers; (2) was regularly required to work more than 40 hours per week; and (3) was paid only a flat-rate commission for each qualified customer he signed up.[46]  On this basis, each attests that he was never paid overtime compensation or guaranteed the minimum wage to which he was entitled under the FLSA.[47]

Important here, the declarants supply a strong basis for inferring that these unlawful employment practices were not particular to them or the ISOs at which they worked, but instead reflect core components of a uniform Management Training Program implemented at Credico ISOs across the country.  The declarations contain virtually identical accounts of the distinctive wage-and-hour practices that the declarants followed pursuant to the Management Training Program.  As to their schedules, each declarant attests that he and his colleagues were required to undergo the following daily routine: (1) attending early morning meetings in the "atmosphere room," where they engaged in motivational rituals; (2) conducting "ride-outs" in the field during which they signed up consumers with their Credico-provided tablets; and (3) attending evening meetings at which they participated in the "bell and gong" ritual.[48]  The declarants uniformly attest that they were required to repeat this routine, which took up 10 to 12 hours per day, five or six days per week.[49]  As to compensation, each attests that he received a fixed commission only

---

[46] *See supra* notes 17–29, 35–37.

[47] *See supra* notes 31–33, 38–39.

[48] *See supra* notes 22–26, 35.

[49] *See supra* notes 27–28, 36.

for the qualified customers he signed up, and received no payment for applications filled out by customers who later proved ineligible.[50]

Plaintiffs' common and reasonably detailed accounts of their experiences pursuant to the Management Training Program satisfactorily suggest a Credico-wide policy and/or practice. Indeed, courts in this District have held that "[w]here plaintiffs allege such idiosyncratic conduct across multiple [locations/subcontractors], it is reasonable to infer that the same pattern of behavior occurred at defendants' other [locations/subcontractors]." *Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265, 270–71 (S.D.N.Y. 2012) (plaintiffs' uniform allegations that they received "purely 'straight time' pay in the same distinctive manner . . . no matter where they worked or who supervised them" supported "a reasonable inference that plaintiffs' experiences reflected a company-wide policy"); *see also Costello*, 2014 WL 4377931, at *6 ("The probity of drawing . . . an inference [of a common unlawful policy] . . .  may . . . be affected by the commonality of the substantive testimony or affirmations that the plaintiffs provide.").

In addition, several declarants claim knowledge that the wage-and-hour practices they challenge derived from Credico, as opposed to the ISOs that directly employed them.  For instance, Vasto, Leite, and Vilchez each attest that they were told by their supervisors that the commissions they received were determined by Credico.[51]  *See* Vasto Decl. ¶¶ 43–44 ("Corona explained that Credico is paid by its clients based upon the sales at the companies in its network. Credico keeps 30% of the profit from each sale, and provides 30% to the owner of the company,

---

[50] *See supra* notes 30, 37.

[51] "The fact that these allegations may be based on hearsay does not diminish their value at this stage." *Jeong Woo Kim v. 511 E. 5th St., LLC*, 985 F. Supp. 2d 439, 449 (S.D.N.Y. 2013). Courts in this Circuit regularly rely on hearsay evidence in determining whether to authorize a collective action notice. *Hamadou v. Hess Corp.*, 12 Civ. 0250 (CM), 2013 WL 164009, at *11 (S.D.N.Y. Jan. 16, 2013); *Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 563 (S.D.N.Y. 2012); *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 402–03 (S.D.N.Y. 2012).

