## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

PHILIP VASTO, ZAO YANG, ALEX       )
TORRES, and XIAOJ ZHENG,            )
individually and on behalf of all others  )
similarly situated,                 )
                                    )
Plaintiffs,                         )
v.                                  )
                                    )
CREDICO (USA) LLC, CROMEX INC.,     )
AND MEIXI XU,                       )
                                    )
Defendants.                         )
_____  )

Civil Action No. 1:15-cv-09298-PAE

## PLAINTIFFS' RESPONSES TO DEFENDANT CREDICO (USA) LLC'S STATEMENT OF ADMITTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Plaintiffs Philip Vasto, Zao Yang, Alex Torres, and Xiaoj Zheng, through their undersigned counsel, submit the following response to Defendant Credico (USA) LLC's Statement of Material Facts pursuant to Fed. R. Civ. P. 56 and L.R. 56. 1. Plaintiffs contend that genuine issues of material fact preclude summary judgment in this case,

## CREDICO'S BUSINESS AS AN OUTSOURCED SALES SPECIALIST

1.      Credico is a client broker and outsourced sales specialist in the direct sales and marketing industry.   Ex. 1, Smith Dep. 62:5-63:1 (Credico "broker[s] clients" on behalf of its subcontractors.); Ex. 2, Credico (USA) LLC Code of Business Ethics and Conduct, at CREDICO_VAS-00000399 (Credico serves as its "clients' premier option to outsource their sales function for their products and services."); Ex. 3, Credico Dep. 12:17-19 (testifying that "Credico outsources the face-to-face marketing service for [its] clients to independent sales offices" (referred to as "ISOs")); Ex. 4, Young Dep. 9:3 (testifying that "Credico USA is a client broker").

**Plaintiffs' Response:** Denied. ████████████████████████████

 Credico has set Standard Operating Procedures for offices within its network, and conducts audits of the offices to ensure compliance with these procedures. Savytska Decl., Ex. 3, Mainhart Dep. 103:8-10; 104:11-13; Savytska Decl., Ex. 2, Smith Dep 66:2-13. These offices receive funds from Credico which they use to pay field agents. Savytska Decl., Ex. 3, Mainhart Dep. 145:2-8; Savytska Decl., Ex. 2, Smith Dep. 83:18-24.

2.      Credico contracts with large national and international clients, across multiple industries, that are in need of a better way to reach new customers and improve their customer acquisition rate.  Ex. 3, Credico Dep. 99:6-8; Ex. 5, Broaddus Dep. 22:22-23; Ex. 12, *Martin, et al. v. Sprint/United Mgmt. Co., et al.,* Case No. 15-cv-5237-PAE, Dkt. No. 72, Declaration of Vincent Buongiovanni of Sprint ("Sprint Decl.") ¶ 14.

**Plaintiffs' Response:** Admitted.

3.      Credico's clients include, but are not limited to, Verizon, Direct Energy, AT&T, and Sprint.  Ex. 3, Credico Dep. 99:6-8, 121:15-17; Ex. 5, Broaddus Dep. 22:22-23.

**Plaintiffs' Response:** Admitted

4.     Each client imposes contractual obligations on Credico that are unique to the needs and requirements of each client's sales and marketing campaign for a particular product or service. Ex. 3, Credico Dep. 48:21-49:1 (testifying that subcontractor agreements vary from subcontractor to subcontractor because of the differences in the "client's requirements and the client's stipulations").

**Plaintiffs' Response:** Admitted in part. ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

5.     Credico did not and does not perform face-to-face sales and marketing through individuals employed directly by Credico. Ex. 3, Credico Dep. 129:3-6 (testifying that Credico has never "directly contract[ed] with workers providing marketing services to its clients"), 129:7-10 (testifying that "Credico has always hired subcontractors in order to directly contract with the workers providing marketing services").

**Plaintiffs' Response:** Admitted

6.     Rather, Credico enters into subcontracts with ISOs to provide its clients' needed sales and marketing services.     Ex. 6, Credico/Cromex Subcontractor Agreement at CREDICO_VAS-00000281-290; Ex. 3, Credico Dep. 12:20-23, 144:12-20 ("Wallace Morgan is a subcontractor to Credico that is representing or doing face-to-face sales and marketing on the Assurance Wireless program. . . . Wallace Morgan has agents go out and solicit customers for the Lifeline program on behalf of Sprint.").

**Plaintiffs' Response:** Admitted

7.     Some ISOs subcontracted both with Credico and with other client brokers. Ex. 7, Mainhart Dep. 12:17-13:17 (testifying that his ISO 7 Marketing worked with "[o]ne

other broker" named "Cydcor" besides Credico), 17:6-21 (testifying that his ISO Apex Marketing and Promotions worked with "other broker[s]" named "Cydcor" and "DS-Max" besides Credico).

**Plaintiffs' Response:** Admitted in part. 7 Marketing contracted with Cydcor "for a month or two" and then worked exclusively with Credico.  Savytska Decl., Ex. 3, Mainhart Dep. 14:22-15:7.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

8.      Credico passes down its contractual obligations to its clients in its subcontracts with the ISOs performing services on that client's campaigns.   Ex. 6, Credico/Cromex Subcontractor Agreement, § 2 ("Subcontractor certifies to be fully familiar with all agreements between Credico USA and Client ('Contract Documents'), and the conditions under which the Services are to be performed.  The Contract Documents are incorporated into this Agreement by reference. . . . Where reference is made to Credico USA in the Contract Documents and the provision pertains to Subcontractor's Services, then such provision shall be interpreted to apply to Subcontractor instead of Credico USA."); Ex. 3, Credico Dep. 27:22-24 ("Credico doesn't have any direct policies.  The policies are from our clients."); Ex.

1, Smith Dep. 62:18-21 ("Assurance Wireless tells Credico what the requirements are for a subcontractor to work on their campaign, and Credico reinforces those rules and regulations.").

**Plaintiffs' Response:** Admitted

9.      During the course of an ISO's performance under a subcontract, Credico serves as an intermediary and liaison between the client and the subcontractor ISO.  Ex. 3, Credico Dep. 156:16-21 ("The account manager role at Credico is designed to facilitate communications between the client as well as the subcontractors, ensure that there is compliance with the operating procedures as well as the contractual requirements in order to fulfill sales."); Ex. 1, Smith Dep. 62:5-63:1 (describing Credico as "an intermediary, so if Assurance Wireless want [sic] to get information to all the subcontractors, they tell Credico and Credico tells [the ISO]").

**Plaintiffs' Response:** Admitted

10.      In its role as intermediary and liaison, Credico ensures that the ISO is meeting the client's expectations and adhering to the client's specific campaign requirements. Ex. 3, Credico Dep. 38:3-9 (Credico's national account managers work with the ISOs to ensure they are "performing the face-to-face sales marketing services appropriately to meet the client's expectations."); Ex. 8, Xu Dep. 67:19-68:1 (testifying that she was aware that there were certain policies "Assurance Wireless required Credico to ensure were being done by the subcontractor" and that she/Cromex had to follow those policies).

**Plaintiffs' Response:** Admitted

11.      Specifically, Credico's National Account Managers work as liaisons between the client and the ISOs working on that client's campaign.  Ex. 7, Mainhart Dep. 21:15-16 ("I act as a liaison between the client and the ISOs.").

**Plaintiffs' Response:** Admitted

12.     The primary responsibility of National Account Managers is to ensure that ISOs are compliant with the requirements and guidelines set forth by the client.  Ex. 7, Mainhart Dep. 128:2-3 (testifying that the essence of his job is compliance); Ex. 3, Credico Dep. 38:3-9 ("The national account managers will work with the subcontractor owner, the independent sales office owner, to make sure that they are in compliance with the client's requirements for the programs and that they are performing the face-to-face sales [and] marketing services appropriately to meet the client's expectations.").

**Plaintiffs' Response:** Admitted

13.     To achieve that purpose, Credico National Account Managers may perform audits of ISOs to ensure compliance with client requirements.  Stip Facts ¶ 63; Ex. 7, Mainhart Dep. 103:8-9 (testifying that when he conducts an audit, he is "looking for compliance to the SOPs that Assurance Wireless sent out"), 72:8-15 (testifying that when he conducts an audit, he goes into "Quickbase, which is [Assurance Wireless's] website" and "fill[s] out the form that pops up in regards to compliance issues").

**Plaintiffs' Response:** Admitted

14.     Credico also pays particularly successful (current or former) ISO owners (referred to as "Consultants" or "promoting owners") to consult with Credico and other ISOs on campaign best practices.   *See* Stip. Facts ¶ 83; Ex. 7, Mainhart Dep. 40:17-41:1 (testifying that "consultants are ISO owners" that have "been around longer" and have "trained and opened up other ISOs"); Ex.1, Smith Dep. 91:7-12 (explaining that "promoting owner" means an ISO owner who refers a new ISO to use Credico as its sales broker), 91:20-22 (testifying that "if someone that worked in my office opened up an office, I coach them, I work with them, I help them"), 173:8-13 (explaining that, as a "promoting owner,"

he consults with other ISO owners such that "you can think of a consultant as [a promoting owner]"), 27:19-23 (testifying that he works at his company, Wallace Morgan, and "[i]n that capacity, [he] act[s] as a consultant to other marketing companies similar to Wallace Morgan"); Ex. 5, Broaddus Dep. 80:22-81:5 (testifying that Tim Kennedy was "a consultant to Credico on behalf of ISOs . . . that he's promoted"); Ex. 3, Credico Dep. 101:17-21 (explaining that Credico has no role in determining which field agents might open their own ISOs).

**Plaintiffs' Response:** Admitted in part. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

15.     Consultants are not employees of Credico.   Stip. Facts ¶ 84; Ex. 9, Kravtchenko Dep. 235:18-19 ("[Consultants] are not employees of Credico.  They're usually ISO owners."); Ex. 5, Broaddus Dep. 32:21-24, 89:1-10 (testifying that consultants "very rarely" go to Credico's office).

**Plaintiffs' Response:** Admitted

16.     The ISO that a consultant owns receives a commission on the sales made by the other Credico subcontractors which the consultant refers to Credico.  Ex. 3, Credico Dep. 87:9-21 (testifying that Credico pays each consultant an "override" which is a "percentage of the revenue generated by the subcontractor" with which the consultant works); Ex. 1, Smith Dep. 92:8-21 (explaining that Smith's promoting owner for Wallace Morgan was "paid a percentage of [Wallace Morgan's] sales . . . as his consultancy fee"), 92:22-93:8 (explaining that an override is the pay "that goes to the promoting owners as a consultancy fee" and Smith "is paid an override for helping [another ISO]").

**Plaintiffs' Response:** Admitted in part.  Consultants are paid for the services they provide to Credico, regardless of whether or not they operate an ISO.  Savytska Decl., Ex. 2, Smith Dep. 142:4-8.

17.     Credico pays the consultant fees referenced in the previous paragraph to the consultant's ISO.  Ex. 1, Smith Dep. 193:22-194:13 (testifying that Wallace Morgan is paid the consultant fees and he, in turn, is paid a salary from Wallace Morgan), 254:11-17 (testifying that after Wallace Morgan ceased doing sales in 2016, all of the income Wallace Morgan subsequently earned was from consultant fees).

**Plaintiffs' Response:** Admitted

18.     Justin Cobb, Raf Diaz, and Tim Kennedy, are or were promoting owners that referred other ISOs to Credico and provided consulting services to those and other ISOs. Stip. Facts ¶¶ 87, 88; Ex. 3, Credico Dep. 83:9-13, 95:8-10.

**Plaintiffs' Response:** Admitted

19.     Thomas Smith ("Smith") is the Owner and President of Wallace Morgan, an ISO that has contracted with Credico.  Stip. Facts ¶¶ 42-43; Ex. 1, Smith Dep. 76:23-77:1.

**Plaintiffs' Response:** Admitted

20.      Smith is a promoting owner who also provides consulting services to other ISOs. Stip. Facts ¶¶ 86, 90-92; *see also* Ex. 1, Smith Dep. 48:17-20;

**Plaintiffs' Response:** Admitted

21.     Smith is not and has never been a Credico employee.  Ex. 10, Dkt. No. 100, Declaration of Rebecca Watkins ("Watkins Decl.") ¶ 7.

**Plaintiffs' Response:** Admitted

22.     As promoting owners and consultants, Cobb, Diaz, and Kennedy are not and were not Credico employees.  *See* Stip. Facts ¶ 83; Ex. 10, Watkins Decl. ¶¶ 2, 11 (testifying

that Diaz and Kennedy "[are] not and ha[ve] never been [] Credico employee[s]"); Ex. 11, Dkt. No. 103, Declaration of Rafael Diaz ("Diaz Decl.") ¶ 2 ("I have never actually been an owner, officer, or director or employee of Credico.").

**Plaintiffs' Response:** Admitted

23.    Credico's outsourced business model is common in the Lifeline phone and phone service industry.  Ex. 12, Sprint Decl. ¶¶ 12, 19, 22.

**Plaintiffs' Response:** Admitted in part.  According to Sprint's declaration some marketing agencies on the Assurance Wireless program directly hire their agents.  Sprint Decl., Dkt. 212.12 ¶ 21.

24.    Credico's outsourced business model is also common in the direct sales and marketing industry at large.  Ex. 12, Sprint Decl. ¶¶ 10, 14; Ex. 5, Broaddus Dep. 47:9-13 ("If you associate it with telemarketing, everybody understands that you outsource telemarketing. . . . Nobody thinks about outsourcing direct sales; however, it is very common."), 48:7-49:17 (testifying that Credico's "biggest competitors" "structur[e] their operations in a similar fashion as Credico" by "subcontract[ing] to independent sales offices").

**Plaintiffs' Response:** Admitted in part.  According to Sprint's declaration some marketing agencies directly hire their agents.  Sprint Decl., Dkt. 212.12 ¶ 21.

25.    Smart Circle, an outsourced sales company with a business model similar to Credico's, has also contracted with ISO owners to provide consulting services to its subcontractor offices. Ex. 1, Smith Dep. 186:15-187:8 (testifying that, like Credico, Smart Circle also "broker[s] clients and subcontracts offices").

**Plaintiffs' Response:** Admitted

## SPRINT AND THE LIFELINE ASSISTANCE PROGRAM

26.     Sprint provides Lifeline Program services through its Assurance Wireless brand. Stip. Facts ¶ 101; Ex. 12, Sprint Decl. ¶ 4.

**Plaintiffs' Response:** Admitted

27.     Sprint receives subsidies from the Universal Service Administrative Company in exchange for providing Lifeline Program service to low-income and other eligible consumers in compliance with the legal and regulatory framework imposed by state and federal law.  47 CFR § 54.407; Ex. 12, Sprint Decl. ¶ 4.

