UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                  :

PHILIP VASTO, ZAO YANG, ALEX TORRES, AND  :
XIAOJ ZHENG, individually and on behalf of all    :
others similarly situated,                          :          15 Civ. 9298 (PAE)
                                  :
                    Plaintiffs,      :          <u>OPINION & ORDER</u>
                                  :
                  -v-                :
                                  :

CREDICO (USA) LLC, CROMEX INC., and MEIXI  :
XU,                                    :
                                  :
                    Defendants.      :
                                  :
------------------------------------------------------------------- X

PAUL A. ENGELMAYER, District Judge:

      Plaintiffs Philip Vasto, Zao Yang, Alex Torres, and Xiaoj Zheng bring this action on

behalf of themselves and similarly situated persons, alleging violations of the Fair Labor

Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), the New York Labor Law, N.Y. Lab. Law

§ 650, *et seq.* ("NYLL"), the Arizona Wage Act, Ariz. Rev. Stat. § 23-350, *et seq.* ("AWA"), and

the Arizona Minimum Wage Act, Ariz. Rev. Stat. § 23-362, *et seq.* (2015) ("AMWA").

      Plaintiffs served as field agents securing low-income customers to acquire wireless

telephones pursuant to a federal subsidy program.  They claim primarily that they were

misclassified as independent contractors, as opposed to as employees, and therefore were denied

statutorily required minimum wage and overtime compensation.  They seek to hold three parties

liable for this misclassification: Cromex, Inc. ("Cromex"), their direct employer, Meixi Xu,

Cromex's owner, and Credico (USA) LLC ("Credico"), the company that subcontracted with

Cromex to administer the federal subsidy program.  Plaintiff Torres also alleges that he was

denied minimum wage and timely payment of wages as required under Arizona law during his

stint with another Credico subcontractor.  Finally, plaintiffs Vasto and Yang separately allege that they were terminated in retaliation for complaining about their classification as independent contractors.

Pending now are the parties' cross-motions for summary judgment.  These motions raise four issues: (1) whether plaintiffs were employees rather than independent contractors under the FLSA, NYLL, and AMWA; (2) if so, whether Credico and Xu may (or, in the case of Xu, *must*) be considered plaintiffs' employers; (3) whether, even if plaintiffs are employees, they are exempt from FLSA and NYLL requirements as outside salespeople; and (4) whether plaintiffs Vasto and Yang have adequately supported their retaliation claims so as to survive summary judgment.

The first three legal issues in this case coincide substantially with those addressed in this Court's recent decision in *Martin v. Sprint United Management Co.*, No. 15 Civ. 5237 (PAE), 2017 WL 4326109 (S.D.N.Y. Sept. 27, 2017).  To the extent the issues overlap, the facts here compel the same result.  For the reasons that follow, the Court holds that, even assuming *arguendo* that plaintiffs were employees rather than independent contractors, (1) Credico cannot be held liable as plaintiffs' joint employer, and (2) the outside sales exemptions to the FLSA and NYLL apply.  Further, assuming *arguendo* that Xu was plaintiffs' employer, plaintiffs have failed to demonstrate a clear assertion of rights under the FLSA so as to sustain a retaliation claim.  These rulings collectively preclude liability for all defendants on all counts.  The Court therefore grants summary judgment in favor of defendants and denies plaintiffs' cross-motion for partial summary judgment.

I.      **Background**[1]

    A.      **Factual Background**

        1.      **The Parties**

The federal government subsidizes provision of cell phones to low-income subscribers

through a program called Lifeline Assistance.  JSF ¶¶ 96–100.  Lifeline participants receive a

---

[1] The Court draws its account of the underlying facts of this case from the parties' submissions in support of and in opposition to this motion, including: Credico's memorandum of law in support of its motion for summary judgment, Dkt. 214 ("Credico Br."); Credico's Local Rule 56.1 statement, Dkt. 213 ("Credico 56.1"); the declaration of Greta B. Williams in support of Credico's motion for summary judgment, Dkt. 212 ("First Williams Decl."); Credico's reply memorandum of law in support of its motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 234 ("Credico Reply Br."); Credico's counter-statement to plaintiffs' Local Rule 56.1 statement, Dkt. 233 ("Credico Counter 56.1"); the declaration of Greta B. Williams in support of Credico's reply memorandum of law in support of its motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 232 ("Second Williams Decl."); Cromex's memorandum of law in support of its motion for summary judgment, Dkt. 219 ("Cromex Br."); the declaration of Joseph F. Tremiti in support of Cromex's motion for summary judgment, Dkt. 220 ("Tremiti Decl."); Cromex's reply memorandum of law in support of its motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 235 ("Cromex Reply Br."); plaintiffs' memorandum of law in support of their cross-motion for partial summary judgment and in opposition to defendants' motions for summary judgment, Dkt. 229 ("Pl. Br."); plaintiffs' Local Rule 56.1 statement, Dkt. 227 ("Pl. 56.1"); the declaration of Olena Savytska in support of plaintiffs' motion for partial summary judgment and in opposition to defendants' motions for summary judgment, Dkt. 226 ("First Savytska Decl."); plaintiffs' reply memorandum of law in support of their motion for partial summary judgment, Dkt. 243 ("Pl. Reply Br."); the declaration of Olena Savytska in support of plaintiffs' reply memorandum of law in support of their motion for partial summary judgment, Dkt. 241 ("Second Savytska Decl."); plaintiffs' counter-statement to Credico's Local Rule 56.1 statement, Dkt. 228 ("Pl. Counter 56.1"); and the parties' joint statement of undisputed facts, Dkt. 205 ("JSF").  This opinion also refers to the declaration of Philip Vasto in support of plaintiffs' motion for conditional class certification, Dkt. 38-2 ("Vasto Decl."); the declaration of Alex Torres in support of plaintiffs' motion for conditional class certification, Dkt. 38-3 ("Torres Decl."); the declaration of Xiaoj Zheng in support of plaintiffs' motion for conditional class certification, Dkt. 38-4 ("Zheng Decl."); and the declaration of Zao Yang in support of plaintiffs' motion for conditional class certification, Dkt. 38-5 ("Yang Decl.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary

free wireless phone and a free preset bundle of minutes and messages, with the option to purchase additional minutes and messages above this preset amount. *See* Credico 56.1 ¶ 140; First Williams Decl., Ex. 56 at 2. Sprint, a telecommunications carrier, participates in the Lifeline Assistance program through what Sprint calls the Assurance Wireless campaign. JSF ¶ 101. To conduct the Assurance Wireless campaign (i.e., to promote and market Lifeline services), Sprint contracts with third-party Outreach Agencies ("OAs"). *Id.* ¶ 102.

Defendant Credico is one of those OAs, tasked with assisting Sprint in implementing the Assurance Wireless campaign. *Id.* ¶¶ 113–17. To that end, in September 2013, Sprint and Credico entered into an Amended and Restated Outreach Agency Agreement (the "OA Agreement") effective September 1, 2013, amending an original agreement dated September 15, 2012. *Id.* ¶ 114; First Williams Decl., Ex. 15 at 511. Attached to the OA Agreement was a copy of Sprint's Standard Operating Procedures ("SOPs"). JSF ¶ 106; First Williams Decl., Ex. 13. Under the OA Agreement, Credico is authorized to solicit and collect applications for Sprint's Assurance Wireless Program within designated areas. JSF ¶¶ 113, 117. Instead of collecting applications itself, however, Credico outsources sales and marketing to subcontractors, to which

---

evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The parties' counter-statements of facts mark certain statements as "disputed" but, instead of identifying an actual factual inconsistency, often only offer additional context or dispute the relevance of the underlying facts. Where these counter-statements do not identify a true factual dispute, the Court treats the statement as undisputed.

it refers as "independent sales offices" ("ISOs").  *Id.* ¶¶ 14–15.  ISOs, in turn, recruit and hire individual "agents" who sell and market products on behalf of Credico's clients.  *Id.* ¶¶ 19–20.

Defendant Cromex is one such ISO, and it is owned by defendant Xu.  *Id.* ¶¶ 29, 39.  Xu oversees Cromex's day-to-day operations.  *Id.* ¶ 40.  Since it began operating in 2014, Cromex has provided sales and marketing services for Credico's clients only, and revenues generated from the Assurance Wireless campaign account for a "significant portion" of Cromex's income. *Id.* ¶¶ 30–31.  The subcontractor agreement between Credico and Cromex extends to Cromex the contractual obligations that Credico owes to Sprint and sets forth the territories in which Cromex is authorized to operate.  *Id.* ¶¶ 50, 54.  It requires further that Cromex (1) comply "with all applicable federal, state, county, and local laws, ordinances, regulations and codes"; (2) "comply and have its own employees comply with the Credico USA Code of Business Ethics and Conduct," as well as "any Credico USA Client Dress Code, Conduct Policy, and Operational Requirements"; (3) "[a]dher[e] to any Client pre-conditions to performing Services, such as drug testing and background checks with authorized providers and compliance with Client branding"; (4) "[t]rain[] its employees in accordance with Credico USA's Client requirements which may include, but [are] not limited to, attending class periodically"; and (5) "[s]olicit[] business on behalf of Credico USA Clients regarding their products or services . . . using the techniques and information as set out in Credico USA Clients' Training Guides."  Credico 56.1 ¶¶ 51–53.