and 40% to the worker who made the sale. . . .  Corona explained that the same system applies for every company in the Credico network, regardless of which client they work for."); Leite Decl. ¶ 9 ("[My supervisor] explained to me that the fee myself [sic] and other agents received was determined by a company called Credico, which had the contract with Direct Energy."); Vilchez Decl. ¶ 17 ("When I complained about my pay at Miami Marketing Associates, [my supervisor] told me that 'the checks come from Credico,' that Credico is the entity that writes the checks, and that Credico was having issues because they were 'changing over their system.'"). At the conditional certification stage, courts in this District have found such statements by managers or supervisors to be probative evidence of a company-wide policy.  *See Morris*, 896 F. Supp. 2d at 271 (statements by plaintiff's supervisor that company did not pay overtime premiums at any of its sites constituted "corroborating evidence of a company-wide policy"); *Hart v. Crab Addison, Inc.*, No. 13 Civ. 6458 (CJS), 2015 WL 365785, at *3 (W.D.N.Y. Jan. 27, 2015) (attestation by affiants that supervisors told them job requirements reflected defendants' corporate policies "suggests the existence of other similarly-situated employees at [d]efendants' other locations"); *Francis v. A & E Stores, Inc.*, No. 06 Civ. 1638 (CS) (GAY), 2008 WL 4619858, at *3 (S.D.N.Y. Oct. 16, 2008) (conditionally certifying nationwide class where plaintiff attested that manager told her that "the overtime rule was company policy") (adopting report and recommendation); *LeGrand v. Educ. Mgmt. Corp.*, No. 03 Civ. 9798 (HB) (HBP), 2004 WL 1962076, at *2 (S.D.N.Y. Sept. 2, 2004) (plaintiffs' attestations that they were told by management that wage-and-hour policies applied at defendants' schools across the country was "sufficient evidence to satisfy plaintiffs' burden at this early stage"); *Harrington v. Educ. Mgmt. Corp.*, No. 02 Civ. 0787 (HB), 2002 WL 1009463, at *2 (S.D.N.Y. May 17, 2002) (plaintiff satisfied "modest preliminary burden" to obtain conditional certification of nationwide class by

attesting that "his supervisors informed him that it was the defendants' policy not to pay assistant directors overtime compensation").

These second-hand accounts are further corroborated by the attestations of Leite and Amjad as to their experiences as owners of ISOs within the Credico network. Each attests that the agents who worked at his ISO were classified as independent contractors and paid solely based on the number of qualified customers they signed up. Leite Decl. ¶ 21; Amjad Decl. ¶ 11. Each attests that this compensation scheme was dictated by Credico: Leite attests that he and other ISO owners received "strict guidelines" from Credico, which required them to specify in job postings that "the [agent] positions were paid solely based upon performance." Leite Decl. ¶ 19. And Amjad attests that, when she started her ISO, her former supervisor gave her a number of standard business-operations forms, which had been provided to him by Credico to use at his own company. Amjad Decl. ¶ 10. These included a sample independent contractor agreement, which states that agents are to be paid only a set fee per sign-up. *Id.*; *see id.*, Ex. 2. Amjad was also given roll call sheets to track each agent's weekly earnings based upon set fees per sign-up. *Id.* ¶ 10; *see id.*, Ex. 5. She attests that she was required to submit these forms each week to a Credico-designated accountant. *See id.* ¶¶ 13–14.

Both Leite and Amjad also attest that, when they opened their ISOs, they were informed by their past supervisors and other Credico executives (including, as to Leite, Credico's vice president for the United States) that the uniform features of the Management Training Program, including the six-day workweek schedule and the morning and evening meetings, were necessary for a "successful business" in the Credico network. Leite Decl. ¶ 22; Amjad Decl. ¶ 12. Leite and Amjad understood these statements to connote that Credico monitored the performance of each agent and ISO, and would shut down a company whose agents did not meet the target for

qualified sign-ups. *See* Leite Decl. ¶ 15 ("[My former supervisor] explained that Credico could take away the client (the entity we were helping sign up customers for) if the office did not meet weekly targets for numbers of sign-ups. In that case, I would have to go into a 'retrain.'"); *id.* ¶ 20 (discussing how, when his ISO was unable to maintain the target number of sign-ups, he was demoted to the position of account executive at another ISO); Amjad Decl. ¶ 21 (attesting that when her ISO was not making enough sign-ups, she was demoted to the assistant manager position at another ISO). The named plaintiffs' attestations that they could be terminated for failing to meet targets for qualified sign-ups suggests that ISO owners, in turn, enforced these quotas, and the long hours required to meet them, within their companies. *See, e.g.*, Torres Decl. ¶ 19 ("My co-workers and I were required to sign up a minimum number of qualified customers per week . . . . We were told by our supervisors at Cromex, including Corona, that we could be terminated for failure to meet these goals."); *id.* ¶ 30 (explaining that agents at Vaeley Marketing Group were informed that they could be terminated for failing to sign up 60 qualified customers per week, and that the ISO owner "had to get approval from Credico to reduce [their] quota").