**Plaintiffs' Response:** Admitted

28.     Some of the Outreach Agencies ("OAs") with which Sprint contracts to sell and market Assurance Wireless mobility and data service and mobile phones perform the work themselves, while others—like Credico—subcontract with local sales companies to perform the actual direct sales services.  *See* Stip. Facts ¶¶ 102-03; Ex. 12, Sprint Decl. ¶¶ 21-22.

**Plaintiffs' Response:** Admitted

29.     As a provider of Lifeline phones and services, Sprint must satisfy various state and federal regulations and guidelines to prevent waste, fraud, and abuse.  *See* Stip. Facts ¶ 99; *see also* 47 C.F.R. § 54.407(d), (e); Ex. 12, Sprint Decl. ¶¶ 5, 16.

**Plaintiffs' Response:** Admitted

30.     The compliance-oriented requirements and procedures for the Assurance Wireless campaign set forth in Sprint's Assurance Wireless Outreach Agency Program Standard Operating Procedures ("SOPs"), which Sprint provides to OAs who, through agents, solicit and collect applications for the Assurance Wireless mobility and data service and mobile phones, include background checks, training, and audits for individuals who

communicate with and solicit Lifeline applications from potentially qualified applicants on its behalf.   Stip. Facts ¶¶ 105-06; Ex. 13, Sprint's Assurance Wireless Outreach Agency Program Standard Operating Procedures ("Sprint SOPs") at CREDICO_VAS-00000534 ("The OA shall complete all required training and acknowledge such completion of training and agreement to the standards of operation requirements by execution of such forms as provided by Assurance Wireless. . . . Agency must ensure all agents have been educated on the requirements and restrictions included in these SOPs and provided a written or electronic copy for later reference. . . . OA will make every effort to prevent any fraudulent or improper activity by its agents."); *id.* at CREDICO_VAS-00000539 ("Background checks must be completed by the OA for every agent working with Assurance Wireless related activity."); Ex. 8, Xu Dep. 67:19-68:21 (testifying that Xu was aware that there "were certain policies that Assurance Wireless required Credico to ensure were being done by the [ISO]" and that Xu "had to follow th[ose] policies of Assurance Wireless," including requiring that potential sales agents take an "o[]nline test, background check, and drug test"); Ex. 14, Cromex Government Compliance Agreement at CROMEX_VAS00015 (Cromex's form Government Compliance Agreement stating that "[b]ecause this is a federal program, there are specific Federal Communication Commission and Federal subsidy rules and regulations that we are required to follow," and stating that "[i]f any of your applications are returned fraudulent, you will be in violation of your Independent Sales Representative Agreement and it will be terminated immediately"); Ex. 1, Smith Dep. 206:16-20 ("[W]ith Assurance Wireless, there are really heavy compliance requirements.  It's a government- mandated program, and there's a lot of publicity around it as well, so we have to be really on top of things.").

**Plaintiffs' Response:** Admitted in part.  ███████████████████

█████████████████████████████████████████████

## CREDICO'S BUSINESS RELATIONSHIP WITH SPRINT

31.     Sprint contracts with Credico to engage third-party subcontractors to "solicit applications and collect applications" for enrollment in the Lifeline Program through Sprint's Assurance Wireless brand.   Ex. 15, Sprint/Credico Amended and Restated Outreach Agency Agreement ("Sprint/Credico OAA") at CREDICO_VAS-00000511-541; Ex. 3, Credico Dep. 144:6-8 ("Sprint is a client of Credico's who has contracted Credico to do face-to-face marketing services for the Lifeline program.").

**Plaintiffs' Response:** Admitted

32.     Under the terms of Credico's contract with Sprint, Credico cannot enter into subcontracts with third parties to conduct direct sales and marketing on the Assurance Wireless campaign without first obtaining Sprint's prior written consent.   Ex. 15, Sprint/Credico OAA at CREDICO_VAS-00000512-513, § 2(e).

**Plaintiffs' Response:** Admitted

33.     Sprint also contracts with other outreach agencies—Credico's competitors— to outsource Sprint's sales of the Assurance Wireless phones and services.   Ex. 12, Sprint Decl. ¶ 12 ("Sprint contracts with a limited number of OAs, currently five, including, for example, Credico . . . and 20/20 Communications Inc. . . . to market the Assurance Wireless brand.").

**Plaintiffs' Response:** Admitted

### *Credico's Contractual Obligations To Sprint*

34.     Pursuant to its contract with Sprint, Credico is obligated to ensure that ISOs with which it subcontracts for the Assurance Wireless campaign are in compliance with the

laws and guidelines related to the Lifeline Program. Ex. 12, Sprint Decl. ¶ 27 ("Outreach Agency Agreements impose minimum standards on the conduct of the OA and the field agents it (or its subcontractors) contract or employ are complying with state and federal laws relating to the Lifeline Program.").

**Plaintiffs' Response:** Admitted

35.     Pursuant to its contract with Sprint, Credico is obligated to ensure that ISOs with which it subcontracts for the  Assurance Wireless campaign meet certain quality control standards. Credico's obligations in this regard include the following:

> a. Subcontractor ISOs may only solicit and collect Assurance Wireless applications in a designated market, including certain states and only certain counties within New York state.   Ex. 15, Sprint/Credico OAA, § 1(a), Appendix A.

> b.  Credico and ISOs with which it subcontracts must comply with Sprint's SOPs, and all successor policies and procedures for the Assurance Wireless program that are provided in writing to Credico. Ex. 15, Sprint/Credico OAA, § 2(a).

> c. Subcontractor ISOs must obtain specified insurance coverage.   Ex. 15, Sprint/Credico OAA, § 2(e), Exhibit C.

> d. Owners of subcontracting ISOs must meet certain eligibility requirements. Ex.
>
> 13, Sprint SOPs at CREDICO_VAS-00000534.

> e.  No subcontracting ISOs or their field agents may make any sales of Assurance Wireless over the internet, including use of social media for any sales or marketing, hosting any websites containing or posting Sprint Content, or

soliciting or obtaining leads for the Assurance Wireless program via mail order or other mass distribution. Ex. 15, Sprint/Credico OAA, § 2(f).

f.  Each field agent of a subcontractor ISO must complete Assurance Wireless training prior to starting services on the Assurance Wireless campaign. Ex. 15, Sprint/Credico OAA, § 3(b).

g.  Credico, subcontractor ISOs, and ISO field agents must use only Sprint-created marketing materials and must not change Sprint's marketing materials or create their own marketing materials without Sprint's review and approval. Ex. 15, Sprint/Credico OAA, § 4(b); Ex. 13, Sprint SOPs at CREDICO_VAS-00000539.

h.  Credico, subcontractor ISOs, and ISO field agents must not offer service plans or terms of service to potential customers that differ from the terms of the Lifeline service offers that Sprint determines and provides.    Ex. 15, Sprint/Credico OAA, § 4(c).

i.  Credico must ensure the ISOs audit their field agents on a quarterly basis to monitor agent activities and agent sale conversion rates to ensure protection against fraudulent transactions. Ex. 15, Sprint/Credico OAA, §§ 5, 10(a).

j.  Credico must investigate suspected fraud. Ex. 15, Sprint/Credico OAA, § 5.

k.  Credico must promptly respond to and take all reasonable necessary actions to address fraud. If fraud is confirmed and Credico does not comply with this obligation, or if the fraud is of the nature to cause Sprint to reasonably conclude that such fraud is systemic within Credico, Sprint may sever the relationship completely. Ex. 15, Sprint/Credico OAA, § 5.

l.  Credico must submit an itemized weekly report to Sprint's National Account

14

Manager which states the number of Assurance Wireless applications submitted to Sprint's application processor during the prior work week, including the agent code of the agent who submitted each application. Ex. 15, Sprint/Credico OAA, § 8.

m. Credico must submit a corrective action plan to Sprint related to any privacy-related failure or other failure related to a breach of Sprint's SOPs. Ex. 15, Sprint/Credico OAA, § 10(c).

n. Credico must immediately deactivate user names and passwords assigned to any field agent who no longer performs activity on the Assurance Wireless campaign. Ex. 13, Sprint SOPs at CREDICO_VAS-00000534.

o. Credico must track subcontractor ISO sales results, and must share those results with the Assurance Wireless National Account Manager. Ex. 13, Sprint SOPs at CREDICO_VAS-00000534.

p. Subcontractor ISOs must conduct self-audits on a prescribed basis. Ex. 13, Sprint SOPs at CREDICO_VAS-00000536.

q. Field agents working on the Assurance Wireless campaign must use a sales pitch that meets Assurance Wireless standards and clearly indicates that only qualified applicants will receive Lifeline service. Ex. 13, Sprint SOPs at CREDICO_VAS-00000536.

r. Field agents working on the Assurance Wireless campaign must be dressed appropriately and wear an approved name badge. Ex. 13, Sprint SOPs at CREDICO_VAS-00000538.

s. Subcontractor ISOs must complete a background check for every agent engaged to service the Assurance Wireless campaign. Ex. 13, Sprint SOPs at

CREDICO_VAS-00000539.

t.   All agents engaged by a subcontractor ISO must be notified, and acknowledge by signature, that they are not Sprint or Assurance Wireless employees.  Ex. 13, Sprint SOPs at CREDICO_VAS-00000539.

u.   Credico must submit to Assurance Wireless certain paperwork related to new agents.  Ex. 13, Sprint SOPs at CREDICO_VAS-000005340.

**Plaintiffs' Response:** Admitted

36.      Credico's contractual obligations to Sprint stem, in significant part, from Sprint's need to comply with federal law and regulation as a Lifeline provider.  Stip. Facts ¶ 106; Ex. 15, Sprint/Credico OAA at 1, § 2.

**Plaintiffs' Response:** Admitted in part.  ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

37.      As a Lifeline provider, Sprint "must implement policies and procedures for ensuring that their Lifeline subscribers are eligible to receive Lifeline services."  47 C.F.R. § 54.410(a).

**Plaintiffs' Response:** Admitted

38.      Sprint "may not provide a consumer with an activated device that it represents enables use of Lifeline-supported service, nor may it activate service that it represents to be Lifeline service, unless and until it has: (1) [c]onfirmed that the consumer is a qualifying low-income consumer pursuant to [47 C.F.R.] § 54.409, and (2) [c]ompleted the eligibility determination and certification required by [the regulations], and completed any other necessary enrollment steps."  47 C.F.R. § 54.410(a).

**Plaintiffs' Response:** Admitted

39.     The Outreach Agreement provides that Credico is responsible for any acts or omissions of any subcontractor ISOs that may violate state or federal law.   Ex. 15, Sprint/Credico OAA, §§ 2(e)(i), 6(a).

**Plaintiffs' Response:** Admitted

40.      Sprint requires Credico to protect against fraudulent transactions in the solicitation and submission of applications for the Assurance Wireless Program and to "take all commercially reasonable actions to ensure that Applications are valid, and . . . [to] work closely with Sprint to ensure that systems are created and adhered to in order to deter Agency fraud (e.g., falsification of customer information on Applications and Applications completed by a field agent without any customer contact or without customer consent)." Ex. 15, Sprint/Credico OAA, §§ 5(a), (c); *see also supra* ¶¶ 35(i)-(k), (m)-(n); *see also infra* ¶¶ 42-44, 50-53.

**Plaintiffs' Response:** Admitted

41.     Credico is financially responsible for reimbursing Sprint for all expenses incurred related to fraud committed by a subcontractor ISO and/or a subcontractor ISO's field agents, including clawbacks of any commissions paid to Credico on fraudulent applications and full reimbursement to Sprint for any penalties or fines imposed on Sprint by the FCC or other regulatory agencies as a result of the fraud.  Ex. 15, Sprint/Credico OAA, §§ 5(f)-(g).

**Plaintiffs' Response:** Admitted

42.      This obligation to guard against fraud is passed down to Credico's subcontractors through Credico's subcontractor agreements.  *See, e.g.*, Ex. 6, Credico/Cromex Subcontractor Agreement at CREDICO_VAS-00000281, § 2.

Plaintiffs' Response: Admitted in Part. █████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

43.      Cromex informed its agents of their responsibilities to guard against fraud and had those sales agents sign a policy confirming their understanding that they could not engage in actions considered fraudulent on the Lifeline program.  *See, e.g.*, Ex. 16, Zero Tolerance Fraud Policy at CROMEX_VAS00064 ("All subcontractors . . . need to be aware that submission of a Lifeline service application containing false information is a crime and violation of the Federal Communications Commission regulations.").

**Plaintiffs' Response:** Admitted in part.  ████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

44.      Types of application fraud include "the submission of inaccurate information, forgery, lack of due diligence by the ISO and its staff, acceptance of suspect  information, simultaneous or consecutive processing of applicant information, [and] nondisclosure of relevant information."  Ex. 16, Zero Tolerance Fraud Policy.

**Plaintiffs' Response:** Admitted

45.      Sprint has "always had zero tolerance for fraud" among its OAs and/or their subcontractors.  Ex. 17, Email at CREDICO_VAS-00035515 (email from Sprint to Credico stating that Sprint has "always had zero tolerance for fraud and will be taking an even harder line on fraudulent and/or unacceptable marketing tactics or behavior").

**Plaintiffs' Response:** Admitted

46.      Credico and Sprint  maintained authority to deactivate an agent code on

the Assurance Wireless campaign—meaning, remove the agent from the Assurance Wireless campaign—if an agent engaged in fraud.  Ex. 3, Credico Dep. 28:14-22 (testifying that "[i]f a client says that they would like an agent to be taken off of a program, then Credico will comply with the client's request" and inform the subcontractor that "the agent will be offboarded and taken off the client's program"), 29:2-5 ("Fraud is one of the main criteria in every one of our clients' programs that is an element that would require or cause an agent to be taken off of a client's program."), 191:18-23 ("In very rare circumstances, if an agent has committed egregious fraud that could cause Credico significant harm financially or with their contract with Sprint or with the government, Credico would ask that an agent be taken off the program."); Ex. 15, Sprint/Credico OAA, § 2(e)(ii); Ex. 6, Credico/Cromex Subcontractor Agreement, § 2.

**Plaintiffs' Response:** Admitted

47.     An agent who is deactivated and removed from the Assurance Wireless campaign is not necessarily terminated by their ISO.  They are only prohibited from working with that ISO on the Assurance Wireless campaign.   Ex. 4, Young Dep. 131:9-132:2 (testifying, with respect to removal of an agent from a campaign or from the ISO altogether, that "if it's [Smith's] ISO, [Smith] does whatever he wants in his ISO" and "[t]hat's true for any ISO.").

**Plaintiffs' Response:** Admitted in part. For most of its existence, Cromex only worked for one campaign, Assurance Wireless.  Savytska Decl., Ex. 10, Xu Dep. 11:24-12:10. ███████████████████████████████████████████

███████████████████████████████████████████

██████████

## CREDICO SUBCONTRACTS WITH CROMEX

48.       Meixi Corona Xu ("Xu") is Cromex's sole owner.  Stip. Facts ¶ 34; Ex. 8, Xu

Dep.6:14-19 (testifying that Xu is the "sole owner" of Cromex).