Plaintiffs were hired by Cromex as field agents to work on the Assurance Wireless campaign.  JSF ¶¶ 10, 139, 193.  Vasto worked for Cromex in New York from approximately March 2015 through May 2015.  *Id.* ¶ 2.  Yang did the same from approximately February 2015 through April 2015, Torres from approximately January 2015 through mid-March 2015, and

Zheng from approximately February 2015 to August 2015.[2]  *Id.* ¶¶ 4, 7, 11.  Field agents like plaintiffs were referred to as "account executives" and could later be promoted to "corporate trainers."  *Id.* ¶¶ 128–29.  Plaintiffs Yang, Zheng, and Torres were all promoted to corporate trainers, and Zheng was subsequently promoted to senior corporate trainer.  *Id.* ¶¶ 200–01.

### 2.     The Responsibilities of Field Agents

Field agents on the Assurance Wireless campaign solicited and collected applications from potentially qualifying Lifeline Program applicants.  *Id.* ¶¶ 149, 181–84.  Agents worked on only one campaign at a time.  First Savytska Decl., Ex. 1 at 175.

As set forth in the OA Agreement, field agents were required to "inform and educate potential [c]ustomers about Assurance Wireless, seek to determine and advise on an individual's qualification for the program and engage the eligible [c]ustomers in the [a]pplication process for Assurance Wireless."  First Williams Decl., Ex. 15 at 512.  Field agents distributed Sprint-provided materials, visiting "targeted community locations and attending public or private community events."  *Id.*

In initially addressing potential applicants for phones pursuant to the Lifeline Program, field agents were required, as set forth in the SOPs, to begin by "utiliz[ing] an approved pitch that meets [Assurance Wireless] standards and clearly indicates only qualified applicants may receive . . . lifeline service."  *Id.* at 536.  One such pitch, for example, could be: "Would you like to find out if you qualify for free lifeline service from Assurance Wireless?"  *Id.*  The SOPs also address the remainder of the interaction between field agents and potential applicants.  For

---

[2] Torres also worked for another Credico ISO in Arizona, Vaeley Marketing Group ("Vaeley"), from approximately mid-March 2015 through June 2015.  *Id.* ¶¶ 8, 220.  While at Vaeley, Torres's relationships with Credico and his supervisors tracked his experience at Cromex, *id.* ¶¶ 210–14, 228–29, and plaintiffs contend that Torres's work at Vaeley was otherwise consistent with his work at Cromex in all relevant respects, Pl. 56.1 ¶ 81.

example, the SOPs state that field agents "must ask potential applicants if they currently have a lifeline phone" and "if they have applied with [Assurance Wireless] or any lifeline carrier recently." *Id*. at 537.

Using their Credico-provided tablets, field agents uploaded completed Lifeline Program applications to a third-party vendor called Solix so that the applications could be either approved or denied.  JSF ¶¶ 153–59.  If an applicant was approved, the enrollee received a free phone, and the government would pay Sprint, via subsidy, for providing that service.  *Id.* ¶¶ 96, 100. Agents, for their part, would receive a commission from Cromex.  *Id.* ¶ 187.  If an applicant was determined not to be qualified, the agent received no pay for that customer.  *Id.* ¶ 188.

### 3.    The Schedules of Field Agents

Plaintiffs reported to work at Cromex's New York City office.  Credico 56.1 ¶¶ 27, 94. The parties dispute whether agents were required to come to work every day.  Defendants point to testimony suggesting scheduling flexibility, *see id.* ¶¶ 89, 106, while plaintiffs rely on Cromex's Account Executive Manual, which provided field agents with a daily schedule and prohibited unexplained absences, *see* Pl. 56.1 ¶¶ 37, 41.  Plaintiffs claim they typically worked between 60 and 70 hours per week.  Pl. 56.1 ¶ 71.  In any event, it is undisputed that agents working on the Assurance Wireless campaign picked up tablets each day from the Cromex office and participated in morning "atmosphere" meetings, during which agents received guidance as to how to solicit Assurance Wireless applications.  JSF ¶¶ 155, 167–69.

Agents like plaintiffs spent the majority of their time soliciting and accepting applications in the field.  *Id.* ¶ 181; *see also* Vasto Decl. ¶¶ 11–12; Torres Decl. ¶ 8; Zheng Decl. ¶ 4; Yang Decl. ¶ 5.  Plaintiffs were supervised by (and communicated exclusively with) Cromex personnel, who would assign agents a particular location (in New York City) in which to begin

their day.  JSF ¶¶ 148, 202–18; Pl. 56.1 ¶ 51; Credico Counter 56.1 ¶ 51.  Upon their return to

the Cromex office at the end of the work day, agents would report their application numbers and

either return their tablets or take them home.  JSF ¶¶ 170–71; Pl. 56.1 ¶ 42; Credico Counter 56.1

¶ 42.  Credico, like Cromex, received agents' application data.  Credico 56.1 ¶ 156.[3]

### 4.      The Hiring of Field Agents

Cromex was directly responsible for its own hiring decisions.  JSF ¶ 19.  To that end,

Cromex conducted its own recruitment and interviews.  *Id.* ¶ 127.  Cromex also made its own

promotion decisions.  *Id.* ¶ 133.  Accordingly, Cromex recruited, interviewed, hired, and

promoted plaintiffs.  *Id.* ¶¶ 192–93, 200.

As part of their onboarding, Cromex field agents signed "Independent Sales

Representative Agreements."  *Id.* ¶ 196.  These agreements allowed either party to terminate the

agreement at will.  *Id.* ¶ 198.  The agreements also permitted plaintiffs to offer their services to

other companies engaged, like Cromex, in direct sales, provided that this other work did not

interfere with ongoing work performed for Cromex.  *Id.* ¶ 197.  Sprint's SOPs also required that

field agents collecting Lifeline Program applications on the Assurance Wireless campaign

submit to background checks.  *Id.* ¶ 108.

### 5.      The Training of Field Agents

Cromex was responsible for training its field agents, including plaintiffs.  *Id.* ¶¶ 134, 169

199.  Field agents also participated in a "Management Training Program" devised by Credico but

implemented through subcontractors.  Pl. 56.1. ¶ 33–34; First Savytska Decl., Ex. 1 at 71.

---

[3] Plaintiffs also claim that Xu personally assigned agents to territories, recorded the daily number
of customer sign-ups, and informed plaintiffs of the office's hours and dress code.  Pl. 56.1 ¶¶ 5–
7.  The materials that plaintiffs cite, however, do not support these propositions.

Credico also conducted in-person audits of ISOs to ensure compliance with clients' requirements.  JSF ¶ 56.

### 6.        The Classification and Compensation of Field Agents

Specific ISOs like Cromex would decide independently whether to classify agents as independent contractors or employees.  Credico 56.1 ¶ 166; Pl. Counter 56.1 ¶ 166.  In this case, plaintiffs' Independent Sales Representative Agreements classified each plaintiff as an independent contractor, Credico 56.1 ¶ 69, and Cromex paid them as such, JSF ¶ 145.  After this lawsuit was filed, however, Credico decided that it would no longer contract with ISOs that classified agents as independent contractors.  JSF ¶ 75.

As Cromex agents, plaintiffs were paid on commission, receiving $10 per approved Assurance Wireless application.  *Id.* ¶ 139.  These payments came from Cromex, *id.* ¶ 143, but the parties dispute who determined agents' pay.  Defendants contend based on the deposition testimony of presidents of other ISOs that ISOs independently determined their agents' pay rates.  Credico 56.1 ¶ 161–62.  Plaintiffs counter that Credico provided ISOs with commission schedules listing individual agents' pay rates and mandated that ISOs pay commissions pursuant to the established rates.  Pl. Counter 56.1 ¶ 161–62; First Savytska Decl., Ex. 37 at 31098.

Vasto earned an average of $136 per week during his time at Cromex.  Pl. 56.1 ¶ 84.  Zheng earned an average of approximately $466 per week.  First Savytska Decl., Ex. 84.  Three of Yang's pay statements are in the record, showing weekly earnings of $40, $220, and $590.  Pl. 56.1 ¶ 85; Credico Counter 56.1 ¶ 85.  Torres has no pay statements, but estimates his average weekly pay was approximately $300 per week.  Pl. 56.1 ¶ 86.

### 7.       The Suspension and Termination of Field Agents

The parties dispute the precise contours of Credico's ability to suspend or terminate field agents.  It is undisputed that Credico had the authority to "deactivate"—i.e., remove from the Assurance Wireless campaign—a field agent suspected of fraud or failure to abide by the SOPs. JSF ¶ 179; Credico 56.1 ¶ 46.  Credico in fact exercised that authority in deactivating Cromex agents.  JSF ¶ 180.  But plaintiffs also assert that Credico has "suspended" agents and "required" their termination.  Pl. 56.1 ¶¶ 137, 139, 144, 146–47; First Savytska Decl., Ex. 62 (Credico email instructing offices to "eliminate 20% of their lowest performers"); First Savytska Decl., Ex. 67 (Credico "Compliance Improvement Plan" describing agent misconduct that could trigger mandatory probation or termination); First Savytska Decl., Ex. 64 (Credico email indicating an agent would be suspended).  Credico responds that it had no authority to terminate agents; rather, "deactivated" agents were merely removed from the Assurance Wireless campaign and not necessarily terminated.  Credico Counter 56.1 ¶¶ 137, 144, 147; First Williams Decl., Ex. 4 at 131–32 (Credico president Jesse Young testifying ISOs owners could remove somebody from the Assurance Wireless campaign without Credico's approval).  Credico suggests further that it deactivated agents only to prevent fraud and noncompliance with client requirements.  Credico 56.1 ¶ 46.