The assembled evidence thus supplies a sufficient basis on which to infer, at a minimum, a *de facto* policy by Credico under which ISO owners were obligated or incented (1) to require their agents/employees to work more than 40 hours per week in order to satisfy Credico's sign-up quotas, but (2) not to compensate them for overtime or guarantee a minimum wage for all hours worked. Courts have found evidence of such "dual-edged policies" to support conditional certification of a class. *Winfield*, 843 F. Supp. 2d at 404 ("[C]ourts have found plaintiffs to be similarly situated when they made common allegations that dual-edged policies of [not paying overtime while imposing strict sales quotas] . . . effectively required them to work uncompensated overtime.") (collecting cases); *see, e.g.*, *Levy v. Verizon Info. Servs., Inc.*, No. 06

Civ. 1583 (SMG), 2007 WL 1747104, at *2, *4–5 (E.D.N.Y. June 11, 2007) (finding telephone sales representatives similarly situated where they alleged that they were encouraged to work overtime to meet strict sales quotas but that overtime was rarely approved, resulting in a consistent failure to pay overtime compensation); *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008) (plaintiffs similarly situated where they presented evidence that defendant's policy of requiring them "to perform job duties that could not easily be completed within 40 hours while, at the same time, strongly discouraging overtime" resulted in off-the-clock work and time shaving); *Wilks v. Pep Boys*, No. 02 Civ. 0837 (AAT), 2006 WL 2821700, at *6 (M.D. Tenn. Sept. 26, 2006) (conditionally certifying nationwide collective where plaintiffs "made a strong case for their argument that [company's compensation] system dictates that managers must commit the FLSA violations alleged by the plaintiffs in order to keep their jobs, or at least that they are strongly motivated to do so"), *aff'd*, 278 F. App'x 488 (6th Cir. 2008).

The plaintiffs' declarations, therefore, furnish a sufficient basis on which to find that they are "similarly situated" to all members of the putative collective.

### 2. Documents Issued by Credico Corroborate Plaintiffs' Claim of an Unlawful Credico-wide Policy

Various documents submitted by the parties buttress plaintiffs' claim that the wage-and-hour policies described in their declarations are common to ISOs in the Credico network. These include the following:

**The Credico-Cromex subcontractor agreement**: This agreement states that "payment to Subcontractor for Services shall be in accordance with [the] Subcontractor Commission Schedule" annexed to the agreement. Kravtchenko Decl. at 9. The schedule, in turn, states that "commissions shall be paid to Subcontractor and Subcontractor shall pay commissions to its field representatives as follows":

| Product | Rep | Office |
|---|---|---|
| Assurance Wireless – Approved Sale | $10.00 | $7.00 |

*Id.* at 28.

**Credico documents distributed at 2014 owners meetings**:  Documents distributed at Credico's May 2014 "new owners meeting" (attended by the owners of "a number of companies in the Credico network," Luchnick Supp. Decl. ¶¶ 4–5) and the March 2014 "owners summit" (which "brought together Credico company owners and assistant managers located throughout the country," *id.* ¶ 13) suggest that the compensation policy reflected on the Credico-Cromex schedule is not particular to Cromex—or to other ISOs that market Assurance Wireless services—but instead reflects a Credico-wide policy of paying agents only fixed-rate commissions:

- The "ARC Rules of Engagement," distributed at the May 2014 meeting, appears to presume the existence of a commission-based payment scheme.  *See* ARC Rules, at 1.  It states that each ISO owner is assigned an account manager "who will be [his] point of contact for operational questions and daily tasks related to sales submissions, reporting, *commissions*, etc."  *Id.* (emphasis added).  And it explains that an owner must log into Credico's ARC Portal to view his company's weekly pay report, which summarizes the "agent commissions" and "owner commissions" earned each week.  *Id.* at 6–9.