**Plaintiffs' Response:** Admitted

49.       On July 16, 2014, Credico entered into a Subcontractor Agreement with

Cromex to perform sales services on the Assurance Wireless Campaign. Ex. 6,

Credico/Cromex Subcontractor Agreement at CREDICO_VAS-00000281-290.

**Plaintiffs' Response:** Admitted

50.       Credico passed its contractual obligations to Sprint down to Cromex through

the terms of its Subcontractor Agreement with Cromex.  *See supra* ¶ 8; Ex. 6,

Credico/Cromex Subcontractor Agreement, § 2 ("Subcontractor certifies to be fully

familiar with all agreements between Credico USA and Client ('Contract Documents'),

and the conditions under which the Services are to be performed.  The Contract Documents

are incorporated into this Agreement by reference.  Subcontractor is bound to Credico USA

in the same manner and to the same extent as Credico USA is bound to its own Client under

the Contract Documents with respect to the Services provided for in this Agreement.   Where

reference is made to Credico USA in the Contract Documents and the provision pertains to

Subcontractor's Services, then such provision shall be interpreted to apply to Subcontractor

instead of Credico USA.").

**Plaintiffs' Response:** Admitted

51.       Cromex's obligations under the Credico/Cromex Subcontractor

Agreement include:

> a.   Cromex must "adher[e] to any Client pre-conditions to performing
>
>       Services, such as drug testing and background checks with authorized

providers and compliance with Client branding."   Ex. 6, Credico/Cromex Subcontractor Agreement, Appendix A.

    b.   Cromex must "train[] its employees in accordance with Credico USA's Client requirements which may include, but is not limited to, attending class periodically." Ex. 6, Credico/Cromex Subcontractor Agreement, Appendix A.

    c.   Cromex must "[s]olicit[] business on behalf of Credico USA Clients regarding their products or services in . . . other specifically designated activities using the techniques and information as set out in Credico USA Clients' Training Guides."  Ex. 6, Credico/Cromex Subcontractor Agreement, Appendix A.

**Plaintiffs' Response:** Admitted

52.   Cromex must comply "with all applicable federal, state, county, and local laws, ordinances, regulations, and codes" in performing under the Agreement.   Ex. 6, Credico/Cromex Subcontractor Agreement, § 5.

**Plaintiffs' Response:** Admitted

53.   Cromex must "comply and have its own employees comply with the Credico USA Code of Business Ethics and Conduct . . . and any Credico USA Client Dress Code, Conduct Policy, and Operational Requirements."  Ex. 6, Credico/Cromex Subcontractor Agreement, § 4.

**Plaintiffs' Response:** Admitted

54.   Cromex's authorized territory for the Assurance Wireless campaign was New York City. Ex. 8, Xu Dep. 77:1.

**Plaintiffs' Response:** Admitted in part.  Cromex's territory was Brooklyn and Staten

Island.  Savytska Decl., Ex. 12, Vasto Dep. 131:17-23.

55.     Cromex was expressly permitted to work with other client brokers on other campaigns outside of those sourced by Credico, as long as they were not in direct competition with Credico's clients.   Ex. 18, Credico/Cromex Non-Competition & Confidentiality Agreement at CREDICO_VAS-00000275-280, § 3(a) (Cromex is free to engage with other entities so long as it does not "engage[] in the following programs: telecommunications, energy, government-funded phones, charities, merchant services, and credit cards.").

**Plaintiffs' Response:** Admitted in part.  The broad noncompete clause made it virtually impossible for Cromex to obtain work from other sources; in fact, Cromex only performed work for Credico's clients.  Savytska Decl., Ex. 10, Xu Dep. 11:24-12:10.

56.     Credico requires its ISOs to work with an accountant or accounting group but does not dictate what accountant or accounting group the subcontractor must use.  Ex. 19, Dkt. No. 104, Declaration of Sandra Smith ("S. Smith Decl.") ¶ 2.

**Plaintiffs' Response:** Admitted in part. ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ Many ISOs use Angela Hurley as their "hub."  Savytska Decl., Ex. 2, Smith Dep. 150:2-7, 150:23-151:1.

57.     Angela Hurley, who performs accounting services for Cromex, is not and has never been an employee of Credico.  Stip. Facts ¶ 35; Ex. 10, Watkins Decl. ¶ 14.

**Plaintiffs' Response:** Admitted in part. Hurley acts as a liaison between Cromex and Credico, helping ensure compliance with Credico procedures.  Savytska Decl., Ex. 2, Smith Dep. 149:23-150:22; Savytska Decl., Ex. 1, Credico Dep. 44:2-7.

## CROMEX ENGAGED SALES AGENTS, INCLUDING PLAINTIFFS, TO SELL AND MARKET ASSURANCE WIRELESS

58.　　Cromex engaged individuals ("Cromex agents") to perform direct sales and marketing services on its campaigns.  Ex. 20, Vasto Independent Sales Representative Agreement at CROMEX_VAS00034-36; Ex. 21, Yang Independent Sales Representative Agreement at CROMEX_VAS00049-51; Ex. 22, Zheng Independent Sales Representative Agreement at CROMEX_VAS00065-67; Ex. 23, Torres Independent Sales Representative Agreement at CROMEX_VAS00031-33.

**Plaintiffs' Response:** Admitted

59.　　Credico did not decide which campaigns an individual field agent would service at the ISO(s) with which they engaged; its role was limited to confirming that agents designated by an ISO met the client's onboarding requirements.  Ex. 3, Credico Dep. 17:8-20:8 (testifying that "as independent sales offices or subcontractors want to onboard agents . . . [Credico] decide[s] if the agent had met the [client-imposed] criteria to perform on that client's program" and that once Credico has determined that the ISO's submissions demonstrate the agent successfully completed the onboarding process, Credico issues the agent a code on the client's behalf, which allows the agent to provide services for that client); Ex. 5, Broaddus Dep. 27:24-28:3 ("An ISO agent has to submit the results of those tests to the on-boarding department [at Credico], and they review it to ensure that it meets the client requirement.  And then [Credico will] facilitate, with the client, the creation of an agent code.").

**Plaintiffs' Response:** Admitted in part.

### *Cromex Recruited, Interviewed, Hired, and Fired Its Sales Agents*

60.        Cromex recruited and interviewed agents, including Plaintiffs, selling phones and cellular service on the Assurance Wireless campaign. Stip. Facts ¶ 127; Ex. 24, Torres Dep. 109:13-110:2 (testifying that he was interviewed by someone who worked for Cromex); Ex. 3, Credico Dep. 201:23-202:1 (testifying that "ISO owners would be recruiting" prospective field agents).

**Plaintiffs' Response:** Admitted

61.        Prospective Cromex field agents, including Plaintiffs, corresponded only with Cromex to set up their interviews.   Ex. 25, Interview Email at YANG000041-45 (emails with Cromex setting up job interview); Ex. 26, Interview Email at VAS000326-331 (emails with Cromex setting up job interview).

**Plaintiffs' Response:** Admitted

62.        Credico had no involvement in recruiting prospective sales agents to work for Cromex or other ISOs.   Ex. 3, Credico Dep. 201:23-201:24 ("Credico's not recruiting anyone. . . . ISO owners would be recruiting.").

**Plaintiffs' Response:** Admitted in part. ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

63.        Cromex representatives conducted the interviews of prospective field agents, including Plaintiffs, at Cromex's office in New York. Ex. 24, Torres Dep. 109:7-12 (testifying that he interviewed at the Cromex office); Ex. 28, Vasto Dep. 109:19-110:2 (same); Ex. 27, Yang Dep. 218:5-8 (testifying that he did not interview with anyone from Credico).

**Plaintiffs' Response:** Admitted

64.      Credico did not interview Plaintiffs or other prospective Cromex sales agents. Stip. Facts ¶ 192; Ex. 24, Torres Dep. 270:4-6 (testifying that he did not interview with anyone from Credico); Ex. 27, Yang Dep. 184:25-185:3 (same); Ex. 28, Vasto Dep. 112:22-24 (same).

**Plaintiffs' Response:** Admitted

65.      Cromex representatives also conducted an interview in the field, during which the prospective field agent learned about the duties of the job from an experienced field agent.  Ex. 28, Vasto Dep. 110:23-111:2, 112:13-16 (testifying that he went into the field as part of his second- round interview so he could "understand what the business was like"); Ex. 27, Yang Dep. 188:6-21 (testifying that, as part of the interview process, he went into the field with another agent who "show[ed] [him] how to sign people up for the free phone").

**Plaintiffs' Response:** Admitted

66.      Xu and/or other Cromex representatives offered Plaintiffs their positions as Independent Sales Representatives.  Ex. 24, Torres Dep. 114:12-17 (testifying that he was offered the position by Tina Tien, who worked at Cromex, and "then her supervisor, which was Corona"); Ex. 27, Yang Dep. 191:10-19 (testifying that he remembers Keisha and Corona from Cromex offering him the job).

**Plaintiffs' Response:** Admitted in part.  Plaintiffs and other agents only began getting paid after it was identified that they met Credico's requirements.  Savytska Decl., Ex. 2, Smith Dep. 67:10-17.

67.      Credico did not hire Plaintiffs or other prospective Cromex sales agents.  Stip. Facts¶ 19; Ex. 27, Yang Dep. 191:15-19 (testifying that Cromex employees offered him the job); Ex. 24, Torres Dep. 114:15-16 (same); Ex. 28, Vasto Dep. 110:8-20 (testifying that a

Cromex administrator called him to tell him he "got the job"); Ex. 3, Credico Dep. 129:3-6 (testifying that Credico has never "directly contract[ed] with workers providing marketing services to its client"), 129:7-10 (testifying that Credico "has always hired subcontractors in order to directly contract with the workers providing marketing services").

**Plaintiffs' Response:** Admitted in part. Plaintiffs and other agents only began getting paid after it was identified that they met Credico's requirements.  Savytska Decl., Ex. 2, Smith Dep. 67:10-17.

68.    Credico did not decide which campaigns an individual field agent would service for the ISO(s) with which they engaged; rather Credico's role was limited to ensuring ISOs complied with the client's agent onboarding requirements.  Ex. 3, Credico Dep. 17:8-20:8 (testifying that "as independent sales offices or subcontractors want to onboard agents . . . [Credico] decide[s] if the agent had met the [client-imposed] criteria to perform on that client's program," and that once Credico has determined that the ISO's submissions demonstrate the agent successfully completed the onboarding process, Credico facilitates the client's issuance of an agent code, which allows the agent to provide services for that client).

**Plaintiffs' Response:** Admitted in part. ███████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

69.    Plaintiffs each signed an Independent Sales Representative Agreement with Cromex, which provided that the "parties expressly intend and agree that Representative is performing all services hereunder as an independent contractor.  Nothing contained herein shall create nor be deemed to create any association, partnership, joint venture or relationship of employer and employee between the parties hereto.  Further, Representative agrees that it will

not hold itself out as an employee, affiliate, partner, joint-venturer, co-principal, or co-employer with Corporation or any of its affiliates."   Stip. Facts ¶ 196; Ex. 20, Vasto Independent Sales Representative Agreement, § 7; Ex. 21, Yang Independent Sales Representative Agreement, § 7; Ex. 22, Zheng Independent Sales Representative Agreement, § 7; Ex. 23, Torres Independent Sales Representative Agreement, § 7.

**Plaintiffs' Response:** Admitted

70.      Each of the Plaintiffs' Independent Sales Representative Agreements with Cromex provided that "[e]ither party may terminate this Agreement at any time, giving the other party written notice, and no damages or other compensation shall be payable to either party on account of such termination."   Ex. 20, Vasto Independent Sales Representative Agreement, § 9(b); Ex. 21, Yang Independent Sales Representative Agreement, § 9(b); Ex. 22, Zheng Independent Sales Representative Agreement, § 9(b); Ex. 23, Torres Independent Sales Representative Agreement, § 9(b).

**Plaintiffs' Response:** Admitted

71.      Plaintiffs were permitted to work and hold other jobs, in addition to their work at Cromex.  Ex. 20, Vasto Independent Sales Representative Agreement, § 1 ("It is understood and agreed that Representative is under no exclusive arrangement with Corporation and may provide similar or other services to companies also engaged in direct sales and marketing provided that such activity does not interfere with the completion of an ongoing project for Corporation."); Ex. 21, Yang Independent Sales Representative Agreement, § 1 (same); Ex. 22, Zheng Independent Sales Representative Agreement, § 1 (same); Ex. 23,  Torres  Independent  Sales  Representative Agreement, § 1 (same).

**Plaintiffs' Response:** Admitted in part.  Plaintiffs' schedules while working for Cromex did not permit them to work for any other companies, and Plaintiffs worked

exclusively for Cromex during their tenure there.  Vasto Decl., Dkt. 62.2, ¶ 33; Torres Decl.,

Dkt 62.8, ¶ 34; Zheng Decl., Dkt. 62.9, ¶ 28; Yang Decl., Dkt. 62.10, ¶ 30.

72.     Multiple sales agents at ISOs other than Cromex testified that they worked, or

knew of other agents who worked, at other jobs while working as sales agents.  Ex. 29,

Cherenfant Dep. 146:23-148:5 (testifying that one sales agent came in "on Fridays and like

every other day pretty much, only three days a week, because he . . . still held a job as a

personal trainer at one of the gyms in Miami"); Ex. 30, Margolis Dep. 106:23-107:4, 109:11-

13, 112:6-11, 112:14-25; Ex. 31, Ruf Dep. 146:23-147:4.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it

is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment.

Notwithstanding this objection, Plaintiffs respond as follows: Denied.  The field agent who

worked at a gym switched to full time at the end of his 2-week notice period at his previous

job. Dkt. 212.29, Cherenfant Dep. 146:17-147:5.

73.     Credico did not provide new Cromex agents with new hire paperwork, only

Cromex provided such forms.  Ex. 28, Vasto Dep. 174:20-23 (testifying that all of his initial

"paperwork had been processed by CroMex"), 184:14-19 (testifying that he entered into an

independent sales representative agreement with Cromex); Ex. 32, Vasto Personnel File at

CROMEX_VAS00016-29; Ex. 33, Yang Personnel File at CROMEX_VAS00052-63; Ex.

34, Zheng Personnel File at CROMEX_VAS00037-48;  Ex. 35, Torres Personnel File at

CROMEX_VAS00001-11.

**Plaintiffs' Response:** Admitted in part.  ███████████████████

███████████████████████████████████████

█████████████████████████

74.     Cromex produced a folder of documents titled "First Day Paperwork,"

which included the following documents: Sprint's Outreach Agency Program Standard Operating Procedures dated 10-23-2013; a "Cromex Agent Expectation Pack"; a background check authorization and consent form; a direct deposit authorization form; a form government compliance agreement to be signed by Cromex Inc. and the independent sales representative; a Cromex "ISA File" checklist; a form "Addendum to Independent Distributor Agreement" which provides that the representative "may be provided with technology to be used in the field, including . . . tablet devices"; a zero tolerance fraud policy acknowledgment form; an independent contractor "set up" sheet for new hires; a handout regarding the compliance obligations for "sales reps on the AW Campaign"; a "vetting form"; and a "Welcome to Cromex" letter that describes office policies.