### 8.       The Terminations of Vasto and Yang

Both Vasto and Yang repeatedly complained about their treatment as independent contractors.  Pl. 56.1 ¶¶ 89–90.  Rather than seek reclassification as employees, however, each sought greater professional latitude in their positions, consistent with their expectations regarding independent contracting work.  Vasto, for example, "complained that [he] had the right as an independent contractor to conduct business on the terms of an independent contractor, i.e., to

have more freedom." First Williams Decl., Ex. 28 at 198. Vasto objected specifically that he could not "choose [his] days," "could not chose the time [he] worked," "could not choose [his] break period," and "could not control anything." *Id.* Yang, for his part, "constantly present[ed] proposals to be an independent contractor" so that he could pursue his own ideas for event marketing. First Savytska Decl., Ex. 41 at 241–42.[4]

Vasto and Yang claim that they were terminated as a result of these complaints. *See* Pl. 56.1 ¶ 91. They cite two sources for this conclusion: (1) statements of supervisors that Yang was a "troublemaker" and "not trying to follow the system," First Savytska Decl., Ex. 41 at 239, and (2) an audio recording of a Credico consultant informing Vasto that he was terminated because he failed to sign up enough customers and his co-workers found him "difficult to work with," First Savytska Decl., Ex. 19.

### B.  Procedural History

On July 27, 2015, plaintiffs filed the initial complaint in this action, bringing claims against Credico, Cromex, Xu, and Jesse Young in the Northern District of Illinois. Dkt. 1. Plaintiffs amended three days later, Dkt. 6, and, in October of that year, moved for conditional certification of a collective under the FLSA, Dkt. 38. Judge Shadur of the Northern District of Illinois denied the motion. Dkt. 41. Plaintiffs thereafter moved to transfer the case to this District, Dkt. 42, and Judge Shadur granted the motion, Dkt. 46. Plaintiffs again moved for conditional certification, Dkt. 62, and this Court granted the motion as to all persons who conducted face-to-face marketing work for Credico and its subcontractor ISOs in the United

---

[4] There are no allegations that Vasto or Yang sought overtime or minimum wage. *See* Am. Compl. ¶¶ 61–72.

States, while classified as independent contractors, at any point during the three years preceding the issuance of court-approved notice, Dkt. 113.[5]  Meanwhile, defendant Young moved to dismiss plaintiffs' claims against him, Dkt. 106, and the Court granted the motion, Dkt. 161.

Following discovery, Credico, Dkt. 211, and Cromex and Xu, Dkt. 218, moved for summary judgment.  Plaintiffs opposed and cross-moved for partial summary judgment.  Dkt. 225.  At the time it resolved the summary judgment motions in the companion case of *Martin v. Sprint/United Management Co.*, No. 15 Civ. 5237 (PAE), the Court issued an order stating that the decision on the motions here would issue in October.  *See* Dkt. 246.

## II.     Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  Rather, the opposing party must establish a genuine issue of fact by

---

[5] The Court later limited this collective to exclude individuals who worked for Wallace Morgan, another Credico ISO which is the subject of the *Martin* lawsuit.  *See* Dkt. 170.

"citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

## III.  Discussion

The parties' cross-motions for summary judgment raise four issues: (1) whether plaintiffs were employees rather than independent contractors under the FLSA, NYLL, and AMWA; (2) if so, whether Credico and Xu may (or, in the case of Xu, *must*) be considered plaintiffs' employers; (3) whether, even if plaintiffs are employees, they are exempt from FLSA and NYLL requirements as outside salespeople; and (4) whether plaintiffs Vasto and Yang have adequately supported their retaliation claims so as to survive summary judgment.

As in *Martin*, this Court holds that, even assuming *arguendo* that plaintiffs were employees rather than independent contractors, (1) Credico cannot be held liable as plaintiffs' joint employer, and (2) the outside sales exemptions to the FLSA and NYLL apply.  These rulings preclude liability altogether for Credico and compel dismissal of Torres's claims under Arizona law.  They also compel dismissal of plaintiffs' minimum wage and overtime claims against Cromex and Xu.  The Court then turns to plaintiffs' claims of retaliation and holds that, even assuming *arguendo* that Xu was plaintiffs' employer, Vasto and Yang cannot sustain a

13

claim for retaliation under the FLSA.  Accordingly, defendants' motions must be granted and plaintiff's motion dismissed.

### A.    Credico as Joint Employer

Credico seeks summary judgment on the ground that the evidence would not permit a finding that it was a "joint employer" of plaintiffs.  In other words, it argues, even assuming plaintiffs were employees, they were employees only of Cromex, and therefore only Cromex can be held liable for any FLSA and NYLL violations.  For the reasons that follow, the Court agrees.[6]

### 1.    Applicable Legal Standards

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The Supreme Court has emphasized that this is an expansive definition with "striking breadth."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  An individual may simultaneously have multiple "employers" for the purposes of the FLSA, in which event, "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA]."  29 C.F.R. § 791.2(a).

"[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'"  *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  Courts determine whether defendants are plaintiffs' joint

---

[6] The parties also cross-move as to Xu's liability as an employer.  Were the Court to reach this issue, the relevant standards are those applied in this Section.  *See infra* Section III(A)(1).  The Court need not address the question, however, as even assuming *arguendo* that Xu was plaintiffs' employer, she cannot be held liable in light of the holdings that follow.

employers based on "the circumstances of the whole activity," *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947), viewed in light of "economic reality," *Goldberg*, 366 U.S. at 33; *see also Barfield*, 537 F.3d at 141–42 (employment is "to be determined on a case-by-case basis by review of the totality of the circumstances").  "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).

"When it comes to 'employer' status under the FLSA, control is key." *Lopez v. Acme Am. Envtl. Co., Inc.*, No. 12 Civ. 511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012); *see also Herman*, 172 F.3d at 135 ("[C]ontrol of employees is central to deciding whether appellant should be deemed an employer.").  In assessing economic reality, the Second Circuit has articulated two tests for evaluating whether an employment relationship existed for the purposes of the FLSA: one relating to formal control and the other to functional control.

The formal control test inquires "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Carter*, 735 F.2d at 12 (quoting *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).

> Formal control does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees.  Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence.

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 939 (S.D.N.Y. 2013) (citing *Herman*, 172 F.3d at 139) (internal quotation marks omitted).

As to the functional control test, the Second Circuit has identified a number of factors pertinent to determining whether a person or entity, even if lacking formal control, exercised "functional control" over an employee.  In *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003), which involved an employer and its subcontractors, the Circuit identified the following non-exclusive factors:

> (1) whether [the alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which [the alleged employers] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the alleged employers].

*Id.*; *accord Barfield v. N.Y.C. Health & Hosp. Corp.*, 432 F. Supp. 2d 390, 392–93 (S.D.N.Y. 2006), *aff'd*, 537 F.3d 132 (2d Cir. 2008).

Under the NYLL, the standard for employer status is nearly identical to that of the FLSA. *Compare* NYLL § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."), *with* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . .").  Accordingly, courts in this District regularly apply the same tests to determine whether entities are joint employers under the NYLL and the FLSA.  *See Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n. 13 (S.D.N.Y. 2010); *see also Glatt v. Fox Searchlight Pictures Inc.*, 293 F.R.D. 516, 526–27 (S.D.N.Y. 2013) (collecting cases); *see also Hart*, 967 F. Supp. 2d at 940 (citing *Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013)) ("To be sure, the New York Court of Appeals has not yet resolved whether NYLL's standard for employer status is coextensive with the FLSA's, but there is no case law to the contrary.").

### 2.  Discussion

On the undisputed facts, Credico satisfies neither the formal nor functional control tests for joint employer status.

### a.      Formal Control

### i.      Hiring and Firing

Plaintiffs concede that Credico "delegated to its subcontractors direct responsibility for hiring and firing agents."  Pl. Br. at 36–37.  They argue nevertheless that Credico maintained "ultimate control" of the hiring process in that Cromex could not hire an agent unless and until Credico generated an individual "activation code" for that agent.  *Id.* at 37; *see also* JSF ¶ 50.  It is undisputed that Credico's role in generating an activation code was limited to ensuring that the agent successfully completed the onboarding process required by Credico's clients.  Credico 56.1 ¶¶ 67–68; Pl. Counter 56.1 ¶¶ 67–68.  The fact that Credico played a necessary, albeit mechanical, role in the hiring process does not itself demonstrate control.  *Cf. Lawrence v. Adderley Industries, Inc.*, No. 09 Civ. 2309 (SJF) (ETB), 2011 WL 666304, at *3 (E.D.N.Y. 2011) (telecommunications company lacks power to hire technicians employed by contractor even though "[a] technician cannot work on a . . . job [for the company] without an identification badge").

As for firing, plaintiffs argue that even though Cromex could terminate agents without Credico's consent, Credico maintained the right to terminate employees by prohibiting them from working on the Assurance Wireless campaign.  Pl. Br. at 37–38.  This residual authority to "deactivate" agents, however, has been held not to demonstrate joint employer control.  In *Jean-Louis v. Metro. Cable Communications, Inc.*, for instance, the district court distinguished between the power to fire and Time Warner's "power to 'de-authorize' any Metro technician

from installing Time Warner services at customers' home while employed by Metro."  838 F.