- A recruiting manual distributed at the March 2014 summit states that agents are paid on commission, and instructs ISO owners how to frame this policy for recruits.  *See* Credico Recruiting Manual, at 49 (providing advice on "[h]ow to handle the commission question").  It directs owners to avoid discussing

compensation if possible.  *Id.*  But if an applicant directly inquires, owners are to

say, "Be excited you get commission," and to "explain it with excitement."  *Id.*

- A document distributed at the May 2014 meeting, with a section entitled

  "Introduction to Credico USA Accounting," describes Credico's role in dictating

  the commission rates to be paid by each ISO:  It states that "[o]ffices *must* pay

  agent commission following the established rates on the commission policy; *no*

  *deviation on commission should be made*."  Credico Accounting Manual, at 20

  (emphasis added).

These documents further show that Credico monitored the hours worked by ISOs' agents,

and indeed appears to have acknowledged that agents participating in the Management Training

Program are required to work more than 40 hours per week.  For instance, the ARC Rules of

Engagement states that ISOs must enter "roll call" and "feet on the street" data by 8 a.m. CST.

ARC Rules, at 4.[52]  Similarly, the recruiting manual instructs ISO owners, when interviewing

applicants, to portray the average hours required by the program as ranging from nine to 15.5

hours per day.  *See* Credico Recruiting Manual, at 12 (during initial interview, owners should tell

interviewees that agents' days "start at 11:00 and run till at least 8:00 in the evening"); *id.* at 29

(during second-round interview, owners should tell interviewees that days "start at 7:30/10:00

and run till at least 7:00/11:00 in the evening").  The manual directs owners to portray these

hours as "the catch" to the program, and to explain them by stating that "[w]e are trying to fit 5–

10 years of experience into 12 months so we do work longer hours than the average business."

*Id.* at 12, 29.

---

[52] An email Leite received from a Credico official, in his capacity as the owner of Winmore
Incorporated, states that Credico uses this data to monitor "what's happening in terms of [each]
office[']s productivity."  Leite Decl., Ex. 3, at 2.

In opposing conditional certification, Credico argues that these documents reflect no more than "recommended best practices," and thus do not show that Credico plays a role "in how its subcontractors classify and pay their workers."  Credico Sur-reply Br. 5.  But the mandatory language of the ARC Rules of Engagement and the Introduction to Credico (USA) Accounting belies this characterization.  On their faces, these documents do not *recommend* that ISO owners submit roll call data on a daily basis or pay agents commission based on the rates established by Credico—they *require* it.  And although the recruiting manual does not itself dictate that agents work more than 40 hours per week or be paid on commission, it acknowledges such policies and does not restrict them to a particular marketing campaign or ISO.[53]

Courts in this Circuit frequently find corporate documents of this nature probative of a common policy that justifies conditional certification of a company-wide collective.  *See, e.g.*, *Costello*, 2014 WL 4377931, at *5 (plaintiffs "met their burden" where "[defendant's] own documents acknowledge[d] that [assistant store managers] nationwide are expected to perform at least some non-exempt work"); *McEarchen v. Urban Outfitters, Inc.*, No. 13 Civ. 3569 (FB), 2014 WL 2506251, at *2 (E.D.N.Y. June 3, 2014) (affirming conditional certification of nationwide class where "the record before the court . . . included evidence in the form of corporate documentation that members of the putative collective share a commonality that is material to the application of the FLSA"); *Alli v. Boston Mkt. Co.*, No. 10 Civ. 4 (JCH), 2011