**Plaintiffs' Response:** Admitted

75.     Credico does not maintain personnel files for Cromex sales agents, and only "store[s] electronically that information that was needed to support that agent onboarding," like the "drug tests, background check, things like that, and proof of eligibility of work," all of which was completed by Cromex or the agents, and then provided to Credico by Cromex.  Ex. 3, Credico Dep. 153:16-155:2; *see also supra* ¶ 73; Stip. Facts ¶¶ 49-50.

**Plaintiffs' Response:** Admitted in part. ███████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

76.     Sprint required Credico to maintain the onboarding documents listed in the previous paragraph.  Ex. 13, Sprint SOPs at CREDICO_VAS-00000540.

**Plaintiffs' Response:** Admitted.

77.     Credico does not maintain or have access to IRS Form 1099s, payroll, or any other information demonstrating the payments made by Cromex or other ISOs to individual

field agents. Ex. 19, S. Smith Decl. ¶ 4 ("Credico does not print or issue payroll checks for any of its subcontractors' field agents."); Ex. 9, Kravtchenko Dep. 74:6-12 ("Credico does not know the amount that ISOs pay to agents.  They run payroll completely separately. . . . ISOs have full prerogative to pay whatever they like."); Ex. 1, Smith Dep. 87:3-6 (testifying that no one at Credico was aware of how Wallace Morgan decided to pay its sales agents).

**Plaintiffs' Response:** Admitted in part. ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

78.     Xu terminated Plaintiff Yang's relationship with Cromex.  Credico had no role in Plaintiff Yang's termination and no one from Credico was present when Yang was terminated. Ex. 27, Yang Dep. 221:2-9 (testifying that Xu terminated him and no one from Credico did); Ex. 36, Affidavit of Zao Yang at YANG000039 ¶ 10 (stating that "Corona fired [him]").

**Plaintiffs' Response:** Admitted

79.     Cromex terminated Plaintiff Vasto's relationship with Cromex.  Credico had no role in Plaintiff Vasto's termination and no one from Credico was present when Vasto was terminated.  Ex. 28, Vasto Dep. 191:8-25 (testifying that he was terminated by Xu and Xu's friend/promoting owner, Smith).

**Plaintiffs' Response:** Admitted in part.  Credico consultant Tommy Smith told Vasto he was terminated.  Savytska Decl., Ex. 19, Recording of Thomas Smith, VAS001062.

80.     Cromex terminated Plaintiff Zheng's relationship with Cromex.  Credico had no role in Plaintiff Zheng's termination and no one from Credico was present when Zheng was terminated.  Ex. 37, Dkt. No. 38-4, Declaration of Xiaoj Zheng ("Zheng Decl.") ¶

30 ("I was terminated by Cromex in August 2015."); Ex. 38, Zheng Dep. 113:7-24 (testifying that he was terminated by his supervisor, Fabio).

**Plaintiffs' Response:** Admitted in part.  Plaintiffs do not have enough information at this stage to determine whether or not Credico played a role in Plaintiff Zheng's termination.

81.     Plaintiffs Yang and Vasto did not discuss their terminations with anyone from Credico.  Stip. Facts ¶ 206; Ex. 28, Vasto Dep. 204:6-12 (testifying that he did not contact anyone at Credico following his termination from Cromex).

**Plaintiffs' Response:** Admitted in part.  Credico consultant Tommy Smith told Vasto he was terminated.  Savytska Decl., Ex. 19, Recording of Thomas Smith, VAS001062.

82.     ISO owners have full prerogative to terminate a field agent from working for their ISO without Credico's approval.  Ex. 4, Young Dep. 131:9-132:2 (testifying that an ISO owner can "do[] whatever he wants in his ISO" and that all ISO owners knew that "they could remove someone from their business" without involving Credico).

**Plaintiffs' Response:** Admitted

### *Cromex Offered Training and Training Opportunities to Its Sales Agents*

83.     Cromex provided Plaintiffs in-field sales training when they started their work as field agents on the Assurance Wireless campaign.  Ex. 39, Dkt. No. 38-3, Declaration of Alex Torres ("Torres Decl.") ¶¶ 5-6 (describing in-field training required by Cromex); Ex. 27, Yang Dep. 203:8-204:2 (testifying he participated in three to four weeks of in-field training and observation); Ex. 38, Zheng Dep. 65:9-13 (testifying about his three day "observation[]" training); Ex. 28, Vasto Dep. 81:3-19 (testifying about a "day of observation" where he was taken "out to the field" for his "first day of training").

**Plaintiffs' Response:** Admitted in part.  Plaintiffs received training on face-to-face marketing strategies, in the street and in the office.  Savytska Decl., Ex. 20, Torres Dep.

199:14-17, 202:6-8; Savytska Decl., Ex. 12, Vasto Dep. 116:2-117:14.

84.     New Cromex agents ("Account Executives") were trained by other, more experienced Cromex field agents ("Corporate Trainers"). Ex. 8, Xu Dep. 45:25-46:5 (testifying that sales agents went into the field "paired with someone [who] had experience" as part of their training); Ex. 28, Vasto Dep. 81:3-8 (testifying that his "leader" took him into the field for his "first day of training"); Ex. 38, Zheng Dep. 68:10-21 (testifying that a Cromex leader taught him "how to approach the people, how to sign up people"); Ex. 24, Torres Dep. 113:2-8 (testifying that he was "paired up with a current leader" so that they could "show [him] how they would go about marketing the campaign and how the face to face interactions would work"); Ex. 27, Yang Dep. 327:15-20 (testifying that he reported his sales for each to a "core leader").

**Plaintiffs' Response:** Admitted

85.     When Plaintiffs were promoted to Corporate Trainers it was Cromex (not Credico) that made the decision to promote them and informed them of that decision. *See, e.g.*, Ex. 24, Torres Dep. 239:3-14 (testifying that Corona and his leader informed him that he had been promoted to corporate trainer); Ex. 27, Yang Dep. 327:24-328:9 (testifying that it was "definitely Corona," accompanied by "[his] leader at the time," who informed him that he had been promoted).

**Plaintiffs' Response:** Admitted

86.     Cromex offered sales training to agents at daily meetings, called "atmosphere meetings." Ex. 28, Vasto Dep. 115:19-23 (testifying that "[t]raining was every single morning" at daily meetings); *see also* Stip. Facts ¶¶ 167-169 (Cromex "provided training on different techniques to solicit and collect applications for Assurance Wireless phones and services"); Ex. 28, Vasto Dep. 153:14-22 (testifying that in meetings agents discussed what

techniques worked for them, i.e., "maybe today a sense of urgency worked for me, or today, KISS, keeping it short and simple, worked well for me," and discussed what they could try instead, i.e., "if you did not close as many [applications], they would say, well, maybe you can work on your fear of loss or your impulse factors").

**Plaintiffs' Response:** Admitted in part.  Agents were trained on various strategies for how to approach and sign up customers.  Savytska Decl., Ex. 12, Vasto Dep. 116:2-22.

87.     ISO sales trainings and/or atmosphere meetings were not led by Credico, nor did Credico require that they be held at all, let alone at a specific time.  Ex. 5, Broaddus Dep. 61:19-62:3 (confirming that "Credico does not require any of the ISOs" to conduct atmosphere meetings and testifying that "[i]t's their business"); Ex. 3, Credico Dep. 72:16-73:1 (testifying that he "d[id] not know" when atmosphere meetings take place at ISO offices); Ex. 9, Kravtchenko Dep. 249:10-17 (testifying that atmosphere meetings are "just a practice of the ISOs" and that she "do[es]n't think that Credico makes any recommendation regarding those meetings"); Ex. 40, Dkt. No. 101, Declaration of Jean Broaddus ("Broaddus Decl.") ¶ 2 ("Credico does not require any of its subcontractors to have morning 'atmosphere room' meetings or evening 'bell and gong' meetings with their field agents."); Ex. 11, Diaz Decl. ¶ 16.

**Plaintiffs' Response:** Admitted in part.  The atmosphere meetings were part of the management training program, devised by Credico's consultants.  Savytska Decl., Ex. 1, Credico Dep. 71:10-15.

88.     Cromex, not Credico, distributed an Account Executive Manual to its field agents, which contained information regarding tactics to improve sales performance.  Stip. Facts ¶¶ 131, 146; Ex. 41, Cromex Account Executive Manual at YANG000014-24 (providing information regarding concepts like the "Law of Averages" or "fear of loss" to

help agents improve their sales numbers); Ex. 8, Xu Dep. 65:22-66:16 (testifying that the Cromex Account Executive Manual was a document Xu provided Cromex agents and was "not a Credico document").

**Plaintiffs' Response:** Admitted in part. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

89.     Cromex field agents were not required to follow the schedule outlined in the Cromex Account Executive Manual.  Ex. 8, Xu Dep. 69:17-70:13 (testifying that the Cromex Account Executive Manual was "not for everybody" and merely included a suggested schedule that might help agents "achiev[e] better success in the business"); *see also* Ex. 29, Cherenfant Dep. 146:23-148:5 (opt-in plaintiff testifying that she was aware of at least one field agent at another ISO who worked only on Fridays and "every other day" because he still held a job as a personal trainer); Ex. 30, Margolis Dep. 106:23-107:4 (opt-in plaintiff at another ISO testifying that he worked as a field agent around his college class schedule).

**Plaintiffs' Response:** Denied.   Cromex's Account Executive Manual included a "Lateness" policy, which stated: "It may go without saying but tardiness will not be accepted and repeat offending will progress from a warning, followed by being sent home for the day to finally being asked to leave the business altogether.  Dkt. 212.41, Cromex Account Executive Manual, at YANG000017. The Manual also included an "Absence" policy, which stated: "No show and no call means no job unless a dire emergency arises.  If you are ill then attend for morning training and announcements, after which the day can be taken for recuperation."  If illness makes your attendance impossible then a doctor's note should be brought."  Dkt. 212.41, Cromex Account Executive Manual, at YANG000017. Plaintiff Vasto was

reprimanded and for being late/missing work.  Savytska Decl., Ex. 20, Recording of Meixi Xu, VAS001029.

90.     Smith drafted the Cromex Account Executive Manual, not Credico.  Ex. 8, Xu Dep.66:5-19 (testifying that Xu "believe[d] Tommy Smith wrote it" and that Xu received it when she was a sales agent at Wallace Morgan).

**Plaintiffs' Response:** Admitted in part.  The Management Training Program underlying the Manual was put together by Credico's consultants.  Savytska Decl., Ex. 1, Credico Dep. 71:10-15.

91.     Cromex, not Credico, distributed a Cromex Leadership Guide to agents upon being promoted to corporate trainer.   Ex. 24, Torres Dep. 197:3-24; Ex. 42, Cromex Leadership Guide at TOR000018-31; *see also* Ex. 1, Smith Dep. 214:24-216:11 (Smith testifying that he drafted the Wallace Morgan Leadership Guide from his "experience in the industry" to include "what [he] thought were the kind of base theories that someone would have to learn" and that he believed Xu would have followed that Guide closely because Xu "came from [Smith's] training and [his] education").

**Plaintiffs' Response:** Admitted in part.   The Management Training Program underlying the Manual was put together by Credico's consultants.  Savytska Decl., Ex. 1, Credico Dep. 71:10-15.  ███████████████████████████████████████████

████████████████████████████████████████████████

92.     Plaintiffs never received any training materials or manuals from Credico. Ex. 24, Torres Dep. 269:14-19 (testifying that he did not receive any training materials from Credico, only from Cromex); *see also supra* ¶¶ 88, 90-91.

**Plaintiffs' Response:** Admitted in part.   The Management Training Program underlying Plaintiffs' training was put together by Credico's consultants.  Savytska Decl., Ex.

1, Credico Dep. 71:10-15.

93.        Plaintiffs did not receive any training from Credico about being an account executive or corporate trainer for Cromex.  Ex. 27, Yang Dep. 204:7-24 (confirming that all of the people training him before he received his code "were other field agents" and leaders at Cromex, and "[n]o one from Credico was leading these training sessions"); Ex. 3, Credico Dep. 74:11-16 ("The agents are trained by the independent sales offices or subcontractor owner, or they may get trained by the client.  So the client may have people out in the field, but there aren't any roles within Credico itself that are responsible for the training of the agents.").

**Plaintiffs' Response:** Admitted in part. The Management Training Program underlying Plaintiffs' training was put together by Credico's consultants.  Savytska Decl., Ex. 1, Credico Dep. 71:10-15.

### *Cromex Sales Agents' Day-to-Day Work Activity & Locations*

94.        Plaintiffs began their work day at Cromex's office.  Ex. 24, Torres Dep. 207:19-21 (testifying that he began his day at Cromex's office); Ex. 38, Zheng Dep. 78:18-20 (same); Ex. 28, Vasto Dep. 123:15-17 (same); Ex. 27, Yang Dep. 206:24-207:2 (same).

**Plaintiffs' Response:** Admitted

95.        Plaintiffs never reported to or worked at Credico's office.  *See* Stip. Facts ¶¶ 210, 215; Ex. 28, Vasto Dep. 172:23-25 (testifying that he has never been to Credico headquarters in Chicago).

**Plaintiffs' Response:** Admitted

96.        No one from Credico supervised or observed Plaintiffs' work in the field. Ex. 28, Vasto Dep. 157:17-158:5 (testifying that no one from Credico ever observed him in the field or supervised him in the office); Ex. 24, Torres Dep. 240:22-246:20 (testifying that

Cromex representatives supervised him and that no one whom he believed to be from Credico actually supervised or observed him out in the field); Ex. 27, Yang Dep. 280:24-292:11, 296:24-300:17,

303:5-23 (testifying that no one whom he believed to be from Credico observed him in the field or directly supervised him).

     **Plaintiffs' Response:** Admitted in part. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████

     97.      Plaintiffs identified only Cromex representatives (and, occasionally, Smith or other promoting owners) as having "supervised, directed, assigned, or otherwise controlled" their work on the Assurance Wireless campaign.  Ex. 43, Torres Interrog. Resp. No. 3; Ex. 44, Vasto Interrog. Resp. No. 3; Ex. 45, Yang Interrog. Resp. No. 3; Ex. 46, Zheng Interrog. Resp. No. 3.

    1.  **Plaintiffs' Response:** Admitted in part. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  In addition, Credico's National account managers interact with one or

more ISOs on a daily basis.  Savytska Decl., Ex. 24, Broaddus Dep. 53:5-15.  Credico

National Account Manager Stefan Mainhart interacts directly with agents to go over

compliance issues.  Savytska Decl., Ex. 3, Mainhart Dep. 98:1-22.