Supp. 2d 111, 124 (S.D.N.Y. 2011).  The district court reasoned that the power to de-authorize in

such a context differed from a firing decision because technicians could continue to perform

other work for Metro.  *See id*. ("[I]t is undisputed that a Metro technician whom Time Warner

has prohibited from perform[ing] installation work while employed by Metro may continue

working for Metro in some other capacity, say as a dispatcher or warehouse worker, or leave

Metro and later perform installations while working as a technician for another company.").

Time Warner's exercise of its de-authorization power therefore was "not the same as a decision

to either (a) prevent a Metro technician from working for Metro altogether; or (b) prevent a

Metro technician from working for another service company that does installation work for Time

Warner," and it was therefore "difficult to describe a decision by Time Warner that has neither

consequence as equivalent to a decision to fire a Metro technician."  *Id*.

The district court drew a similar distinction in *Godlewska v. HDA*, in which home

healthcare attendants employed by a not-for-profit contractor brought FLSA claims against the

contractor as well as a city agency that engaged the contractor to administer home attendant

services to city residents.  916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v.*

*Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014).  In granting the city agency's motion

for summary judgment on the ground that it was not a joint employer, the district court

distinguished between the agency's power to direct the contractor to remove a home attendant

from a particular patient's case and the power to terminate the home attendant.  *See id.* at 258

(although the city agency could "direct [the contractor] to remove [a] home attendant from [a]

particular patient's case," there was "no evidence, . . . that [the city agency] ha[d] power . . . to

require [the contractor] to fire a home attendant entirely").

The same distinction also carried the day in *Lawrence v. Adderley Industries, Inc.*, 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011).  There, the district court held that Cablevision had not exercised formal control over technicians employed by a contractor, Adderley Industries, such that Cablevision could be considered the technicians' joint employer under the FLSA.  *Id.* at *11. Cablevision "maintain[ed] a list of approved workers, *i.e.*, individuals authorized to install its equipment, and any individual not on that list [could not] install Cablevision equipment."  *Id.* at *3.  Cablevision had the power to "direct Adderley not to assign an individual who was previously employed by one of its other contractors and had been disciplined or fired for bad performance to a Cablevision project" or to "remove[] technicians from its list of approved workers."  *Id.*  Notwithstanding this "de-authorization" power, the district court held that "[b]ased upon the evidence in the record, there [was] no genuine dispute as to a material fact that Cablevision did not . . . have the power to hire and fire [Adderly] technicians."  *Id.* at *8.

Plaintiffs counter that deactivation in this case amounted to termination because Cromex worked exclusively for Credico and its clients.  Pl. Br. at 38 n.36.  But Cromex was permitted to work with other entities, Credico 56.1 ¶ 55, and in any event, the record suggests Credico's deactivation authority was not absolute, as Xu testified that she declined to terminate a group of agents notwithstanding Credico's request, Second Williams Decl., Ex. 79 at 81.

Accordingly, the first formal control factor does not favor a finding of joint employer status.

### ii.     Work Schedules and Conditions

The Court next assesses whether plaintiffs have adduced evidence sufficient to support a finding that Credico supervised and controlled plaintiffs' work schedules or conditions of employment.

The record is clear that Cromex, rather than Credico, controlled plaintiffs' schedules. Plaintiffs admit that Credico did not set agents' hours or schedules except insofar as Cromex was an agent of Credico.  Pl. Counter 56.1 ¶ 110; *see also* Pl. Reply Br. at 6 ("Cromex provided Plaintiffs with a daily schedule.").  Plaintiffs' primary argument as to this factor—raised in a footnote—is that Credico must have exercised scheduling control because, purportedly, "all of Credico's subcontractors throughout the country adhere to similar daily schedules and routine." Pl. Br. at 39 n.37.  Because plaintiffs fail to provide record support for this factual assertion, however, it may not be credited in evaluating the summary judgment motions.  *See* Fed. R. Civ. P. 56(c)(1).[7]

The record is equally clear regarding supervision.  Plaintiffs identified Cromex representatives as their supervisors.  JSF ¶ 202.  They identified no Credico employees as having supervised, directed, assigned, or otherwise controlled their work on the Assurance Wireless campaign.  Credico 56.1 ¶ 98.  Cromex, not Credico, conducted training, determined daily sales locations, oversaw work in the field, and reviewed sales numbers at the end of the day.  JSF ¶¶ 131, 146–47, 169–70.  Consistent with those facts, plaintiffs never communicated with Credico employees save one Credico consultant, Pl. Counter 56.1 ¶ 136, and Yang, Torres, and Zheng could not name a single Credico employee, JSF ¶¶ 206, 211, 215.  Indeed, plaintiffs apparently had "no means of contacting Credico."  Cr. 56.1 ¶ 192; *see also* JSF ¶¶ 212, 217.

Plaintiffs respond primarily that Credico nevertheless had the "right" to supervise agents. Pl. Br. at 32–33 & n.31.  Although plaintiffs are correct that joint employer status may be found even where control is "exercised only occasionally," *id*. at 32 n.31 (quoting *Herman*, 172 F.3d at

---

[7] Plaintiffs argue further that the Management Training Program required "long hours" for agents. Pl. Reply Br. at 21 n.36.  Even assuming Credico mandated "long hours," it remains undisputed that Cromex dictated agents' day-to-day schedules.

139), here Credico in fact did not exercise control over plaintiffs' day-to-day operations. To be sure, Credico did exercise some measure of quality control to ensure compliance with Sprint's SOPs. *See id.* at 31–33. But evaluation and monitoring to ensure productivity and compliance is not tantamount to control. Again, *Jean-Louis* is instructive. Plaintiffs there presented extensive evidence of monitoring by Time Warner, including:

> that sixteen full-time Time Warner personnel conduct 800–900 random quality control assessments per week on what amounts to some 4% of all jobs; that Time Warner contracts to obtain real-time feedback regarding Metro installations directly from Time Warner customers; that Time Warner uses its assessments and the ECHO results to compile extensive and detailed data regarding these assessments; and that Time Warner provides this data to Metro and discusses it with Metro in monthly meetings.

838 F. Supp. 2d at 127. Nevertheless, the district court held, such efforts did not reflect a joint employer relationship: "[A]ll of this evidence shows that Time Warner makes efforts to ensure that Metro is providing quality service; the evidence does not show that Time Warner controls the day-to-day manner in which technicians provide that service." *Id.* It held further: "Plaintiff's evidence regarding Time Warner's quality control assessments cannot establish control of work schedules or conditions of employment under the law of this Circuit." *Id.* at 128; *see also Zheng*, 355 F.3d at 75 ("[S]upervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate, subcontracting arrangement.").

Other courts have similarly held that "[e]xercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions." *Godlewska*, 916 F. Supp. 2d at 259; *see also Chen v. Street Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 286 (E.D.N.Y. 2005) ("[T]he Court will not consider evidence plaintiffs present with respect to this factor to the extent it concerns the presence of . . . quality control personnel."). Courts instead have distinguished between

21

circumstances where the putative joint employer "'maintains specific standards to which [its contractors] and [the contractors' employees] must adhere, and regularly monitors the [contractor's employees] to ensure that their performance satisfies [the putative joint employer's] expectations,'" which does not itself establish control of work conditions, and circumstances where the putative joint employer "'is . . . responsible for the day-to-day management of the [contractor's employees].'" *Lawrence*, 2011 WL 666304, at *9 (quoting *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 692 (D. Md. 2010)).

The Second Circuit's recent decision in *Saleem v. Corporate Transportation Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017), is in accord. There, black-car drivers asserted FLSA and NYLL claims against owners of black-car "base licenses" and certain affiliated entities. *Id.* at 134. The black-car drivers had signed agreements with certain defendants that required the black-car drivers to follow "Rulebooks." *Id.* at 136. These were manuals that "set[] out certain standards of conduct." *Id.* The Rulebooks included, *inter alia,* prohibitions on "harassing customers or other drivers and submitting fraudulent vouchers," "a dress code, which required drivers to dress neatly in specified business attire," and "guidelines for keeping vehicles clean." *Id.* The defendants insisted upon compliance with the Rulebooks and could hold hearings and impose penalties in the event of noncompliance. *Id.* Nevertheless, the Second Circuit held that the Rulebooks did not render the black-car drivers defendants' employees, as defendants "wielded virtually no influence over other essential components of the business." *Id.* at 149.

At bottom, Credico exercised no more than minimal control over plaintiffs' work. Absent meaningful control over plaintiffs' schedules or conditions of employment, the second formal factor inclines strongly in Credico's favor.

### iii.    Rate and Methods of Payment

There is no genuine dispute that Cromex, not Credico, determined whether agents were classified as independent contractors or employees.  Credico 56.1 ¶ 166.[8]  Nevertheless, "the test is whether a putative joint employer determines pay rates, not whether it affects them."  *Jean-Louis*, 838 F. Supp. 2d at 129–30.  The heart of this analysis, therefore, is whether Credico or Cromex determined agents' pay rate.

As to that question, Plaintiffs provide persuasive documentary evidence.  A 2014 Credico memorandum provides "[o]ffices must pay agent commission following the established rates on the commission policy; no deviation on commission should be made."  First Savytska Decl., Ex. 37 at 31098.  In turn, the March 8, 2015 Commission Schedule states "[i]n accordance with this Schedule . . . and the Subcontractor Agreement, commissions shall be paid to Subcontractor and Subcontractor shall pay commissions to its field representatives as follows:

| Product | Rep | Office |
|---|---|---|
| Assurance Wireless - Approved Sale | $10.00 | $7.00 |

First Savytska Decl. Ex. 79 at 3.  Credico further maintains a database that tracks agents' sales data and produces pay reports for ISO owners.  JSF ¶¶ 79–82.