---

[53] Attempting to minimize the recruiting manual, Credico argues that it was "not prepared or provided by anyone from Credico."  Credico Sur-reply Br. 6; Dkt. 103 ("Diaz Decl."), ¶ 10.  But Credico does not dispute that the manual was, as Luchnick attests, distributed at the March 2014 Credico summit, in a binder bearing the Credico logo, to Credico owners from around the nation. *See* Luchnick Supp. Decl. ¶¶ 13–14; *id.*, Ex. 4.  In any event, to the extent that Credico is challenging the credibility of Luchnick's declaration, that issue is not to be resolved at this juncture.  *Flood v. Carlson Rests. Inc.*, No. 14 Civ. 2740 (AT), 2015 WL 260436, at *5 (S.D.N.Y. Jan. 20, 2015); *accord Morris*, 896 F. Supp. 2d at 269; *Lynch*, 491 F. Supp. 2d at 368 ("At this procedural stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations.").

WL 4006691, at *4 (D. Conn. Sept. 8, 2011) (conditionally certifying nationwide class based on,
*inter alia*, evidence that defendant held a "uniform orientation" at which "employee guidelines"
were distributed, and implemented a "standardized eight week training program for new
[assistant general managers], promulgated at the corporate level").

### B.     Credico's Opposition

In the face of plaintiffs' showing, Credico argues that plaintiffs have failed to establish
that they are similarly situated to other members of the putative collective.  *See* Credico Br. 8–
13.  It argues that even if plaintiffs were subject to unlawful employment practices at their
respective ISOs, the evidence does not supply a sound basis to infer that their experiences are
typical of agents across ISOs nationwide.  *Id.*  Drawing on the Court's decision denying
nationwide conditional certification in *Martin*, Credico argues that plaintiffs here similarly "did
not identify any unlawful corporate policy or practice that Credico mandated for all of its
subcontractors that violates the FLSA."  Credico Sur-reply Br. 1 (emphasis omitted).

Credico's reliance on *Martin* is misplaced.  The facts here are far afield from those that
led the Court to deny certification there.  In *Martin*, the plaintiffs sought conditional certification
of a class of all workers ("Agents") whose job was to gather Lifeline applications for Assurance
Wireless (the "Sprint-wide class"), or, in the alternative, all persons whose job was to collect
Lifeline applications through Credico, either directly or through one of its subcontractors (the
"Credico-wide class").  *Martin*, 2016 WL 30334, at *5, *12.  In support, the plaintiffs submitted
declarations of 10 Agents who collectively had worked for six companies ("Sprint Partners"),
including two Credico subcontractors, in three states, each of whom alleged employment
practices that violated the FLSA.  *Id.* at *1–3, *8.  They also submitted Sprint-issued documents
showing that Sprint exerted control over Sprint Partners and imposed various requirements that
bear on Agents' activities.  *Id.* at *5–6.

Critically, however, the documents adduced in *Martin* were "conspicuously silent as to how Agents are to be classified and paid"; they did not indicate that Sprint or Credico dictated the wages or schedules of individual workers.[54]  *Id.* at *6–7, *12.  And the *Martin* plaintiffs had not "come forward with any evidence that would situate the decision to implement the wage-and-hour practices of which they complain[ed] above the level of the declarants' immediate employers."  *Id.* at *10.  They "d[id] not, for instance, make any concrete factual allegations to the effect that Agents employed by other Sprint Partners were subject to the same unlawful practices, or that the wage, hour, and classification practices that they protest were imposed by, or derived from, Sprint [or Credico]" themselves, "as opposed to the Sprint Partner that directly hired them."  *Id.* at *10, *12.  Accordingly, the Court held that the plaintiffs had "fail[ed] to adequately show that the policies they protest are traceable in some way to the . . . compan[ies] (Sprint [or Credico]) that would unite the existing plaintiffs, including opt-ins, and the balance of the nationwide putative class."  *Id.* at *11–12.  For this reason, the Court denied plaintiffs' bid for collective certification of a Sprint- or Credico-wide collective of Agents who gathered applications for Assurance Wireless.  *Id.* at *20.