98.      Plaintiffs did not identify any Credico employees as having "supervised,

directed, assigned, or otherwise controlled" their work on the Assurance Wireless

campaign.  *See* Ex. 43, Torres Interrog. Resp. No. 3; Ex. 44, Vasto Interrog. Resp. No. 3; Ex.

45, Yang Interrog. Resp. No. 3; Ex. 46, Zheng Interrog. Resp. No. 3.

**Plaintiffs' Response:** Admitted in part.



In addition, Credico's National account

managers interact with one or more ISOs on a daily basis.  Savytska Decl., Ex. 24, Broaddus

Dep. 53:5-15.  Credico National Account Manager Stefan Mainhart interacts directly with

agents to go over compliance issues.  Savytska Decl., Ex. 3, Mainhart Dep. 98:1-22.

99.      Cromex Corporate Trainer field agents had the opportunity to select his/her

team's daily sales location within Cromex's designated territory, and the Corporate Trainers

informed other Cromex sales agents of those daily sales locations.  Ex. 8, Xu Dep. 75:1-4,

76:3-6 (testifying that Cromex sales agents pick their own territory); Ex. 24, Torres Dep.

217:5-218:4 (testifying that account executives "were always sent out with a leader . . . who

would get to pick from certain locations as to where they felt they want to go" and that he selected his location when he was a corporate trainer based on his "overall experience, personal experience, or areas suggested by other leaders"); *see also, e.g.*, Ex. 48, Taylor Dep. 58:3-20 (opt-in plaintiff Monte Taylor testifying that when he worked at a different ISO in Arizona, he chose to work in Tucson "because it's where our numbers were the best," but that he could have chosen to work in Phoenix instead if he preferred), 73:13-23 ("As a team, you would basically decide how it's going at a specific location.  If it's not going well, then we decided where we would go or we would search around for a better spot.").

**Plaintiffs' Response:** Admitted in part.   Cromex was assigned a specific territory by Credico, encompassing Brooklyn and Staten Island.   Savytska Decl., Ex.12, Vasto Dep. 131:17-21.  Within that territory, Cromex field agents were sent to a specific location for the day.  Savytska Decl., Ex. 12, Vasto Dep. 132:9-17.  Ms. Xu assigned territories to corporate trainers and outreach agents.  Savytska Decl., Ex. 12, Vasto Dep. 134:19-135:13.

100.     Credico did not determine daily sales locations for Cromex field agents. Ex. 24, Torres Dep. 248:12-15 (confirming that "no one from Credico assigned [him] to a particular location. . . in the field").

**Plaintiffs' Response:** Admitted in part.   Cromex was assigned a specific territory by Credico, encompassing Brooklyn and Staten Island.   Savytska Decl., Ex. 12, Vasto Dep. 131:17-21.  Cromex field agents were sent to a specific location for the day within that territory.  Savytska Decl., Ex. 12, Vasto Dep. 132:9-17.

101.     Cromex agents traveled to a different location in the field each day.  Ex. 28, Vasto Dep. 136:7-9 (confirming that an agent's location varied "from day to day"); Ex. 24, Torres Dep. 216:13-25 (testifying that "there were quite a few locations . . . that we would be going to" and that agents would go to more than one location in a given day).

39

**Plaintiffs' Response:** Admitted

102.     Cromex field agents, especially Corporate Trainers, had the ability to move around within their daily sales area to solicit potential Assurance Wireless customers, as well as move to entirely new locations. Ex. 24, Torres Dep. 216:13-25 (testifying that agents would go to more than one location in a given day); Ex. 27, Yang Dep. 320:22-24 (testifying that he would go to more than one location in the field on a given day).

**Plaintiffs' Response:** Admitted in part.  Field agents were required to remain at their assigned location for the whole day with the person they had been paired with.  Savytska Decl., Ex. 12, Vasto Dep. 132:9-22.

103.     Vasto independently used his own "contacts within" "certain community organizations" to set up appointments where he would make sales calls in the field.  Ex. 28, Vasto Dep. 204:24-206:14.

**Plaintiffs' Response:** Admitted in part. Plaintiff Vasto was reprimanded, and ultimately terminated, for setting up his own events and not "following the system."  Savytska Decl., Ex. 19, Recording of Thomas Smith, VAS001062.

104.     Cromex sales agents worked to establish their own sales force by recruiting, interviewing, and training other independent sales representatives.  Ex. 24, Torres Dep. 306:15-307:8; Ex. 47, Cromex Management and Training Outline at VAS000024 (describing role of corporate trainer as including "Teach/train new trainees," "Micro management skills," "Team building," "Crew Management," and "Interviews").   Once promoted to corporate trainer, agents were expected to "go about building [their] own team."  Ex. 24, Torres Dep. 197:10-198:10 (testifying that the leadership manual he was given by Cromex upon being promoted to corporate trainer was "kind of like a guiding force as to how you should go about building your team.  That's pretty much it.").

**Plaintiffs' Response:** Admitted in part. Cromex agents worked to build a team of agents as part of the Management Training Program, with the end goal of opening a new office. Dkt. 212.47, Cromex Management and Training Outline, VAS000024.

105.     At the end of each day on which they worked, Plaintiffs typically reported their sales numbers to Cromex. Ex. 24, Torres Dep. 235:10-19 (testifying that he reported his numbers for the day to his Cromex "leader and Corona"); Stip. Facts ¶ 170.

**Plaintiffs' Response:** Admitted

### *Cromex Sales Agents' Work Schedule and Hours*

106.     Cromex did not require agents to come to work every day. Ex. 8, Xu Dep. 48:23-49:5 (testifying that field agents could show up one day for work and then not show up for three days).

**Plaintiffs' Response:** Denied. The Cromex Account Executive Manual has an "Absence" policy, which states: "No show and no call means no job unless a dire emergency arises. If you are ill then attend for morning training and announcements, after which the day can be taken for recuperation. If illness makes your attendance impossible then a doctor's note should be brought." Dkt. 212.47, Cromex Management and Training Outline, VAS000024. Defendant Xu reprimanded Plaintiff Vasto for being late to work. Savytska Decl., Ex. 20, Recording of Meixi Xu, VAS001029.

107.     Zheng repeatedly would go to work one day and then not return for multiple days. Ex. 8, Xu Dep. 50:18-51:3.

**Plaintiffs' Response:** Admitted in part. Zheng missed work because he was on sick leave. Savytsak Decl., Ex. 26, Zheng Dep. 111:16-19.

108.     Plaintiffs testified that they were informed of their daily work schedules by their Cromex supervisors, not by Credico. Ex. 24, Torres Dep. 208:5-209:21 (confirming that

"Corona and Tina" from Cromex informed him of what time to arrive to the office in the morning, and no one from Credico told him "what time [he] had to arrive" or "what time [he] had to stay until in the evenings"); Ex. 38, Zheng Dep. 79:12-14 (testifying that his "CroMex manager" informed him when to arrive to work in the morning); Ex. 28, Vasto Dep. 124:4-7 (testifying that it was Corona who informed him of when to arrive to work in the morning).

**Plaintiffs' Response:** Admitted

109.     Credico had no involvement with scheduling meetings that its subcontractor offices held with their agents.  Ex. 3, Credico Dep. 72:16-73:1 (testifying that he "d[id] not know" when atmosphere meetings take place at subcontractor offices); Ex. 9, Kravtchenko Dep. 249:10-17 (testifying that atmosphere meetings are "just a practice of the ISOs" and that she "do[es]n't think that Credico makes any recommendation regarding those meetings").

**Plaintiffs' Response:** Admitted

110.     Credico did not set agents' hours or schedules or require agents to be at any particular location for any duration of time.  Ex. 3, Credico Dep. 74:17-75:3 (affirming that Credico was not involved at all in the hours worked by the agents); Ex. 40, Broaddus Decl. ¶ 3 ("Credico does not require any of its subcontractors or their field agents to work any minimum or maximum number of hours or days per week."); Ex. 28, Vasto Dep. 158:2-5 (confirming that no one "from Credico" ever dictated to Vasto "how many hours a day [he was] required to work"); Ex. 11, Diaz Decl. ¶ 17 ("Credico does not require any of its subcontractors to work any minimum or maximum number of hours or days per week.").

**Plaintiffs' Response:** Admitted in part.  The ISO owners act as agents of Credico, acting in accordance with Credico and client requirements. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

111.      Opt-in plaintiff Leonard Margolis worked at Allure Marketing where he sold internet, phone, and television services for Time Warner Business Class, for which he was compensated at a "set fee . . . 80 percent of the total monthly cost for a two-year contract, and 90 percent for a three-year [contract] and above."  Ex. 30, Margolis Dep. 12:6-12, 15:17-24, 17:4-17.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Margolis signed up customers for Time Warner Cable and was paid a percentage of the values of the services signed up for.  Savytska Decl., Ex. 27, Margolis Ans. Ints. pp. 4-5.

112.      After opt-in plaintiff Leonard Margolis began college, he shifted from working full- time as a field agent to part-time.  Ex. 30, Margolis Dep. 106:23-107:4 (testifying that after starting college he cut back on his field agent work to work "full day Monday" and "after class on Wednesday[s] and Friday[s]").

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  At the end of the school semester, Margolis went back to working full time.  Savytska Decl., Ex. 28, Margolis Dep. 109:4-7

113.      Margolis was also aware of at least one other field agent working as an agent around her class schedule.  Ex. 30, Margolis Dep. 112:6-11.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  The field

agent worked part-time for a brief period after her school semester started, then left.  Dkt. 212.30, Margolis Dep. 112:6-11.

114.     Opt-in plaintiff Melissa Ruf worked at Diamond Consulting where she sold Direct Energy services in "residential areas in Philadelphia," and was compensated at a commission rate of $35 per sale.  Ex. 31, Ruf Dep. 16:14-17:7, 46:18-25 (testifying that she "physically went out to residential areas in Philadelphia" and "spoke to residents in their homes about their electric bill . . . and their possible options for selecting a supplier"), 86:14-17.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Ruf signed up customers for Direct Energy services, and was paid $35 for each qualified customer that she signed up.  Ex. 29, Ruf Ans. Ints. pp. 4-5.

115.     Opt-in plaintiff Melissa Ruf testified that there was at least one field agent working as an agent at her ISO around his class schedule.  Savytska Decl., Ex. 31, Ruf Dep. 146:23-147:4.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Ruf testified that she could not choose the days she could come into work.  Dkt. 212.31, Ruf Dep. 146:4-9.

116.     Opt-in plaintiff Ruf personally paid for her transportation on business trips. Ex. 31, Ruf Dep. 126:18-24.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment.

Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

117.     Opt-in plaintiff Monte Taylor worked at Dynamic Enterprises and Desert Valley Marketing in Arizona where he sold Assurance Wireless phone service and was compensated at a commission rate of $12 per clean sale (and, later, $10 per clean sale).  Ex. 48, Taylor Dep. 15:4-10, 16:10-13, 41:13-21, 94:20-95:16.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Taylor was paid $12, then $10 for each qualified person he signed up for Assurance Wireless services. Savytska Decl., Ex. 30, Taylor Supp. Ans Ints. p. 3.

118.      Opt-in plaintiff Monte Taylor personally paid for his transportation and lodging on business trips.  Ex. 48, Taylor Dep. 101:24-106:4.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

119.     Opt-in plaintiff Shari Cherenfant worked at CG International in Nashville, Tennessee, where she sold Comcast Xfinity services.  Ex. 29, Cherenfant Dep. 19:23-20:21, 78:4-16.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Cherenfant worked at CG International promoting Xfinity products and services.  Savytska Decl., Ex. 31, Cherenfant Ans. Ints. p. 5.

120.      Opt-in plaintiff Cherenfant also worked at MarketStorm Global and

OmniFortuna in Miami, Florida, where she sold Comcast Xfinity services.   Ex. 29, Cherenfant Dep. 21:24-22:8, 23:23-25, 24:4-6, 25:18-22, 78:4-16.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Cherenfant worked at MarketStorn Global and OmniFortuna promoting Xfinity products and services. Savytska Decl., Ex. 31, Cherenfant Ans. Ints. pp. 5-6.

121.      Opt-in plaintiff Cherenfant was also aware of another field agent who worked around his school schedule.  Ex. 29, Cherenfant Dep. 146:23-147:14.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Cherenfant testified that she worked 6 days, 70-90 hours a week.  Savytska Decl., Ex. 32, Cherenfant Dep. 165:13-21.

122.      Opt-in plaintiff Cherenfant was aware of at least one field agent who only came in on Fridays and "like every other day"—"only three days a week, because . . . at the time, [he] still held a job as a personal trainer at one of the gyms in Miami."  Ex. 29, Cherenfant Dep. 146:23-147:5.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  The field agent in question switched to full time at the end of his 2-week notice period at his previous job.  Dkt. 212.29, Cherenfant Dep.146:17-147:5.

123.      Opt-in plaintiff Aron Eilertsen worked at Gotham Outsourcing in New York,

where he sold Verizon residential services and was compensated a commission "per each sale that was installed." Ex. 49, Eilertsen Dep. 28:6-8, 41:3-16, 49:10-17, 162:5-6.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Eilertsen signed up customers for Verizon FiOS products and was paid only for customers who ultimately had services installed.  Savytska Decl., Ex. 33, Eilertsen Ans. Ints. p. 4.

124.     Opt-in plaintiff Aron Eilertsen deducted his bus fares and other miscellaneous business expenses on his taxes.  Ex. 49, Eilertsen Dep. 161:20-162:19.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

125.     Opt-in plaintiff Christopher Melore worked at Universal Marketing & Promotions in New York, New York, where he went "business-to-business" and sold Quill products (home and office supplies) to businesses and was paid "30 percent of the total sales" price per order (and fifteen percent of the total sales price for reorders).  Ex. 50, Melore Dep. 13:12-20, 14:13-15, 15:5-6, 85:18-86:2, 113:15-22, 142:21-143:17, 157:2-19.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Melore went door-to-door promoting Staples and Quill products and was paid based on the number of qualified customers he signed up.  Savytska Decl., Ex. 34, Melore Ans. Ints. p. 4.

126.     Opt-in plaintiff Christopher Melore deducted his "business expenses" from work as a field agent on his taxes.  Ex. 50, Melore Dep. 118:20-119:15, 182:5-15.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

127.   Opt-in plaintiff Corey Krimmer worked as a sales agent at JAB Global based in Mineola, New York.  Ex. 51, Krimmer Dep. 11:22-23.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Krimmer worked as a corporate account manager at JAB Global.  Savytska Decl., Ex. 35, Krimmer Ans. Ints., p. 4.

128.   Krimmer worked on the residential Verizon campaign, in which he sold residential Verizon service (phone, internet, cable).  Ex. 51, Krimmer Dep. 62:3-5.  Krimmer usually collected sales on his own, personal tablet:  JAB field agents had the option to use their own tablets or use tablets provided by Verizon.  *Id.*, Krimmer Dep. 100:17-102:2.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Krimmer signed customers up for Verizon FiOS services, and was paid only for customers he signed up who were in fact qualified for Verizon FiOS services.  Savytska Decl., Ex. 35, Krimmer Ans. Ints., pp. 4-5.