Defendants counter with testimony by Credico employees that, in practice and as understood by Credico and the ISOs, "[t]he rate specified in the commission schedules is merely

---

[8] Plaintiffs suggest that Credico demonstrated its control over classification after this lawsuit was filed by refusing to work with subcontractors who classified agents as independent contractors. Pl. Br. at 40 n.39; JSF ¶ 75.  But the mere fact that Credico *could have* exercised this form of control over classification is insufficient to demonstrate formal or functional control.  A contractor is always free to choose a new subcontractor in order to redirect policy in any (lawful) direction.  Until the contractor exercises that authority in service of a particular policy, however, it cannot be said to have exerted control over that policy; otherwise, control over every element of managerial policy would be attributable to the contractor.

a suggestion, and the subcontractor owners are free to distribute their payments as they see fit."
Credico Counter 56.1 ¶ 76. One ISO owner testified that he could and did decide payment rates
without restriction from Credico, and that he paid agents at rates that went above those set forth
in the Credico documents. First Williams Decl., Ex. 1 at 87 ("I can pay the [field agents]
whatever way I want and whatever amount I wish.").

There is therefore a factual dispute on this issue, and it goes to the heart of this formal
control factor. If Credico's Commission Schedule rates were mandatory, then Credico exercised
control over field agents' rate of payment. If, however, these rates were merely suggestions,
such that Credico and Cromex understood that Cromex was free to set pay rates without
pushback, then such control did not clearly rest in Credico's hands. On summary judgment, the
Court cannot resolve that dispute. For purposes of each side's cross-motion on the joint
employment issue, the Court must assume, *arguendo*, that this factor is resolved contrary to the
movant.

As to Credico's motion, however, that conclusion would not preclude a finding that
Credico lacked formal control over plaintiffs. Where the formal control factors considered as a
whole clearly disfavor a finding of such control, the Court may so find. In *Godlewska*, for
example, the district court held that the first, second, and fourth formal control factors weighed
against formal control while the third factor was inconclusive. 916 F. Supp. 2d at 262. On that
record, the court held, there was no formal control, even if the defendant were assumed to have
determined plaintiffs' rate and method of payment:

> [T]he [formal control] test is not satisfied because the [defendant] did not have the
> power to hire and fire, did not supervise and control plaintiffs' schedules and
> conditions of employment, and did not maintain employment records. In light of
> my finding that the first, second, and fourth [formal control] factors are not
> satisfied, the record's inconclusiveness as to the third [formal control] factor is
> immaterial.

24

*Id.*  Therefore this Court—having held that the first and second factors disfavor formal control—turns to the fourth factor.

### iv.      Records

Plaintiffs argue that Credico maintained employment records because it kept a database listing agents' contact information, sales data, and other information necessary for generating pay records.  Pl. Br. at 40–41.  The parties do not dispute that Credico maintains a file containing each agent's name, date of birth, gender, start date, contact information, ISO, and number of sign-ups recorded each day.  Pl. 56.1 ¶¶ 44–45, 48; Credico Counter 56.1 ¶¶ 44–45, 48.

Nevertheless, Credico "never 'maintained employment records on the matter most relevant to overtime obligations under the FLSA: the *hours* worked' by individual [field agents]."  *Jean-Louis*, 838 F. Supp. 2d at 130 (quoting *Barfield*, 537 F.3d at 144) (emphasis in *Jean-Louis*).  "This is not a case where a putative joint employer 'signs off on' time sheets completed by each plaintiff, 'verif[ies] the number of hours worked by each' plaintiff and 'then provides records of the hours worked' to the plaintiff's contractor employer who uses the records to compensate the plaintiff on a per-hour basis."  *Id.* (quoting *Barfield*, 537 F.3d at 136).

Moreover, Sprint's SOPs required Credico to keep records of onboarding information to comply with Lifeline Program regulations.  *See* First Williams Decl., Ex. 13 at 540.  Where a putative joint employer's activities with respect to employment records constitute "only an extension of . . . quality control procedures," this formal control factor is not satisfied.  *Godlewska*, 916 F. Supp. 2d at 262 (internal quotation marks omitted); *see also Jean-Louis*, 838 F. Supp. 2d at 131 (because Time Warner's records . . . do not translate into Metro technicians' per hour compensation but are instead maintained largely as part of Time Warner's quality

control process, those records do not weigh in favor of finding that Time Warner jointly employs the technicians.").

Accordingly, the fourth formal control factor does not favor joint employer status. Because the first and second factors are likewise unsatisfied, Credico did not exercise formal control of Cromex field agents. The Court turns next to the analysis of functional control.

### b.     Functional Control

### i.     Premises and Equipment

"[W]hether a putative joint employer's premises and equipment are used by its putative joint employees . . . is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Zheng*, 355 F.3d at 72. "Although . . . shared premises . . . is [not] anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship), the factfinder can use these readily verifiable facts as a starting point in uncovering the economic realities of a business relationship." *Id.*

The record is clear that plaintiffs never reported to or worked at any Credico office. Credico 56.1 ¶ 95. Yang, Torres, and Zheng each could not name a single person who worked at Credico. JSF ¶¶ 206, 211, 215. Indeed, Torres testified that he did not know where Credico's office was located. *Id.* ¶ 210. On the other hand, it is undisputed that Credico supplied certain equipment—the tablets that plaintiffs used to collect applications—and that plaintiffs picked up these tablets at the Cromex office before heading out into the field each day. *Id.* ¶¶ 153–55.

This functional control factor is therefore inconclusive. Credico's separate premises weigh against a finding of functional control, but plaintiffs' use of Credico equipment weighs in favor.

         **ii.**       **Whether Immediate Employer's Business Shifts as Unit**

The next functional control factor asks whether Cromex "had a business that could or did shift as a unit from one putative joint employer to another." *Jean-Louis*, 838 F. Supp. 2d at 132 (quoting *Zheng*, 355 F.3d at 72). "This factor 'is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client.'" *Id.* (quoting *Zheng*, 355 F.3d at 72). "Nevertheless, the Second Circuit has cautioned that 'the absence of a broad client base,' like 'shared premises,' is not 'anything close to a perfect proxy for joint employment (because they are both perfectly consistent with a legitimate subcontracting relationship).'" *Id.* (quoting *Zheng*, 355 F.3d at 72).

Here, it is undisputed that Cromex contracted only with Credico. JSF ¶ 30. Credico responds that the terms of its subcontracting agreement expressly permitted Cromex to work with other brokers on other campaigns, and that other ISOs *did* contract with other brokers. Credico 56.1 ¶¶ 7, 55. Plaintiffs counter that the subcontracting agreement contained a non-compete clause prohibiting Cromex from working with any enterprises competing with Credico in the telecommunications, energy, charity, merchant services, or credit card industries. Pl. Br. at 29; First Williams Decl., Ex. 18 at 277–78. Other ISOs were bound by similar non-compete agreements, Pl. Counter 56.1 ¶ 7, but it is unclear whether those ISOs worked with other contractors.

This factor, too, is therefore inconclusive. In holding that a group of black-car drivers were independent contractors not subject to a franchisor's control, the Second Circuit observed not only that the drivers transported passengers for competitor black-car companies, but also, "significantly," that the drivers' non-compete provisions did not prohibit them from doing so. *Saleem*, 854 F.3d at 136, 141–42. Here, the effect of the non-compete provision is less clear.

Although Cromex indisputably had the contractual authority to shift contractors, its functional ability to do so was limited by a broad non-compete clause that, to the extent enforceable, would have required engaging a contractor in a substantially different segment of the market. Credico Br. at 25. Whether as a result of that provision or not, Cromex did not work with other contractors, and it is unclear whether other ISOs subject to the same provision were able to do so. Under these circumstances, the evidence relating to the second functional control factor is inconclusive.

### iii. Whether Plaintiffs Have Discrete Line Jobs

The third functional control factor "examines the extent to which [p]laintiff[s] performed a discrete line job that was integral to the purported joint employer's process of production." *Hugee v. SJC Grp.*, No. 13 Civ. 0423 (GBD), 2013 WL 4399226, at *9 (S.D.N.Y. August 14, 2013). "Interpreted broadly, this factor could be said to be implicated in every subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service." *Jean-Louis*, 838 F. Supp. 2d at 133–34 (quoting *Zheng*, 355 F.3d at 73) (emphasis in original). Accordingly, this factor is examined on a spectrum:

> On one end of the spectrum lies piecework on a producer's premises that requires minimal training or equipment, and . . . [o]n the other end of the spectrum lies work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology.

*Hugee*, 2013 WL 4399226, at *9 (quoting *Zheng*, 355 F.3d at 73). "[C]ourts have questioned whether this factor translates well outside of the production line employment situation." *Godlewska*, 916 F. Supp. 2d at 263 (internal quotation marks and alterations omitted); *see also Jean–Louis*, 838 F. Supp. 2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product."). In part for that reason, courts are to consult "industry custom and historical practice"

28

in weighing this factor, as "insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws." *Zheng*, 355 F.3d at 73–74.