In so ruling, however, the Court emphasized that "[t]he existence of an intermediary company does not, of course, preclude a finding of a nationwide practice attributable to a common principal such as Sprint [or Credico]."  *Id.* at *10.  On the contrary:  "One can readily imagine a scenario in which a company with nationwide operations imposed a common policy as to wages, hours, or employment classifications that bound the intermediaries proximate to the

---

[54] Although the plaintiffs in *Martin* submitted a contract between Sprint and Credico, stating that Sprint was to pay Credico a set fee for each approved application, *see Martin*, 2016 WL 30334, at *7, they did not submit, as plaintiffs do here, a contract specifying the wages that are to be paid to individual workers hired to promote Assurance Wireless, *see* Kravtchenko Decl. at 9, 28.

affected workers." *Id.* But, the Court stressed, "solid evidence of such a policy, not conjecture, is necessary." *Id.* The *Martin* plaintiffs simply failed to supply such evidence. *Id.* at *11–13.

Plaintiffs have done so here. They have presented solid evidence of the type lacking in *Martin*. The declarations submitted here provide a concrete basis for inferring that the unlawful employment practices the declarants claim to have suffered are "traceable" to Credico: Multiple declarants attest that their supervisors told them that their fixed-rate commissions were set by Credico. And the declarants who opened their own ISOs attest that they lacked discretion in setting wage-and-hour policies for their workers. Such policies, they attest, were dictated, monitored, and enforced by Credico. The Credico-issued documents that plaintiffs have adduced further support their claim that agents were paid according to a fixed commission schedule and expected to work more than 40 hours per week. Notably, these documents portray these policies as applying to *all* ISOs in the Credico network. By their terms, they do not limit their scope to particular ISOs, regions, or clients.

This case is thus easily distinguished from *Martin* and other cases finding insufficient evidence to justify conditional certification of a nationwide class. *See Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 800 (S.D.N.Y. 2012) (denying conditional certification where there was "no evidence . . . that could plausibly lead to the inference that [assistant store managers] nationwide are performing non-exempt tasks" besides the testimony of six employees who worked exclusively in the New York area), *adopted*, No. 09 Civ. 9575 (LAP) (GWG), 2012 WL 2588771 (S.D.N.Y. July 2, 2012); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (denying conditional certification of nationwide collective where there was no evidence that the "employer intended, compelled[,] or condoned unlawful consequences that were a direct result of the [alleged unlawful] policy"); *Jenkins v. TJX Cos. Inc.*, 853 F. Supp. 2d

317, 321 (E.D.N.Y. 2012) (denying conditional certification where "[p]laintiff's sole submission

in support of the existence of a common de-facto policy requiring [assistant store managers] to

perform non-exempt tasks [was] [p]laintiff's own deposition testimony, discussing his own

personal experience").

Separately, Credico asks the Court to credit declarations by four of its executives and two

ISO owners (the "Credico declarants") attesting either to the actual or apparent compliance of its

subcontractors with the pertinent wage laws, or that wage-and-hours policies are set by

subcontractors acting on their own.  *See* Credico Sur-reply Br. 3–6 (citing, *inter alia*,

Kravtchenko Decl. ¶ 11 (Credico client services manager attesting that Credico believes that

some of its subcontractors pay their workers in accordance with the applicable minimum wage

and overtime laws); Dkt. 102 ("Medina Decl."), ¶¶ 3–4 (ISO owner attesting that his company

pays agents on an hourly basis and complies with the FLSA, and that he has discretion to

determine "how and when to pay the field agents working for [his] company"); Diaz Decl.

¶¶ 16–17 (attesting that "[t]o the best of [his] knowledge, Credico does not require any of its

subcontractors to have morning 'atmosphere room' meetings or evening 'bell and gong'

meetings with their field agents," or "to work any minimum or maximum number of hours or

days per week")).  But at this stage, courts in this Circuit routinely decline to consider such

opposing declarations, because the issue for the Court is not whose evidence is more persuasive,

but "whether Plaintiffs have made the 'modest factual showing' that they are required to make at

this stage of the litigation."  *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 456–57 (E.D.N.Y.