129.   JAB Global paid Krimmer as a W-2 employee. Ex. 52, Krimmer W2 at KRIM000167.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment.

Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

130.     Krimmer was paid by JAB Global either a $250 weekly base or commission on his sales, whichever was greater.  Ex. 51, Krimmer Dep. 63:11-64:16.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

131.     Krimmer never tried to speak to anyone at Credico about his wages because he "didn't feel that it would accomplish anything" because "the way that it was structured [his pay], was really up to [JAB's owner] Julian." Ex. 51, Krimmer Dep. 20:9-20.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

132.     Krimmer's current retail position is different from his work as a sales agent because he does not "have to approach customers in order to make a sale, they come up to me, where at JAB, for the most part nobody was going to come up to me . . . I had to approach a customer." Ex. 51, Krimmer Dep. 47:9-16, 48:6-9 (confirming "JAB was more like [he was] selling" rather than "[j]ust helping people"), 119:19-120:13 (testifying that "selling Verizon FiOS . . . was the best way to describe [his work] to the general population [and] how [he] did describe it to the general population."

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Krimmer signed customers up for Verizon FiOS services, and was paid only for customers he signed up who were in fact qualified for Verizon FiOS services.  Savytska Decl., Ex. 35, Krimmer

Ans. Ints., pp. 4-5.

133.    Krimmer regularly referred to his work on the Verizon FiOS campaign as "sales" or "selling."   Ex. 51, Krimmer Dep. 115:6-21 (confirming that he "considered [him]self to have been working on the retail sales campaign at Verizon"), 119:22-120:7 ("Selling . . . was the best way to describe [his work] to the general population."), 159:7-14 ("I was facilitating the installation of the service for Verizon FiOS."); Ex. 53, Krimmer Tweet, Exhibit 9 to Krimmer Dep. (Krimmer tweet describing himself as "[s]elling Verizon FiOS").

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Krimmer signed customers up for Verizon FiOS services, and was paid only for customers he signed up who were in fact qualified for Verizon FiOS services.  Savytska Decl., Ex. 35, Krimmer Ans. Ints., pp. 4-5.

### _Cromex Sales Agents, Including Plaintiffs, Considered Themselves To Work for Cromex, Not Credico_

134.    Plaintiff Zheng described his position as an "Independent Contractor" in his resume detailing his work at Cromex.  Stip. Facts ¶ 216; Ex. 38, Zheng Dep. 103:6-10; Ex. 54, Xiaoj Zheng Resume at ZHE000001-2.

**Plaintiffs' Response:** Admitted

135.     When Plaintiff Torres was working at Vaeley Marketing, he did not tell anyone that he worked for Credico.  Ex. 24, Torres Dep. 163:15-20 (confirming that he told people that he worked at "Vaeley Marketing" and "[n]ot Credico").

**Plaintiffs' Response:** Admitted in part.  Plainitff Torres updated his resume to list his

work under Credico.  Savytska Decl., Ex. 20, Torres Dep. 161:11-14.

136.     Plaintiffs did not communicate with Credico employees at all regarding their work. Ex. 28, Vasto Dep. 203:24-204:12; Stip. Facts ¶¶ 212, 217 (Torres and Zheng "never spoke with any Credico employees about [their] work on the Assurance Wireless campaign while working at Cromex.").

**Plaintiffs' Response:** Admitted in part. ███████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████

## PLAINTIFFS SOLD ASSURANCE WIRELESS IN THE FIELD

### *Plaintiffs' Activity in the Field*

137.     To "convince" potential customers to enroll in Assurance Wireless service, agents "pitched" the Lifeline Program and used various sales strategies.  Stip. Facts ¶¶ 169, 191; Ex. 24, Torres Dep. 226:25-227:19 (testifying that he changed his pitch "as [he] gained more experience"); Ex. 27, Yang Dep. 196:23-25 (confirming that "it was [his] job to convince [customers] to sign up for a phone"); Ex. 55, Torres Notes at TOR000049 (Torres's contemporaneous, handwritten notes identifying goals of increasing sales, effectiveness, and efficiency, and identifying the "how" as "us[ing] 'smart' method" and "us[ing] 'Eisenhower' methods"); *see also* Ex. 27, Yang Dep. 226:17-228:24 (confirming his "primary duty [was] to be out in the field signing people up for the phones and the phone service" and that that primary duty is what he spent "the majority of [his] day doing when [he] [was] an account executive").

**Plaintiffs' Response:** Admitted.

138.     The sales pitch used by agents in the field included a description of Assurance Wireless's service offering, as well as comparisons of Assurance Wireless's services to those offered by competing Lifeline service providers.   Ex. 13, Sprint SOPs

at CREDICO_VAS-00000536-537; *see infra* ¶ 141.

       **Plaintiffs' Response:** Admitted in part. ████████████████████

████████████████████████████████████████████████

███████████████████████

      139.     Plaintiffs helped interested customers complete and submit the necessary paperwork to apply for Assurance Wireless service. Stip. Facts ¶ 186.

       **Plaintiffs' Response:** Admitted.

      140.     Individuals enrolled in Assurance Wireless service have the option to pay for additional services ("add-ons"), above the preset data plan offered under the Lifeline Program, including additional minutes, text messages, data packs, 411 service, international calling, and other services. Ex. 56, Assurance Wireless New Offer Flyer at CROMEX_VAS00013-14 (flyer describing Assurance Wireless's "Best Offer Yet!" and noting that there are also other "low-cost plans available with more minutes and data"); Ex. 57, Assurance Wireless Non-California Training Slide at CROMEX_VAS00012 (describing what is offered by the Assurance Wireless program and describing the availability of "two additional plans" as well as the option to "add money to your account to purchase additional minutes, international calling, games, and ringtones").

       **Plaintiffs' Response:** Admitted in part. Regardless of these add-ons, Plaintiffs were paid $10 for each qualified customer they signed up, and were paid only for qualified customers. Vasto Decl., Dkt. 62.8, ¶ 29; Torres Decl., Dkt 62.8, ¶¶ 20-21; Zheng Decl., Dkt. 62.9, ¶ 19; Yang Decl., Dkt. 62.10, ¶ 23.

      141.     Cromex field agents also attempted to convince individuals who already received Lifeline services from another Lifeline provider to switch to Assurance Wireless service. Ex. 28, Vasto Dep. 144:7-14 (testifying that if someone had another Lifeline service,

he and other Cromex field agents "would then sign them up for Assurance and switch them over"); Ex. 58, Assurance Wireless Talking Points at CREDICO_VAS-00006992-6993 (talking points that explain, "How does the Assurance Wireless plan compare to Safelink's plan?" and "How does the Assurance Wireless plan compare to other Lifeline plans?").

**Plaintiffs' Response:** Admitted

142.    Although Cromex set a required minimum weekly number of sales, the Plaintiffs set their own daily and weekly sales goals.  Stip. Facts ¶ 186; Ex. 24, Torres Dep. 296:11-20 (explaining that the daily/weekly goal sheets reflected "how we would pretty much keep track of our goals for the week, how many people we wanted to talk to and how many people we wanted to actually sign up"); Ex. 59, Torres Daily/Weekly Goals Worksheet at TOR000043-44 (identifying "70+ apps" as a goal one week and "60+ apps" as a goal another week); Ex. 27, Yang Dep. 262:14-263:13; Ex. 60, Dkt. No. 38-5, Declaration of Zao Yang ("Yang Decl.") ¶ 21 ("My co-workers and I were required to sign up a minimum number of qualified customers per week for Assurance Wireless cell phones and wireless services.").

**Plaintiffs' Response:** Admitted in part.  The weekly goals were set by Cromex and/or Credico.  Torres Decl., Dkt, 62.8 ¶ 30; Zheng Decl., Dkt. 62.8 ¶ 18; Yang Decl., Dkt, 62.10 ¶ 21.

143.    Plaintiff Vasto worked as a sales associate before working as an agent at Cromex. Ex. 28, Vasto Dep. 257:8-12 (testifying that he worked as a "sales associate" at Best Buy), 280:25-281:3 (testifying that his experience working at Best Buy was "sales experience").

**Plaintiffs' Response:** Admitted

144.     Cromex took prior sales experience into consideration when recruiting and hiring new field agents.  Ex. 26, Email at VAS000326 (email from Cromex setting up interview and noting that Cromex was interested in "explor[ing] [Vasto's] previous experience").

**Plaintiffs' Response:** Admitted in part.   No specific skills or experience were required for agents to work for Cromex. Savytska Decl., Ex. 10, Xu Dep., 47:7-10, 47:22-24.

145.     Plaintiff Torres worked as a sales associate at Godiva Chocolatier before working at Cromex.  Ex. 24, Torres Dep. 145:13-23.

**Plaintiffs' Response:** Denied. Torres worked as a key holder at Godiva prior to working at Cromex.  Savytska Decl., Ex. 20, Torres Dep. 10:16-11:2.

146.     Plaintiff Torres testified that his prior experience working in retail was helpful in his work at Cromex because he had experience getting customers "[t]o purchase what it is that you are selling."  Ex. 24, Torres Dep. 227:20-228:13.

**Plaintiffs' Response:** Admitted

147.     Sprint required that Cromex agents use electronic tablets in the field that contained an Assurance Wireless web-portal application containing the Lifeline qualification application that applicants used to verify their eligibility for Assurance Wireless service. Ex. 13, Sprint SOPs at CREDICO_VAS-00000537.

**Plaintiffs' Response:** Admitted

148.     Credico loaned tablets to Cromex on a strict consignment basis.   Ex. 6, Credico/Cromex Subcontractor Agreement, Appendix D; *see also*  Stip. Facts ¶ 156.

Plaintiffs' Response: Admitted in Part. ██████████████████████████

████████████████████████████████████████████████

149.    Cromex was financially responsible for any damage or loss of tablets loaned by Credico.  Ex. 6, Credico/Cromex Subcontractor Agreement, Appendix D.

**Plaintiffs' Response:** Admitted

150.     Cromex agents received and returned their tablets to Cromex, not Credico. Stip. Facts ¶¶ 154, 155.

**Plaintiffs' Response:** Admitted

151.    Cromex had its agents sign an agreement that the agent would be financially responsible to Cromex for loss or damage to the tablets that Cromex provided to them.  *See, e.g.*, Ex. 61, Addendum to Independent Distributor Agreement at CROMEX_VAS00030.

**Plaintiffs' Response:** Admitted

### *Enrollment Application Approval Process*

152.    Under Federal Regulations, a Lifeline applicant was approved based on objective criteria, specifically (1) "a consumer's household income . . . must be at or below 135% of the Federal Poverty Guidelines for a household of that size" or "[t]he consumer, one or more of the consumer's dependents, or the consumer's household must receive benefits from one of the following federal assistance programs: Medicaid; Supplemental Nutrition Assistance Program; Supplemental Security Income; Federal Public Housing Assistance; or Veterans and Survivors Pension Benefit;" and (2) the "consumer must not already be receiving a Lifeline service, and there must not be anyone else in the subscriber's household subscribed to a Lifeline service."  47 C.F.R. § 54.409.

**Plaintiffs' Response:** Admitted

153.     Sprint is contractually obligated "to ship the phones on Approved Applications and approve Applications which meet all eligibility criteria."  Ex. 13, Sprint SOPs at CREDICO_VAS-00000515; Stip. Facts ¶ 159.

**Plaintiffs' Response:** Admitted

154.        After Solix, a third-party vendor of Sprint that receives the applications for Assurance Wireless, confirmed that the customer qualified for Lifeline service, Solix sent a postcard to the address listed on the application to confirm that the addressee had, in fact, ordered the phone. Provided there was no response within the subsequent ten-day period, Sprint shipped the phone directly to the approved applicant. Stip. Facts ¶¶ 158-59; Ex. 5, Broaddus Dep. 180:21-181:8.

**Plaintiffs' Response:** Admitted

155.        In the fall of 2015, Sprint adopted a "live phone" program, whereby the Cromex agent and potential customer were informed of whether the enrollment application met Lifeline eligibility requirements in real time.    Customers whose enrollment applications were approved during the "live phone" program were given an Assurance Wireless phone right then "at the point of sale."   Ex. 9, Kravtchenko Dep. 41:17-42:9 (testifying that "when a sale is done in the field, the customer actually receives the phone at point of sale" from the field agent who activates or assists the customer in activating the phone "in the field").

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment, since none of the plaintiffs worked during this time period.   Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

156.        Credico received data from Solix and/or Sprint showing whether enrollment applications had been approved or denied.  Ex. 9, Kravtchenko Dep. 214:17-215:11, 293:9-20.

**Plaintiffs' Response:** Admitted

157.      Sprint prepares and provides Commission Reports to Credico on a weekly and monthly basis. Sprint's Commission Reports reflect all enrollment applications that were collected during the previous week and/or month. Ex. 3, Credico Dep. 225:19-226:4 ("Sprint sends us a report each month that shows the amount of sales that would have occurred for a given month, and then if we agree with that, then they will send it to Sprint finance for payment."); *see, e.g.*, Ex. 62, Commission Report Email at CREDICO_VAS-00000788 (February commission report from Sprint that provides "the commission due" and breaks down the rate per approval along with denial codes for applications they are "not paying for").

**Plaintiffs' Response:** Admitted in part. ███████████████████████████

███████████████████████████████████████

158.      Credico also maintains commission information in its web-based ARC owner portal so that ISOs are able to retrieve the information at their convenience. Ex. 5, Broaddus Dep. 203:20-204:4; Ex. 9, Kravtchenko Dep. 51:17-52:11 (explaining that the "ISOs have access to a very limited [w]eb site version, owner portal [ARC]").

**Plaintiffs' Response:** Admitted in part. ISOs are required to update the ARC portal on a daily and weekly basis with information regarding sign-ups made by each agent. ███████

████████████████████████████████████

### *Cromex Paid Its Sales Agents On Commission Per Sale*

159.      Xu paid her sales agents by commission per sale (of Assurance Wireless phones and service) because that is how she had been paid when she worked at Wallace Morgan as a sales agent. Ex. 8, Xu Dep. 29:4-7 (testifying that she had been paid through "sales commission" when she worked at Wallace Morgan), 46:17-18 (testifying that the Cromex sales agents "only get compensated on pure commission"), 63:2-9 (testifying that she paid "[her] agents the same way" that she was paid when she worked as "an outside

salesperson").

**Plaintiffs' Response:** Admitted

160.      Because Plaintiffs were paid on commission, they were motivated to increase the number of people they enrolled for Assurance Wireless phones and services. Ex. 24, Torres Dep. 296:25-298:4 (explaining that, as a sales agent, "the more time you spend talking to one client, the more you are going to let other clients walk away.  So the less time you spend talking to a client, then it will increase the amount of people that you can sign up").