The facts here do not signal joint employment. To be sure, field agents' work is in some sense integral to Credico's business: field agents solicit customers, and Credico ultimately derives its revenue from those face-to-face interactions. Pl. 56.1 ¶ 95; Credico Counter 56.1 ¶ 95. But the marketing and outreach services that the field agents provide are ultimately just that, services, rather than discrete line jobs. *Cf. Hugee*, 2013 WL 4399226, at *9 ("As a security guard, Plaintiff was a service provider and did not perform a discrete line job. . . . Thus, the third [functional control] factor weighs against a finding of joint employment.").

Further, there is no question that direct marketing and sales campaigns are commonly outsourced. *See* Credico 56.1 ¶ 23. Credico, in fact, is just one of multiple OAs conducting Sprint's Assurance Wireless campaign. JSF ¶¶ 102–05. Plaintiffs offer no evidence to suggest that this outsourcing model has been devised here or elsewhere to evade application of labor laws.

Given the nature of plaintiffs' work as providers of a service and the ubiquity of outsourcing in the relevant industry, the third functional control factor does not favor a finding of functional control.

### iv.    Whether the Contractors Are Fungible

The fourth factor examines "whether responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 72. "[T]his factor weighs in favor of a determination of joint employment when employees are tied to an entity . . . rather than to an ostensible direct employer." *Id*. On the other hand, where "employees work for

29

an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists." *Id*.

"[T]he Second Circuit has stated that if the fourth factor 'weigh[ed] in favor of joint employment when a general contractor uses numerous subcontractors who compete for work and have *different* employees,' the fourth factor 'would classify nearly all subcontracting relationships as joint employment relationships—a result that finds no support either in the law or in our country's practices.'" *Jean-Louis*, 838 F. Supp. 2d at 135 (quoting *Zheng*, 355 F.3d at 74 n.11) (emphasis in original). Accordingly, "the fourth factor asks not whether all of the putative joint employer's contractors do the same work but whether, if the putative joint employer hired one contractor rather than another, 'the *same* employees would continue to do the *same* work in the *same* place.'" *Jean-Louis*, 838 F. Supp. 2d at 135 (quoting *Zheng*, 355 F.3d at 74) (emphasis in original).

This factor is inconclusive. Favoring defendants, it is undisputed that ISOs, rather than Credico, hire field agents. Credico 56.1 ¶ 67. In finding against joint employment, the court in *Jean-Louis* noted that, because "the undisputed evidence shows that, rather than hiring technicians, Time Warner hires contractors who hire technicians, all the evidence suggests that when an Installation Company dissolves, technicians wishing to continue working on behalf of Time Warner are required to apply and be hired for a position from another Installation Company." *Id*. (internal quotation marks and alterations omitted).

At the same time, plaintiffs offer evidence that Cromex field agents might not necessarily work for Credico "only to the extent that their direct employer is hired by that entity." *Id*. (quoting *Zheng*, 355 F.3d at 72). Agents could transfer between ISOs on the same campaign by

filling out a form and submitting it to Credico for review.  JSF ¶ 125.  Torres, for instance, transferred from one Credico subcontractor to another, where he performed nearly identical duties on the same schedule and with the same pay.  Pl. 56.1 ¶ 81.  There are also emails from Credico employees referencing transfers of agents between offices.  *See, e.g.*, Second Savytska Decl., Ex. 94.  Accordingly, although the evidence is conjectural insofar as Credico and Cromex in fact maintained their relationship, there is some evidence that could support an inference that Cromex's field agents "would continue [providing outreach services for Credico] if [Credico] severed its relationship with [Cromex]."  *See Jean-Louis*, 838 F. Supp. 2d at 135.

### v.    Supervision

The fifth functional control factor assesses "the degree to which [Credico] or [its] agents supervised plaintiffs' work."  *Zheng*, 355 F.3d at 72.  As reviewed above in connection with the second formal control factor, plaintiffs have not adduced evidence sufficient to support a finding that Credico played a significant role in supervising plaintiffs.  *See supra* Section III(A)(2)(a)(ii). "The inquiry under this factor is 'largely the same' as the inquiry under the second [formal control] factor and is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs."  *Godlewska*, 916 F. Supp. 2d at 264 (quoting *Jean-Louis*, 838 F. Supp. 2d at 126 n.7).  Although "there is evidence that [Credico] supervised [Cromex field agents] in some minimal capacity[,] . . . on balance, even considering all of the evidence in the light most favorable to Plaintiffs," this functional control factor cannot support a finding that Credico jointly employed plaintiffs.  *Jean-Louis*, 838 F. Supp. 2d at 135.

### vi.    Exclusive or Predominant Work

The sixth functional control factor assesses "whether plaintiffs worked exclusively or predominantly for [Credico]."  *Zheng*, 355 F.3d at 72.  The record is clear that, during the

relevant time period, plaintiffs worked only for Credico.  JSF ¶ 139.  This factor therefore

weighs in favor of joint control.  *See Jean-Louis*, 838 F. Supp. 2d at 136 ("The parties do not

dispute that, during the time period at issue in this case, Metro technicians performed

installations only for Time Warner.  Accordingly, this factor weighs in favor of finding that Time

Warner jointly employed Metro technicians.").

### vii.   Overall Assessment

Ultimately, after analyzing the relevant functional control factors, the Court finds that,

"on balance," *Godlewska*, 916 F. Supp. 2d at 265, Credico did not exercise functional control

over Cromex field agents, *see Zheng*, 355 F.3d at 76–77 ("[T]he Court need not decide that *every*

factor weighs against joint employment.") (emphasis in original).  The first, second, and fourth

factors are inconclusive; the third and fifth disfavor a finding of functional control; and the sixth

alone favors such a finding.  Of these factors, "*[m]ost importantly*, the fifth [functional control]

factor is not satisfied; [Credico] did not supervise plaintiffs' work, manage plaintiffs on a day-to-

day basis, or evaluate plaintiffs' performance" beyond quality control assessments.  *Godlewska*,

916 F. Supp. 2d at 265 (emphasis added).  "In short, [Credico] did not relate to plaintiffs as an

employer."  *Id.*  (finding no functional control where "the overlapping second, sixth, and, to a

lesser extent, fourth [functional control] factors are satisfied").

Accordingly, the Court finds that Credico neither formally nor functionally controlled

Cromex field agents.  It therefore cannot be held liable for the claimed FLSA and NYLL

violations as a joint employer.

Nor can Credico be held liable for any alleged violations of Arizona law.  The parties

agree that the joint employer analysis under Arizona law is identical to that under the FLSA and

NYLL.  *See* Credico Br. at 9 n.6; Pl. Reply Br. at 26 n.44.  Federal courts in Arizona have

embraced that position.  *See, e.g.*, *Montoya v. 3PD, Inc.*, CV-13-8068 (PCT) (SMM), 2014 WL
3385116, at *1 n.2 (D. Ariz. July 10, 2014); *Collinge v. IntelliQuick Delivery, Inc.*, 2:12-00824
(JWS), 2013 WL 6410164, at *1 n.6 (D. Ariz. Dec. 8, 2013) ("Both sides tacitly recognize—and
the court agrees—that if the . . . defendants are not employers within the broad definition of that
term under the FLSA, then they cannot be employers for purposes of [the AWA and AMWA].").
This approach is also consistent with the statutory language, as the FLSA and AMWA define
"[e]mployer" identically as an entity acting "directly or indirectly in the interest of an employer
in relation to an employee."  FLSA § 203(d); AMWA § 23-362(B).  In view of this authority, as
well as the AMWA's express application of FLSA standards in defining "[e]mploy," *see* AMWA
§ 23-362(D), the Court proceeds upon the parties' agreement.

Like Cromex, Vaeley was a Credico ISO contracted to work on the Assurance Wireless
campaign.  JSF ¶ 220.  The parties agree that Torres had no greater contacts with Credico while
working at Vaeley than he did at Cromex.  *Id.* ¶¶ 210–14, 228–29.  Plaintiffs further concede that
Torres's work schedule and compensation at Vaeley were consistent with those at Cromex.  Pl.
56.1 ¶ 81.  As plaintiffs have offered no basis to distinguish Vaeley from Cromex with respect to
Credico's formal or functional control, they have not adduced sufficient evidence to demonstrate
that Credico served as Torres's joint employer while he worked at Vaeley.  Credico therefore
cannot be held liable as Torres's joint employer, and because Vaeley has not been named a
defendant here, any claims arising out of Arizona law must be dismissed.

### B.    The Outside Sales Exception

The next issue raised by the cross-motions is whether, even if plaintiffs were employees
rather than independent contractors, the outside sales exception to the FLSA and NYLL apply.

### 1.  Applicable Legal Standards

The FLSA's minimum wage and maximum hour requirements for the payment of employees do not apply to "an employee employed . . . in the capacity of an outside salesman." 29 U.S.C. § 213(a)(1).  The NYLL incorporates this "outside sales" exception.  *See* NYLL § 651 ("'Employee' includes any individual employed or permitted to work by an employer in any occupation, but shall not include any individual who is employed or permitted to work . . . as an outside salesman[.]"); *see also Kinney v. Artist & Brand Agency LLC*, No. 13 Civ. 8864 (LAK) (DF), 2015 WL 10714080, at *12 (S.D.N.Y. Nov. 25, 2015), *report and recommendation adopted*, No. 13 Civ. 8864 (LAK), 2016 WL 1643876 (S.D.N.Y. Apr. 22, 2016); *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013); *Cangelosi v. Gabriel Bros., Inc.*, No. 15 Civ. 3736 (JMF), 2015 WL 6107730, at *2 (S.D.N.Y. Oct. 15, 2015).