2014) (quoting *Amador v. Morgan Stanley & Co. LLC*, No. 11 Civ. 4326 (RJS), 2013 WL

494020, at *3 (S.D.N.Y. Feb. 7, 2013)) (collecting cases); *see, e.g.*, *Winfield*, 843 F. Supp. 2d at

407 n.6 ("[C]ourts in this Circuit regularly conclude that [competing] declarations do not

undermine the plaintiffs' showing in the first stage of the conditional certification process."); *In re Penthouse Exec. Club Comp. Litig.*, No. 10 Civ. 1145 (NRB), 2010 WL 4340255, at *4 (S.D.N.Y. Oct. 27, 2010); *Flood*, 2015 WL 260436, at *5 n.6; *Hernandez v. Merrill Lynch & Co.*, No. 11 Civ. 8472 (KBF), 2012 WL 1193836, at *5 (S.D.N.Y. Apr. 6, 2012); *see also Winfield*, 843 F. Supp. 2d at 407 n.6 (declining to consider 23 declarations by defendants' employees disputing plaintiffs' allegations where "plaintiffs ha[d] not had an opportunity to depose these declarants); *Amador*, 2013 WL 494020, at *8 ("[S]tatements gathered by an employer from its current employees are of limited evidentiary value in the FLSA context because of the potential for coercion.").[55] Here, defendants' declarations do not displace the showing that plaintiffs have made, to wit, that Credico "imposed a common policy as to wages [and] hours . . . that bound the intermediar[y] [ISOs] proximate to the affected [agents]." *Martin*, 2016 WL 30334, at *10.

The Court, therefore, holds that plaintiffs have made the necessary "modest factual showing" that they and agents employed by Credico ISOs nationwide "together were victims of a common policy or plan that violated the law."[56] *Myers*, 624 F.3d at 555 (internal quotation

---

[55] Although not necessary to this decision, the Court notes that the Credico declarants' assertions are in tension with Credico's documents. For example, while Credico's client services manager attests that "Credico does not know with any degree of certainty how Cromex compensates its field agents," Kravtchenko Decl. ¶ 12, the Credico-Cromex contract annexed to her declaration states that Cromex agents are to be paid $10 for every qualified sign-up of an Assurance Wireless customer, *id*. at 28. Similarly, while the client services manager claims that "Credico does not sponsor, establish or promote any management training," *id*. ¶ 17, Credico's website quotes Young as stating that "[a]ll of the new independent sales offices are being led by owners who came through our management training program, which provides top producing sales professionals with the mentoring and training needed to run their own business." Credico Art.

[56] This holding is in accordance with numerous decisions in this District granting conditional certification of nationwide collectives on "comparable or thinner records." *Flood*, 2015 WL 260436, at *4 (declarations alleging common violations at eight T.G.I. Friday's locations in four states, "coupled with the evidence of Defendants' centralized control over T.G.I. Friday's restaurants nationwide, suffices to meet the minimal burden for [nationwide] conditional

marks and citation omitted).  The Court accordingly approves conditional certification of a collective of all persons who performed face-to-face marketing work for Credico and its subcontractor ISOs in the United States, while classified as independent contractors.

### C.   Court-Authorized Notice

Plaintiffs seek approval of a judicial notice and consent form, Dkt. 87, Ex. 8, which they propose be distributed to all putative class members via email and text message.  Pl. Reply Br. 10.  Credico requests that the parties be given two weeks to confer on the content and means of dissemination of the notice, as well as the terms of the production of contact information for potential opt-in plaintiffs.  Credico Br. 13.

The Court grants Credico's request, and directs the parties to confer and submit to the Court, by two weeks from the issuance of this Order, an agreed-upon proposal, including a proposed notice, procedures for its dissemination, and terms for the production of contact information for potential opt-in plaintiffs.  In preparing the proposal, the parties are to give due consideration to the parameters set forth in *Martin* as to these issues.  *See Martin*, 2016 WL 30334, at *15–20.  The Court also offers the following guidance to assist the parties in their deliberations.