**Plaintiffs' Response:** Admitted

161.      ISO owners determine their agents' compensation structure.  Ex. 1, Smith Dep. 37:17-38:8 (testifying that he paid some Wallace Morgan sales agents a guaranteed minimum "base salary"), 41:12-15 (testifying that he paid some Wallace Morgan agents "over and above" the rate included in the commission schedule), 87:3-6 (testifying that Credico was not aware of how much he paid agents), 87:10-11 ("I can pay the subcontractors whatever way I want and whatever amount I wish."), 99:5-11 (testifying that he "decide[s] what to pay to the representatives" regardless of what's stated in the payment summaries and commission schedules); Ex. 11, Diaz Decl. ¶ 5 ("Credico does not instruct its subcontractors that they must pay their field agents on a commission basis, hourly basis or otherwise.  This always has been within my complete discretion as the principal of my company."), ¶ 6 ("Credico's subcontractors pay their agents in a variety of ways, including but not limited to minimum wage, minimum wage plus commission, salary, commission only, flat fee, and tiered commission.").

**Plaintiffs' Response:** Admitted in part.  Credico provides commission schedules listing out pay for subcontractor office and individual agent.  AW Comm Sched., Dkt 84, pp.

35-39.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

162.     Credico did not require that an ISO pay its agents in any particular way or amount and did not even receive information regarding what any ISO actually paid its agents.   Ex. 9, Kravtchenko Dep. 53:12-21 (testifying that the rates included on Credico's commission schedules are "industry suggested amounts.   They're not what Credico, in any way, is telling them that they should be paid"), 56:18-19, 74:6-12 ("Credico does not know the amount that ISOs pay to agents. They run payroll completely separately. . . . ISOs have full prerogative to pay whatever they like."); Ex. 1, Smith Dep. 86:21-87:3 (testifying that he paid field agents in addition to what they earned according to the commission schedule), 99:16-100:22 (describing the commission statements as a "pre-produced pay report" and stating that even though the statement states $10 for each qualified customer, "[i]t doesn't mean I have to pay them that"); Ex. 3, Credico Dep. 221:18-222:24 (testifying that ISOs could "decide how they wanted to pay the rep versus keep the money for themselves" and that "[t]he ISO owner can pay their representative what they would like"); Ex. 4, Young Dep. 105:5-9 (testifying that he "[has] no control over what the ISOs pay"), 147:12-21 (testifying that the "ISOs come up with their own payment plans" and Credico only "suggest[s] a guideline"); Ex. 63, Dkt. No. 102, Declaration of John Medina ("Medina Decl.") ¶ 3 (ISO owner stating "[i]t has always has been within my complete discretion as the principal of my company to determine how and when to pay the field agents working for my company"); Ex. 11, Diaz Decl. ¶ 5 ("Credico does not instruct its subcontractors that they must pay their field agents on a commission basis, hourly basis or

otherwise.   This always has been within my complete discretion as the principal of my company.").

**Plaintiffs' Response:** Admitted in part.   Credico provides commission schedules listing out pay for subcontractor office and individual agent.  AW Comm Sched., Dkt 84, pp. 35-39. ██████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

163.     Credico does not print or issue payroll checks to field agents.  Ex. 19, S. Smith Decl. ¶ 4.

**Plaintiffs' Response:** Admitted

164.     Credico does not receive or maintain payroll information from the ISOs with which it subcontracts.  Ex. 19, S. Smith Decl. ¶ 3.

**Plaintiffs' Response:** Admitted in part.  ████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

165.     Credico did not receive or maintain compensation information or tax forms for Cromex agents.  Ex. 9, Kravtchenko Dep. 74:6-12 ("Credico does not know the amount that ISOs pay to agents.  They run payroll completely separately."); Ex. 1, Smith Dep. 87:3-6 (testifying that no one at Credico was aware of how Wallace Morgan decided to pay its sales agents).

**Plaintiffs' Response:** Admitted in part.  ████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

166.     Prior to the filing of this and related lawsuits, ISO owners, including Xu, decided "whether to treat [their] company's field agents as either W-2 employees or 1099 independent contractors without any direction or control by Credico or any other third party." Ex. 63, Medina Decl. ¶ 2; Ex. 3, Credico Dep. 75:6-76:24 (testifying that prior to December 2015, Credico would not have had any ability to find out how its subcontractors classified their agents); Ex. 11, Diaz Decl. ¶ 4 ("[P]rior to 2016 Credico never instructed its subcontractors as to how to classify its field agents.  Specifically, subcontractors had the discretion whether to treat their field agents as either W-2 employees or 1099 independent contractors.   I always have made this decision without any direction or control by Credico."); Ex. 4, Young Dep. 52:19-23 (prior to instituting a new business policy in late 2015, Credico's "belief had always been [] that because [Credico] was not running the ISOs, that – and because the ISOs run so different from operation to operation, that it was their place, not Credico's place, to dictate how those agents were termed"); Ex. 1, Smith Dep. 118:11-18 (Smith originally decided to classify Wallace Morgan agents as independent contractors because the agents "spent so much time away from the office that it was not in [his] interest to look into paying them hourly.").

**Plaintiffs' Response:** Admitted.

167.     Prior to the filing of this and related lawsuits, Credico had little to no knowledge of how any particular ISO classified its field agents. *See* Dkt. No. 117, Letter to Judge Engelmayer at 2 (requesting guidance from the Court regarding the collective list because "Credico has little if any firsthand knowledge as to which of the subcontracted ISOs classify their field agents as independent contractors and which classify their field agents as employees"); Ex. 1, Smith Dep. 43:24-47:15 (testifying that Credico did not compel him to classify his workers in a particular way and that "[Credico] do[es]n't know who's classified

as what.  They have no way of telling"); *see supra* at ¶ 167.

       **Plaintiffs' Response:** Admitted in part. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████

       168.     Prior to the fall of 2015, some ISOs contracting with Credico classified their agents as independent contractors, while others classified their agents as employees.  Ex. 7, Mainhart Dep. 229:5-15 (testifying that he referred to the agents at his own ISO as employees because "they were W-2"), 11:4-12:19 (testifying that he was the owner of an ISO called 7 Marketing from 2010 until 2014); Ex. 1, Smith Dep. 36:3-7 (testifying that when Wallace Morgan first opened in 2014, its agents "were independent contractors"); Ex. 52, Krimmer W2 at KRIM000167.

       **Plaintiffs' Response:** Admitted

       169.     In or around the fall of 2015 Credico—looking "to find a way to protect [it]self" from further lawsuits—"made a business decision" that it would no longer subcontract to companies that classified their field agents as independent contractors rather than employees.  Ex. 4, Young Dep. 52:4-54:13; Ex. 3, Credico Dep. 51:8-52:2.  Several ISOs decided to continue classifying their agents as independent contractors and "chose to no longer work with Credico."  Ex. 4, Young Dep. 52:4-54:13.

       **Plaintiffs' Response:** Admitted

       170.     Driven Enterprises, Inc., a company that subcontracts with Credico in Arizona, pays its field agents on an hourly basis, at a rate that is at least minimum wage for all hours worked, and overtime for hours worked beyond 40 in a workweek, plus commission upon the individual field agent's achievement of a minimum commissionable sales level.  Ex. 63, Medina Decl. ¶¶ 1, 4.

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

171.    Credico subcontractors pay their agents in a variety of ways, including, but not limited to, minimum wage, minimum wage plus commission, salary, commission only, flat fee, and tiered commission. Ex. 11, Diaz Decl. ¶ 6.

Plaintiffs' Response: Admitted in part.  Although some subcontractors, such as Assurance International, purport to guarantee a minimum "base pay", their agents are not in fact paid minimum wage. Shelton Decl., Dkt 38.6 ¶ 17; Whitney Decl., Dkt. 38.7 ¶ 15; Rowlett Decl., Dkt. 38.8 ¶ 13.

172.    Plaintiffs did not receive health insurance, retirement benefits, or any other employment benefits from Cromex.   Ex. 38, Zheng Dep. 108:5-11; Ex. 27, Yang Dep. 307:14-19; Ex. 28, Vasto Dep. 190:11-17; Ex. 24, Torres Dep. 275:3-8.

**Plaintiffs' Response:** Admitted

173.    Cromex did not withhold any taxes or make any deductions from field agents' compensation. Ex. 28, Vasto Dep. 190:18-21.

**Plaintiffs' Response:** Admitted

### *All Parties—Including Plaintiffs—Considered Agents' Work In the Field to be "Sales"*

174.    Xu described her company's work as "sales."  Ex. 8, Xu Dep. 6:11 ("I run a sales company.").

**Plaintiffs' Response:** Admitted in part.  Xu described the work of Cromex agents as signing up customers.  Savytsak Decl., Ex. 10, Xu Dep. 56:17.

175.    Credico considers "the most important duty of a field agent" to be "provid[ing] a quality sale to a customer." Ex. 3, Credico Dep. 193:4-6.

**Plaintiffs' Response:** Admitted in part.   Credico, through subcontractor offices, provides marketing services for its clients.  Dkt. 212.3, Credico Dep. 12:15-23.

176.     Sprint's SOPs refer to Plaintiffs' work as "sales."   Ex. 13, Sprint SOPs at CREDICO_VAS-00000536 (stating that each "agent must adhere to the *sales* guidelines set forth" within and that Sprint maintains the right to audit the "*sales* [t]actics" an ISO employs to protect the "customer's *sales* experience") (emphasis added).

**Plaintiffs' Response:** Admitted in part.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████

177.     On April 7, 2016, a panel of Commissioners from the FCC released an order relating to the apparent liability of Total Call Mobile, Inc.'s ("TCM") collection of tens of thousands of duplicate and ineligible consumer enrollments in the Lifeline program. Throughout the course of the FCC's Order, the FCC referred to the individuals who solicited and collected Lifeline applications on TCM's behalf as "sales agents."  Ex. 71, FCC Order, *In re: Total Call Mobile, Inc*. at 2, 5-6 ("TCM represented to the Commission that it would train all sales agents and managers on compliance issues related to the solicitation and enrollment of Lifeline consumers."); *see also id.* at 9-11,  13-16,  19-21,  25-27,  40  ("In  November, 2014,  the  Universal  Service  Administration Committee was able to identify 32,498 intra-company duplicate subscribers enrolled by over 800 Total Call Mobile sales agents.").

**Plaintiffs' Response:** Admitted.

178.     Plaintiff Vasto referred to his work in the field as "sales."  Ex. 64, Dkt. No. 38-2, Declaration of Philip Vasto ("Vasto Decl.") ¶ 13 (stating he made "sales pitches"), ¶ 15 (stating atmosphere meetings helped get agents "pumped up for the day's sales"), ¶ 22 ("[M]y co-workers and I had to go back to the Cromex office . . . and go over the day's sales

during a ritual called 'bell and gong.'  During bell and gong, the workers who had signed up the most customers that day would walk up and ring a bell or hit a gong the number of times that correspond with the number of sales they made that day."); *see also id.* ¶¶ 19, 26, 34, 43; Ex. 28, Vasto Dep. 150:15-17 (testifying that he spent "all day soliciting").

**Plaintiffs' Response:** Admitted in part.   Vasto explained as follows: "We were providing face-to-face marketing services."  Savytska Decl., Ex. 12, Vasto Dep. 180:15-16. Vasto was signing up customers, who may or may not be ultimately approved for Assurance Wireless services.  Savytska Decl., Ex. 12, Vasto Dep. 180:23-181:7.

179.     Plaintiff Yang confirmed that he was "engaged in face to face sales and marketing work for CroMex."  Ex. 27, Yang Dep. 214:9-17; *see also* Ex. 60, Yang Decl. ¶¶ 3, 19.

**Plaintiffs' Response:** Admitted

180.     Plaintiff Torres's August 2016 resume described his field agent responsibilities as "setting and hitting sales goals."  Ex. 65, Torres resume at TOR000003.

**Plaintiffs' Response:** Admitted

181.     Torres also referred to his work at Cromex as "sales" in his sworn declarations in this action.  Ex. 39, Torres Decl. ¶ 3 ("In late January 2015, I began working for a company called Cromex in New York City, where I promoted Assurance Wireless cell phones and wireless service plans using face-to-face sales and marketing tactics."), ¶ 9 (stating he "ma[de] sales pitches"), ¶ 16 (stating that at the end of his shift he went "over the day's sales"); *see also id.* ¶¶ 11, 14, 23, 28, 35; Ex. 24, Torres Dep. 169:7-13 (confirming that he agrees "with the statement that [he] promoted . . . Assurance Wireless cell phones and wireless service plans using face to face sales and marketing tactics").

**Plaintiffs' Response:** Admitted in part. Torres has also referred to his work in the

filed as marketing Assurance Wireless products.  Savytska Decl., Ex. 20, Torrs Dep. 93:21-25.

182.     Plaintiff Zheng referred to his work in the field as "sales." Ex. 37, Zheng Decl. ¶ 7 (stating he "ma[de] sales pitches"), ¶ 9 (stating agents used atmosphere meetings to get "excited for the day's sales"), ¶ 11 (alleging he was sent to "areas that were not good for making sales"), ¶ 15 ("At the end of our shifts, my co-workers and I had to go back to the Cromex office by 6 pm, where they would collect our tablets and go over the day's sales."); *see also id.* ¶¶ 13, 29.

**Plaintiffs' Response:** Admitted in part.   Zheng has also referred to his work in the filed as "marketing."  Savytska Decl., Ex. 26, Zheng Dep. 71:20-22, 90:11-16.

183.     Plaintiffs referred to their work on the Assurance Wireless campaign as "making sales" in their Complaint. Dkt. No. 1, Class Action Complaint ¶ 17 ("Credico . . . provides its clients with face-to-face sales and marketing services."), ¶ 18 ("Cromex provides its clients with face-to-face sales and marketing services through its team of workers located in New York."), ¶ 15 (alleging field agents "perform core work that is necessary to Defendants' business, namely providing face-to-face sales and marketing services"), ¶ 22 ("During the training period, the [field agents] learn Defendants' sales strategies."), ¶ 28 (alleging Defendants "track [agents'] sales numbers"), ¶¶ 33, 39 (alleging Defendants required Plaintiffs to "report to a specific location to make sales"); *see also id.* ¶¶ 16-17, 34, 40, 42.

**Plaintiffs' Response:** Admitted in part.  Plaintiffs have also referred to their work as marketing, promoting products, and signing up new customers.  Vasto Decl., Dkt, 62.2, ¶ 12; Torres Decl., Dkt. 62.8, ¶ 3; Zheng Decl., Dkt. 62.9, ¶ 4; Yang Decl., Dkt. 62.10, ¶ 3.