"'An employee employed in the capacity of an outside salesman' is an employee (1) whose 'primary duty' is 'making sales,' or 'obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer,'" and (2) "[w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  *Kinney*, 2015 WL 10714080, at *12 (quoting 29 C.F.R. § 541.500(a)).

"Primary duty" refers to "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).

"A sale 'includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.'"  *Flood v. Just Energy Mktg. Corp.*, No. 15 Civ. 2012 (KBF), 2017 WL 280820, at *4 (S.D.N.Y. Jan. 20, 2017) (quoting 29 U.S.C. § 203(k)).  "The U.S. Supreme Court has explained that 'other disposition' must be interpreted to mean 'those arrangements that

are tantamount, in a particular industry, to a paradigmatic sale of a commodity.'" *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 164 (2012)).

"Courts also consider whether the employee bears indicia of an outside salesperson." *Flood*, 2017 WL 280820, at *4. As to that inquiry, courts consider the "hallmark activities" of an outside sales employee, such as "(1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage." *Chenensky v. N.Y. Life Ins. Co.*, No. 07 Civ. 11504 (WHP), 2009 WL 4975237, at *5 (S.D.N.Y. Dec. 22, 2009). "The question of how an employee spends his time working is one of fact, but the question of whether those activities exempt him from the FLSA is one of law." *Id.*

### 2.   Discussion

For the reasons that follow, the Court holds that plaintiffs fall under the outside sales exemption because (1) the field agents' primary duty was sales, (2) the field agents customarily and regularly engaged in that primary duty away from Cromex's place of business, and (3) the field agents bore the indicia of outside salespeople.

### a.   Sales as Primary Duty

Plaintiffs argue at the outset that it is unclear whether their "primary duty" was signing up customers or "recruiting new agents and becoming leaders in the Management Training Program." Pl. Br. at 53–54. This is not a matter of genuine dispute. The parties agree that field agents "spent the majority of their day" soliciting and collecting Assurance Wireless applications from individuals seeking to enroll in the Lifeline Program. JSF ¶ 181. Each plaintiff has averred "I participated in Cromex's so-called 'Management Training Program,'" but the "only work

myself and my co-workers performed was to go out in the field and try to sign up new customers for Assurance Wireless."  Torres Decl. ¶ 8; Zheng Decl. ¶ 4; Yang Decl. ¶ 5; *see also* Vasto Decl. ¶¶ 11–12 ("I started the so-called 'Management Training Program' . . . . In reality, the only work myself and my co-workers performed was to go out in the field and try to sign up new customers for Assurance Wireless.").  Indeed, Yang confirmed that his "primary duty [was] to be out in the field signing people up for the phones and the phone service."  Pl. Counter 56.1 ¶ 137.

Hence the Court proceeds on the understanding that plaintiffs' primary duty was signing up Assurance Wireless applicants.  That task entailed approaching potential Assurance Wireless applicants, engaging them with a "pitch" about Assurance Wireless, providing information regarding Lifeline Program services, asking questions, and uploading applications via tablet. JSF ¶¶ 158, 189–90; Credico 56.1 ¶¶ 137–41.  Further, because a potential recipient of Lifeline Program services may receive only one Lifeline Program enrolled mobile phone per household, JSF ¶ 100, Sprint's SOPs required field agents to "ask potential applicants if they currently have a lifeline phone with [Assurance Wireless] or any other carrier" and "if they have applied with [Assurance Wireless] or any lifeline carrier recently," First Williams Decl., Ex. 15 at 537. Plaintiffs were paid on a commission basis for approved Assurance Wireless applications, and were thereby incented to collect as many successful applications as possible, whether from new applicants or from applicants with existing enrollments through other carriers.  JSF ¶ 187; Credico 56.1 ¶¶ 141, 160.

The parties dispute whether this work is properly characterized as sales.  As noted, this question, one of applying law to fact, is for the Court.  *See Flood*, 2017 WL 280820, at *4 ("[T]he question of how [plaintiffs] spent their working time is a question of fact.  The question

whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.") (internal quotation marks and alterations omitted).

Plaintiffs raise two principal arguments why their work as field agents seeking to induce applicants to enroll in the Lifeline Program via Sprint's particular brand of products and services did not constitute sales. First, plaintiffs note, the products and services that the field agents promoted were ultimately provided free of charge to qualifying applicants, and "no money was exchanged." Pl. Br. at 52. Second, they argue, the field agents did not obtain a binding commitment from the potential applicant. In fact, at the conclusion of a field agent's interaction with an applicant, defendants would not have extended a binding offer to the applicant or even made a decision whether the applicant was eligible under the Lifeline Program. *See id.* at 52–53.

Plaintiffs' first argument is based on the fact that the qualifying applicants did not themselves pay money to Sprint for its products and services. Instead, as beneficiaries of the Lifeline Program, they received Sprint's products and services gratis. But Sprint was otherwise compensated for its each consummated sale: It was paid subsidies by the federal government— through the Universal Service Administrative Company—for providing these products and services pursuant to the Lifeline Program. Pl. Counter 56.1 ¶ 27. The field agents' classification as exempt outside salespeople is not precluded by the fact that a third party, the government, paid the agents' principal, Sprint. For purposes of the outside sales exemption, there is no requirement that payment to outside salespeople come directly from the customer. *See Christopher*, 567 U.S. at 165 (pharmaceutical sales representatives made sales when soliciting nonbinding commitments from doctors to write prescriptions for patients who ultimately purchased pharmaceuticals). Here, as counsel for Credico analogized at argument in *Martin*, qualifying applicants effectively possessed (courtesy of the federal program) a "virtual voucher"

for Lifeline Program services, and the field agents' job was to persuade these applicants to spend

that voucher on Sprint. *See* Transcript of Oral Argument at 52, *Martin v. Sprint United*

*Management Co.*, No. 15 Civ. 5237, Dkt. 319.

Plaintiffs' second argument fails because an employee need not have created binding

sales or orders to be considered an outside salesperson. "There is nothing in the FLSA or the

NYLL that limits the definition of an outside salesperson to someone who has the unfettered

discretion to finalize a binding sale." *Flood*, 2017 WL 280820, at \*5; *see also Baum v.*

*AstraZeneca LP*, 605 F. Supp. 2d 669, 680 (W.D. Pa. 2009), *aff'd on other grounds*, 372 F.

App'x 246 (3d Cir. 2010) ("[T]he statutory language does not require a final sale, complete and

consummated."). Rather, it is enough for employees to have "'direct[ed] efforts toward the

consummation of a sale.'" *Flood*, 2017 WL 280820, at \*5; *see also Dailey v. Just Energy Mktg.*

*Corp.*, No. 14-cv-02012 (HSG), 2015 WL 4498430, at \*3 (N.D. Cal. July 23, 2015) (an

"employee is clearly engaged in sales activity" where she "directs [her] efforts at persuading a

particular customer to purchase a product and is compensated on the basis of [her] success in

doing so") (citation omitted).

Judge Forrest's decision in *Flood v. Just Energy Marketing Corp.* is instructive. There,

the plaintiff brought FLSA and NYLL claims on behalf of himself and other door-to-door

workers who solicited new accounts for Just Energy Marketing Corp., Just Energy New York

Corp., and Just Energy Group, Inc. (collectively, "Just Energy"), companies that marketed and

sold gas and electricity. 2017 WL 280820. The plaintiff argued that he was not an outside

salesperson because he lacked authority to approve a new customer for an energy contract with

Just Energy; Just Energy had the final discretion whether to accept a new customer, and the

contracts for Just Energy services were not effective until Just Energy approved them. *Id*. at \*2.

Judge Forrest rejected that argument, reasoning: "If he was not making the sale, who was?  No one?  This makes no sense.  Indeed, he was paid commissions based directly on sales he had made.  The proof is in the pudding, so to speak." *Id*. at *4.

Here, as in *Flood*, plaintiffs' efforts were plainly directed toward the consummation of a sale.  Field agents' job involved persuading potentially qualifying customers to fill out an application for Lifeline Program services and to induce current Lifeline Program enrollees to switch to Sprint's Assurance Wireless brand from other Lifeline Program service providers that competed with Sprint.  If the customer was found qualified, he or she would receive products and services from Sprint, and the field agent would receive a commission.  *See Sydney v. Time Warner Entm't-Advance/Newhouse P'ship*, No. 13 Civ. 286 (FJS), 2017 WL 1167284, at *4-5 (N.D.N.Y. Mar. 28, 2017) (territory sales representatives' "primary duty was making sales" where "the entirety of their job was focused on acquiring new customers" for installation services for which they were paid on commission).

Accordingly, the Court finds that the field agents' primary duty while working at Cromex was sales.

### b.   Away From Employer's Place of Business

It is undisputed that field agents spent the majority of their work hours performing their duties in the field, away from the Cromex office.  JSF ¶ 181.  Accordingly, plaintiffs meet the outside sales exemption's requirement that they be "customarily and regularly engaged away from [Cromex's] place or places of business in performing [their] primary duty."  *Kinney*, 2015 WL 10714080, at *12 (quoting 29 C.F.R. § 541.500(a)).

### c.       Indicia of Outside Salesperson

The field agents also bore many indicia of outside salespeople.  They independently

solicited new business in the form of new applications for Lifeline Program services through

Assurance Wireless.  They received a commission-based salary.  JSF ¶ 139.  The field agents

"worked away from the office, with minimal supervision, and they were rewarded for their

efforts with incentive compensation."  *Christopher*, 567 U.S. at 166.