First, the Court is prepared to grant plaintiffs' request for permission to distribute the notice via email and text message.  As the Court explained in *Martin*, courts in this District have

---

certification"); *Grant v. Warner Music Grp. Corp.*, No. 13 Civ. 4449 (PDG), 2014 WL 1918602, at *4–5 (S.D.N.Y. May 13, 2014) (granting motion for nationwide court-authorized notice based on declarations from the named plaintiff and three opt-in plaintiffs and excerpts from defendants' website); *Guttentag v. Ruby Tuesday, Inc.*, No. 12 Civ. 3041 (HB), 2013 WL 2602521, at *2 (S.D.N.Y. June 11, 2013) (granting nationwide conditional certification based on plaintiffs' declarations and depositions covering eight store locations in four states, as well as other evidence of defendants' nationwide overtime policy, centralized staffing, and labor budget management system); *Lynch*, 491 F. Supp. 2d at 369 (granting conditional certification based on "the allegations in [plaintiff's] complaint, the deposition testimony of four opt-in plaintiffs and [defendant's] 30(b)(6) representative, and three opt-in plaintiff declarations").

permitted email and text message distribution where, as here, the nature of the employer's business facilitated a high turnover rate among employees.  *Id.* at \*19 (citing *Bhumithanarn v. 22 Noodle Mkt. Corp.*, No. 14 Civ. 2625 (RJS), 2015 WL 4240985, at \*5 (S.D.N.Y. July 13, 2015); *Chamorro v. Ghermezian*, No. 12 Civ. 8159 (TPG), Dkt. 17, ¶ 2(1) (S.D.N.Y. Feb. 25, 2013)).

Second, because plaintiffs allege willful violations of the FLSA, *see* FAC ¶¶ 73–74, the Court will approve a three-year limitations period in defining the scope of the collective action. *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999) ("The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions, but allows a three-year limitations period for 'a cause of action arising out of a willful violation.'" (quoting 29 U.S.C. § 255(a)); *Martin*, 2016 WL 30334, at \*16.

However, the Court is not persuaded by plaintiffs' argument for equitable tolling.  *See* Pl. Reply Br. 10.  As the Court explained in *Martin*, equitable tolling is appropriate "only in rare and exceptional circumstances," *Phillips v. Generations Family Health Ctr.*, 723 F.3d 144, 150 (2d Cir. 2013) (internal quotation marks and citation omitted), "where a plaintiff has been prevented in some extraordinary way from exercising his rights," *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (internal citation omitted).  Plaintiffs argue that tolling is appropriate here on account of the delay that resulted from the transfer of this case from the Northern District of Illinois.  Pl. Reply Br. 10.  But it was plaintiffs who moved to transfer the case to this District. The Court does not find that the resulting delay was beyond plaintiffs' control, or that justice requires tolling of the limitations period.  *See Hart*, 2015 WL 365785, at \*5 ("[E]quitable tolling may be appropriate when a significant delay in ruling on an FLSA motion for conditional certification is attributable to the Court and not the parties.").

Moreover, less than seven months have passed since plaintiffs filed their original motion for conditional certification in the Northern District of Illinois, and less than five months have passed since plaintiffs renewed their motion in this District.  Such delay is not of a magnitude that would justify tolling.  *See, e.g.*, *Mark v. Gawker Media LLC*, No. 13 Civ. 4347 (AJN), 2014 WL 5557489, at *3 (S.D.N.Y. Nov. 3, 2014) (11-month delay in resolving conditional certification motion not "extraordinary" and did not justify equitable tolling from date motion was filed).  Therefore, the proposed notice shall be directed to all persons who performed face-to-face marketing work for Credico and its subcontractor ISOs in the United States, while classified as independent contractors, within three years of the issuance of a court-approved notice.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for conditional certification of a collective consisting of all persons who conducted face-to-face marketing work for Credico and its subcontractor ISOs in the United States, while classified as independent contractors, at any point during the three years preceding the issuance of a court-approved notice.

The parties are directed to submit to the Court, within two weeks of this Order, an agreed-upon proposal, including a proposed notice, procedures for its dissemination, and terms for the production of contact information for potential opt-in plaintiffs, consistent with this Order.  The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 62 and 90.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 5, 2016
       New York, New York