184.     Plaintiffs referred to their work on the Assurance Wireless campaign as

"making sales" in their First Amended Class Action Complaint.  Dkt. No. 6, First Amended

Class Action Complaint ¶¶ 1, 7, 11-14, 45 (stating field agents "provide face-to-face sales

and marketing services"), ¶ 43 (stating field agents "perform core work that is necessary to

Defendants' business, namely providing face-to-face sales and marketing services"), ¶ 44

(alleging "Defendants set weekly sales targets for [field agents]"), ¶¶ 62, 68 (alleging

Defendants required field agents to "report to a specific location to make sales"); *see also id.*

¶¶ 26, 33, 35, 50, 56, 63, 69, 71.

**Plaintiffs' Response:** Admitted in part.  Plaintiffs have also referred to their work as

marketing, promoting products, and signing up new customers.  Vasto Decl., Dkt, 62.2, ¶ 12;

Torres Decl., Dkt. 62.8, ¶ 3; Zheng Decl., Dkt. 62.9, ¶ 4; Yang Decl., Dkt. 62.10, ¶ 3.

185.      Opt-in plaintiffs considered their works as field agents to be "sales."

Ex. 66, Luchnik Dep. 50:16-21 (confirming that she was "engaging in sales" during her time

as a field agent); Ex. 67, Amjad Dep. 72:14-17 (testifying that upon returning from the field

to the office, agents would "write down how many sales [they] did next to [their] name");

Ex. 29, Cherenfant Dep. 64:1-7 (confirming that in employment interviews she referred to her

time as a corporate trainer as "prior sales experience"); Ex. 48, Taylor Dep. 27:11-13

(testifying that his job at the ISO Dynamic Enterprises was his "first sales job ever"), 37:5-10

(testifying that during his interview at the Desert Valley Marketing, the interviewer was

looking for "customer service skills, sales.  Sales was really big"); Ex. 49, Eilertsen Dep.

25:12-22 (describing his position at Gotham Outsourcing as "sales" or "sales associate"); Ex.

50, Melore Dep. 67:23-68:3 (testifying that he was told during his interview that Universal

Marketing agents are "given a percentage of the sales made for [their] work in the field"),

140:22-24 (testifying that he "received a percentage of the sales that [he] made by going

door-to-door and that were approved as well"); Ex. 68, Valerie Morales Resume at

MORALES000050 (Morales's resume listing her previous experience as a "[s]ales [r]epresentative" at Red Tower Marketing); Ex. 69, Morales Dep. 52:13-53:7 (confirming that she began working at Red Tower Marketing "as a sales representative" and that "sales representative" described what she was doing at the company), 134:3-7 (testifying that her main goal throughout the day was "to get as many sales"), 154:17-21 (testifying that she would document "how many sales [she] would get" in her notebook"), 207:5-7 (confirming that she "reported [her] sales number to Diana").

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Denied.  Opt-in Plaintiffs understood their work to be face-to-face marketing.  Savytsak Decl., Ex. 38, Amjad Dep. 54:20-24; Savytska Decl., Ex. 39, Bolden Dep. 19:7-9; Savytska Decl., Ex. 40, Ruf Dep. 35:8-12.

186.    Opt-in plaintiff Aron Eilertsen repeatedly described his field agent position as "sales" or "sales associate," but, after speaking with his attorney by phone during a break in the deposition, later stated he no longer wanted to refer to his title as sales associate. Ex. 49, Eilertsen Dep. 20:9-12, 25:16-22 ("Q: What was your position title at Gotham? A: My position title at Gotham. . . I guess it would be sales. Q: Sales associate? A: Sales associate."), 43:13-22, 55:8-13, 75:24-76:10 (off the record for break), 83:5-22 (stating he worked in "marketing, advertising" and that earlier in the deposition he had referred to his position as "sales associate" "without the understanding of what actually the sale position was within [the ISO]"), 83:23-85:3 (confirming that he spoke to his attorney during the break and asserting attorney-client privilege over whether his attorney had "suggest[ed] that [he] not use the word sales or sales associate in describing [his] work at [the ISO]"), 85:4-86:2 (confirming

that "before the break [he] referred to [his position] as a sales associate position" "[b]ut now [he] do[es] not want to refer to it as sales associate").

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part. Eliertsen promoted Verizon FiOS services to potential customers, and was paid only if the customers ultimately had the services installed.  Savytsak Decl., Ex. 33, Eilertsen Ans. Ints. p. 4.

187.    In deposition, opt-in plaintiff Corey Krimmer originally referred to his work on the Verizon FiOS campaign as "sales" and "selling," but, after speaking with his attorney during a break in the deposition, later testified that he did not consider it to be "sales." Ex. 51, Krimmer Dep. 19:2-9 (describing "different sales techniques"), 44:2-16 (explaining his work at the ISO was different from typical retail sales work because he was "expected to sell" Verizon FiOS rather than "[j]ust assist customers who were looking for items"), 48:23-49:12 (off the record for break), 113:9-21 (testifying that he would not consider his work "sales" but instead "marketing" or "like signing up, not selling"), 134:21-135:10 (off the record for break), 135:12-136:4 (confirming he spoke with his attorney during both the first and second breaks), 158:12-159:14 (confirming that earlier during the deposition he had testified he considered his work to be "selling" and that that was "the easiest way to explain it" but that now he only considered  that his work "was facilitating the installations of the service for Verizon FiOS when in fact Verizon is selling their service to the customer"), 160:12-23 (asserting attorney-client privilege over whether "anyone instructed [him] not to use the word 'sales' today").

**Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment.

Notwithstanding this objection, Plaintiffs respond as follows: Admitted in part.  Krimmer signed customers up for Verizon FiOS services, and was paid only for customers he signed up who were in fact qualified for Verizon FiOS services.  Savytska Decl., Ex. 35, Krimmer Ans. Ints., pp. 4-5.

## PLAINTIFF VASTO'S AND YANG'S RETALIATION CLAIMS

188.    Plaintiff Vasto stated in deposition that he was retaliated against because he "complained that [he] had the right as an independent contractor to conduct business on the terms of an independent contractor."  Ex. 28, Vasto Dep. 198:23-199:7.

**Plaintiffs' Response:** Admitted

189.    Plaintiff Yang did not complain about his pay to anyone at Credico.  Ex. 27, Yang Dep. 35:23-36:2.

**Plaintiffs' Response:** Admitted

190.    Plaintiff Yang did not make any specific complaints about minimum wage, overtime pay, or his independent contractor status to anyone at Credico.  Ex. 27, Yang Dep. 35:23-36:2 ("Q. Can you recall any specific time when you complained about your pay to someone who works at Credico?  A. I can't."), 223:15-224:7, 237:15-22.

**Plaintiffs' Response:** Admitted in part.  Yang complained on various occasions about the fact that he was misclassified as an independent contractor.  Savytska Decl., Ex. 41, Yang Dep. 241:19-242:6.

191.    Plaintiff Vasto did not complain to Smith about not receiving minimum wage or overtime.  Ex. 28, Vasto Dep. 29:23-30:10.

**Plaintiffs' Response:** Admitted

192.    Plaintiff Vasto did not make any specific complaints about minimum wage, overtime pay, or his independent contractor status to anyone at Credico.  Ex. 28, Vasto

Dep. 201:21-202:4, 203:24-204:5 ("Q. Did you complain to anyone at Credico about your classification as an independent contractor?  A. I had no means of contacting Credico, so my complaints were always to the internal CroMex staff.").

**Plaintiffs' Response:** Admitted in part.  Plaintiff Vasto had complained, on multiple occasions, about being improperly classified as an independent contractor rather than as an employee. Dkt. 212.28, Vasto Dep. 198:6-199:18.

193.     Plaintiff Vasto complained to Smith "about the system, the management training program and the system that they were following."  Ex. 28, Vasto Dep. 201:21-202:4.

**Plaintiffs' Response:** Admitted.

194.     Plaintiff Yang did not complain to Smith about his compensation or his independent contractor classification. Ex. 27, Yang Dep. 223:15-224:7.

**Plaintiffs' Response:** Admitted.

195.     Cromex required field agents to sign up a minimum number of qualified customers per week.  Ex. 28, Vasto Dep. 210:7-211:12; Ex. 64, Vasto Decl. ¶ 28 ("During the time I worked at CroMex, my coworkers and I were required to sign up a minimum of 80 qualified customers for Assurance Wireless cell phones and wireless services every week."); Ex. 27, Yang Dep. 262:14-263:13; Ex. 60, Yang Decl. ¶ 21 ("My co-workers and I were required to sign up a minimum number of qualified customers per week for Assurance Wireless cell phones and wireless services.").

**Plaintiffs' Response:** Admitted.

196.     If the field agents did not meet this minimum threshold, they could face termination by Cromex.  Ex. 28, Vasto Dep. 210:7-211:12; Ex. 64, Vasto Decl. ¶ 28 ("We were told by our supervisors at Cromex, including Corona and Jose Santos, that we could be terminated for failure to meet these goals."); Ex. 27, Yang Dep. 262:14-263:13; Ex. 60, Yang

Decl. ¶ 21 ("We were told by our supervisors at Cromex, including Corona, that we could be terminated for failure to meet these goals.").

**Plaintiffs' Response:** Admitted.

197.     Plaintiff Vasto testified that Cromex required agents to sign up between 60 and 80 qualified customers per week and told him that, if he did not, he could be terminated. Ex. 64, Vasto Decl. ¶ 28; Ex. 28, Vasto Dep. 210:7-18.

**Plaintiffs' Response:** Admitted.

198.     Plaintiff Vasto usually signed up 30 to 50 qualified customers per week. Ex. 64, Vasto Decl. ¶ 30; Ex. 28, Vasto Dep. 210:19-211:12; Stip. Facts ¶ 176.

**Plaintiffs' Response:** Admitted.

199.     Plaintiff Vasto occasionally had days during which he did not sign up a single qualified customer.  Ex. 28, Vasto Dep. 214:19-21.

**Plaintiffs' Response:** Admitted.

200.     Plaintiff Yang testified that Cromex required agents to sign up at least 60 qualified customers per week and told him that, if he did not, he could be terminated.  Ex. 27, Yang Dep. 262:14-18; Ex. 60, Yang Decl. ¶ 21.

**Plaintiffs' Response:** Admitted.

201.     Plaintiff Yang often did not reach the 60 application weekly target.   He averaged between 20 and 50 qualified sign-ups per week.  Ex. 27, Yang Dep. 263:8-14 (testifying that he signed up "between 20 and 50" qualified customers in a week, correcting his declaration testimony that stated he "signed up between 30 and 50 qualified customers in a week"); Stip. Facts ¶ 174.

**Plaintiffs' Response:** Admitted.

202.     Plaintiff Yang agreed that his "termination could have been because

[he] consistently failed to meet the 60 customers per week." Ex. 27, Yang Dep. 264:10-15.

**Plaintiffs' Response:** Admitted.

## SALES AGENTS TRANSFERRED TO OTHER ISOs

203.      In March 2015, Plaintiff Torres began working at Vaeley Marketing in Arizona, where he also worked on the Assurance Wireless campaign.   Ex. 24, Torres Dep. 18:19-19:10, 88:16-20.

**Plaintiffs' Response:** Admitted.

204.      Torres elected to move to Arizona to work at Vaeley Marketing in part because "it was supposed to be a better opportunity, it was a good opportunity and there is more room to grow." Ex. 24, Torres Dep. 317:5-11.

**Plaintiffs' Response:** Denied.  Defendant Xu told Torres that he would not have a job if he stayed at Cromex in New York.  Torres Decl., Dkt. 62.8, ¶ 25.

205.      The owner of Vaeley Marketing, Keisha Iverson, had been Torres's group leader at Cromex before she incorporated Vaeley.  Ex. 24, Torres Dep. 201:3-9 (testifying that he had the same leader at Cromex as he did at Vaeley), 253:17-22 (testifying that "Keisha was the office owner of Vaeley Marketing, but before that in Cromex she was [their] group leader").

**Plaintiffs' Response:** Admitted.

206.      Torres did not speak to anyone other than Xu and Keisha regarding his transfer to Vaeley.  Ex. 24, Torres Dep. 252:23-253:14 (testifying that no one else, besides Corona, told him that he "had to move to Arizona and start working at Vaeley").

**Plaintiffs' Response:** Admitted.

207.      Torres testified that he arrived at work at "around the same time" at Vaeley as he had at Cromex and that he had the "same" hours.  Ex. 24, Torres Dep. 257:25-258:6

(testifying that he began the day at Vaeley at "[a]round the same time" as when he worked for Cromex), 260:15-21 (testifying that he had the "same" hours when he worked at Vaeley), 279:6-11 (testifying that at Vaeley, he worked "pretty much . . . the same times" as agents at Cromex).

     **Plaintiffs' Response:** Admitted.

208.     Torres testified that he followed the "same" routine at Vaeley as he did at Cromex. Ex. 24, Torres Dep. 258:2-259:6.

     **Plaintiffs' Response:** Admitted.

209.     Opt-in plaintiff Adrian Sherrod transferred from Plato Group to Event Horizon. Ex. 70, Sherrod Dep. 124:4-21.

     **Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

210.     Sherrod transferred to Event Horizon because it was been newly incorporated by his former assistant manager at Plato Group, who Sherrod thought was "a great dude," and Sherrod "wanted to help" him out.  Ex. 70, Sherrod Dep. 124:13-15.

     **Plaintiffs' Response:** Plaintiffs object to this Statement of Fact on the grounds that it is not relevant to Defendant Credico (USA) LLC's Motion for Summary Judgment. Notwithstanding this objection, Plaintiffs respond as follows: Admitted.

Respectfully submitted,

PHILIP VASTO, ZAO YANG, ALEX
TORRES, and XIAOJ ZHENG,
individually and on behalf of all others
similarly situated,

By their attorneys:

/s/ Harold Lichten_____
Harold Lichten
Jill Kahn
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrlaw.com
jkahn@llrlaw.com

Ryan F. Stephan
James B. Zouras
Catherine T. Mitchell
STEPHAN ZOURAS LLP
205 North Michigan Avenue
Suite 2560
Chicago, IL 60601
rstephan@stephanzouras.com
jzouras@stephanzouras.com
cmitchell@stephanzouras.com

Dated:  June 7, 2017

## CERTIFICATE OF SERVICE

I hereby certify that, on June 7, 2017, a copy of this document was served via electronic mail on counsel for Credico (USA) LLC:

Jennifer H. Rearden
Gabrielle Levin
200 Park Avenue, 48th Floor
New York, New York 10166
Telephone: 212.351.3901
Facsimile: 212.351.5301
glevin@gibsondunn.com
jrearden@gibsondunn.com

Theodore J. Boutrous, Jr. (admitted *pro hac vice*)
333 South Grant Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520
tboutrous@gibsondunn.com

Jason C. Schwartz (admitted *pro hac vice*)
Greta B. Williams (admitted *pro hac vice*)
Ryan C. Stewart (admitted *pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539
jschwartz@gibsondunn.com
gbwilliams@gibsondunn.com
rstewart@gibsondunn.com

*Attorneys for Defendant Credico (USA) LLC*


/s/ Harold Lichten_____
Harold Lichten