These characteristics of the field agents' work resemble the circumstances of *Chenensky*

*v. New York Life Insurance Co.*, in which the district court found that the outside sales exemption

applied where the plaintiff "solicited new business, presented available products to prospects,

obtained a commitment to purchase, and ultimately received a commission-based salary."  2009

WL 4975237, at *6.  The district court there also found persuasive the fact that the plaintiff

"spent a majority of his time outside of the New York Life office, free from a manager's day-to-

day supervision."  *Id*.

Similarly, in *Nielsen v. Devry Inc.*, a district court in Michigan held that the outside sales

exemption applied to "field representatives" employed by Devry, Inc., "a for-profit company that

provides career-oriented, technology-based higher education at more than 25 campuses

nationwide."  302 F. Supp. 2d 747, 750 (W.D. Mich. 2003).  The field representatives' job was

"to identify potential students, persuade them to apply, and follow through with them to ensure

they ultimately pay tuition and begin classes."  *Id*.  In finding that the outside sales exemption

applied, the district court relied in part on the fact that the field representatives were paid a salary

with a "commission-like feature."  *Id*. at 757.  The district court reasoned that "[c]ompensation

based wholly or in significant part on commissions correlates with a finding that the employee

does sales work."  *Id*.

To be sure, compared to some outside salespeople, the work of Cromex field agents was not inherently "unsuitable to an hourly wage." *See* Pl. Br. at 47–48. Inasmuch as the field agents had to report to the Cromex office at the beginning and end of each workday to receive and return their tablets, JSF ¶¶ 154, 170, an hourly wage arrangement was presumably administratively feasible. But the presence of ample other "hallmark activities" of outside salespeople supports finding that this exemption applies. *Chenensky*, 2009 WL 4975237, at *5. Further, to the extent that plaintiffs' apparently low earnings distinguish this case from *Flood* and *Dailey*, *see* Pl. Br. at 51 n.49, nothing in the FLSA sets a compensation floor for the outside sales exemption, and indeed the exemption's regulatory history reveals that the Department of Labor expressly rejected applying a minimum salary requirement, *see Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22122-01, 22175–76, 2004 WL 865626 (Apr. 23, 2004) ("Since outside sales employees are not subject to the standard salary level test, it would not be appropriate to apply the highly compensated test to these employees.").

Accordingly, the Court holds that, even if plaintiffs were employees of Cromex, they were exempt under the FLSA and NYLL as outside salespeople.

## C.     Retaliation

Plaintiffs Vasto and Yang also allege retaliation under the FLSA. To wit, they claim that Cromex terminated them as a result of their complaints about their status as independent contractors. Although plaintiffs originally brought claims under both the FLSA and NYLL Section 740, they withdrew the latter claim in their opposition brief, proceeding instead under the FLSA alone. Pl. Br. at 57. Defendants move for summary judgment on the issue.

The FLSA provides that it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]."  29 U.S.C. § 215(a)(3).  The Court evaluates an FLSA retaliation claim under the familiar three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). First, a plaintiff must establish a *prima facie* case of retaliation by showing "(1) participation in protected activity known to the defendant, like the filing of an FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010).  If the plaintiff does so, "the burden shifts to the defendant to articulate a 'legitimate, non-discriminatory reason for the employment action.'"  *Id.* (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  The plaintiff must then produce "sufficient evidence to support a rational finding" that defendants' proffered rationales "were false, and that more likely than not discrimination was the real reason for the employment action."  *Id.* at 53–54 (internal quotation marks omitted).

Plaintiffs falter at the first step, as they fail to show they participated in a "protected activity known to the defendant."  *See id.* at 53.  To satisfy that element of a *prima facie* case, an employee's "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Greathouse v. JHS Sec., Inc.*, 784 F.3d 105, 116 (2d Cir. 2015) (quoting *Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)).  An "employee need not invoke the Act by name," and "oral complaints made to an employer" will suffice, but the employee must "make[] the assertion of rights plain."  *Id.*

In this case, Vasto averred in his deposition that he was "retaliated against, because time and time again" he told his supervisors that he "was an independent contractor."  First Williams Decl., Ex. 28 at 198.  He complained that he "had a right as an independent contractor to conduct business on the terms of an independent contractor, i.e., to have more freedom."  *Id.* at 199. Specifically, he sought the flexibility to choose his location, his hours, his days, and his break period.  *Id.* at 197–199.  Yang, too, alleges retaliation "based on the fact that [he] was constantly presenting proposals to be an independent contractor," seeking to pursue his own ideas for marketing events.  First Savytska Decl., Ex. 41 at 241–42.

The parties dispute whether a worker's complaint that he was "misclassified" as an independent contractor qualifies as protected activity absent a specific invocation of the rights associated with employee status.  At least one court in this district has held it does not.  *See Landeata v. N.Y. & Presbyterian Hosp., Inc.*, No. 12-4462, 2014 WL 836991, at *8–9 (S.D.N.Y, March 4, 2014).  Vasto and Yang's claims, however, fail for a more fundamental reason: because they complained only that they were entitled to more workplace "freedom" as independent contractors, neither sought to be treated as an employee under the FLSA, let alone to invoke the rights enjoyed by such an employee.

Independent contractors are "outside the reach" of the FLSA.  *See Hart*, 967 F. Supp. 2d at 911.  Although the Act provides employees with certain protections, such as the right to a minimum wage, 29 U.S.C. § 206, or extra pay for overtime, *id.* § 207, it contains no corresponding protections for independent contractors.  As such, plaintiffs did not make "an assertion of rights protected by the statute."  *Kasten*, 563 U.S. at 14.

Plaintiffs' cited cases are not to the contrary.  In one, the plaintiff complained to management on eight separate occasions that the company "was not in compliance with the

43

FLSA" because it underpaid employees, going so far as to provide "copies of the statute on some occasions." *Rosenfeld v. GlobalTranz Enters., Inc.*, 811 F.3d 282, 288 (9th Cir. 2015). In another, the plaintiff had written a letter to her employer stating "she was misclassified as exempt under the FLSA, and was entitled to overtime pay." *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 45 (1st Cir. 1999). In these cases, the employee put the employer on notice of a complaint under the FLSA, even if the complaint conveyed little more than that the employer was "breaking some sort of law" by paying low wages. *See E.E.O.C. v. Romeo Cmty. Sch.*, 976 F.2d 985, 989 (6th Cir. 1992). The cases thus share a common thread: the plaintiff complained that she (or others) ought to receive the legal benefits attendant to employee status.

In this case, by contrast, plaintiffs never sought overtime or minimum wage, let alone raised express complaints to that effect. Instead, they embraced their status as independent contractors—a status outside the ambit of the FLSA—and requested only that their duties conform to that status. And the comments that plaintiffs claim were the impetus for retaliation cannot be interpreted as expressing a desire to vindicate rights protected under the FLSA. To the contrary, they sought "time and time again" to reaffirm their status as independent contractors and thereby secure workplace freedoms to which they were not entitled under the FLSA. A reasonable employer would understand these complaints not as assertions of rights under the FLSA, but rather as complaints about working conditions or the terms of plaintiffs' "employment contract as [they] understood it." *Dunn v. Sederakis*, 143 F. Supp. 3d 102, 114 (S.D.N.Y. 2015) (holding generalized complaints about overtime compensation insufficient to state a claim for FLSA retaliation). Indeed, as plaintiffs' own authority reveals, "not all abstract grumblings will suffice to constitute the filing of a complaint with one's employer." *Valerio*, 173 F.3d at 44; *see also Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir. 1999) ("[N]ot all amorphous expressions

of discontent related to wages and hours constitute complaints filed within the meaning of § 215(a)(3).").  In short, plaintiffs' complaints were far from being "sufficiently clear and detailed" articulations of FLSA-relevant grievances to put Cromex on notice that plaintiffs sought "protection" under the FLSA.  *See Kasten*, 563 U.S. at 14.  As such, they fail to establish a *prima facie* case of retaliation.  The Court therefore grants defendants' motion for summary judgment on that claim.[9]

### D.  Employees vs. Independent Contractors

As noted, the cross-motions for summary judgment also raise the issue whether plaintiffs were properly classified as independent contractors rather than employees under the FLSA and NYLL.  Were the Court to reach this issue, the same principles articulated in *Martin* would apply.  *See* 2017 WL 4326109, at 32–33.  But here, as in *Martin*, the Court has no occasion, under either statute, to examine whether plaintiffs were employees or independent contractors.  The Court's ruling that the outside sales exemption applies precludes plaintiffs' minimum wage and overtime claims, and plaintiffs' claims against Credico are separately interred by the Court's ruling that, even if plaintiffs were employees of Cromex, Credico was not a joint employer.

### CONCLUSION

For the foregoing reasons, the Court (1) denies plaintiffs' motion for partial summary judgment and (2) grants' defendants' cross-motions for summary judgment.  The effect of this ruling is to grant summary judgment in favor of defendants on all claims.

---

[9] The Court therefore need not reach defendants' alternative arguments that (1) Cromex had a legitimate, non-retaliatory reason for terminating Vasto and Yang that plaintiffs cannot show is pretextual, and (2) that Vasto and Yang waived any FLSA retaliation claim by bringing claims under NYLL Section 740.  *See* Credico Br. at 45–50; Cromex Br. at 25–30.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 211, 218, and 225, and to close this case.

      SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 27, 2017
      New York, New York